Brian M. Holm (California State Bar No. 255691)
Joseph S. Green (California State Bar No. 251169)
Nathan G. Batterman (California State Bar No. 280029)
HOLM LAW GROUP, PC
171 Saxony Road, Ste. 203, Encinitas, CA 92024
p. 858.433.2001   f. 888.483.3323
brian@holmlawgroup.com
josh@holmlawgroup.com
nathan@holmlawgroup.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

JANE DOE NOS. 60 through 121 inclusive, individuals,

     Plaintiffs,

v.

AYLO HOLDINGS S.A.R.L. (f/k/a "MindGeek S.a.r.l.", a foreign entity; AYLO FREESITES, LTD., (f/k/a "MG Freesites, Ltd. and d/b/a "PornHub," "YouPorn," "RedTube," and "Tube8") a foreign entity; AYLO BILLING US CORP., (f/k/a MG Billing US Corp." and d/b/a "ProBiller") a Delaware corporation; and 9219-1568 QUEBEC, INC., a foreign entity;

     Defendants.

Case No.: 3:23-CV-01821-WQH-KSC

**FIRST AMENDED COMPLAINT FOR:**

1) **SEX TRAFFICKING (18 U.S.C. §§ 1591(a), 1594(c), 1595);**

2) **RACKETEERING (18 U.S.C. § 1962(c))**

3) **CONSPIRACY TO COMMIT RACKETEERING (18 U.S.C. § 1962(c))**

4) **HUMAN TRAFFICKING (Cal. Civ. Code § 52.5)**

DEMAND FOR JURY TRIAL

    Jane Doe Nos. 60 through 121[1] **("Plaintiffs")** hereby allege as follows:

---

[1] On December 15, 2020, forty GirlsDoPorn victims sued defendants for similar claims under 18 U.S.C. 1595—*Jane Doe Nos. 1-40 v. MG Freesites, Ltd, et al.*, United States District Court, Southern District of California Case No.: 3:20-CV-02440-WQH-KSC. Nineteen victims were added to the case before it resolved.  The fictitious names in this action therefore begin at Jane Doe No. 60 to avoid any confusion.

# I.

## SUMMARY OF CLAIMS

1. In 2007, Michael Pratt and Matthew Wolfe started a sex trafficking venture in San Diego, California known as "GirlsDoPorn."[2]  For over a decade, GirlsDoPorn used force, fraud, and coercion to get hundreds of high school and college-aged women to film pornographic videos that GirlsDoPorn sold on the Internet.

2. The illegal publication of the sex trafficking videos upended victims' lives. Within 48 hours of being uploaded to the Internet, the videos went viral amongst every person in the victims' network, causing them to become pariahs in their own communities. Victims were ridiculed and ostracized by friends, classmates, teachers, professors, principals, clergy members, and family.  To this day, some victims' parents will not speak with them. Many victims lost their jobs, and some were expelled from college. When they built up the courage to go out in public, strangers made suggestive comments about the videos or bluntly propositioned them for sex.  Because of this, every victim became suicidal and depressed.  Nearly every victim has been diagnosed with Post Traumatic Stress Disorder.  Some victims have attempted suicide, and multiple victims have been involuntarily committed out of concern for their welfare.  Many have legally changed their names and physical appearances in an effort to minimize the abuse.

3. On June 2, 2016, four victims filed a civil complaint against Pratt, Wolfe, and Garcia laying bare GirlsDoPorn's sex trafficking scheme. See, *Jane Doe Nos. 1-22 v. GirlsDoPorn.com*, *et al.*, San Diego Superior Court Case No. 37-2016-0019027-CU-FR-CTL **("State Court Action")**.  It was clear very early in the case that plaintiffs' claims of force, fraud, and coercion were supported by compelling evidence.  In pretrial rulings, Hon. Gregory W. Pollack found that plaintiffs were more likely than not going to prevail

---

[2] The individuals, including but not limited to Michael Pratt **("Pratt"),** Matthew Wolfe **("Wolfe")**, Wolfe, Andre Garcia **("Garcia")**, Valorie Moser **("Moser")**, Theodore Gyi **("Gyi")** and Douglas Wiederhold **("Wiederhold")**, websites, and offshore and domestic entities used to operate this sex trafficking venture, are collectively referred to herein as **"GirlsDoPorn."**

on their fraud claims at trial, and Hon. Joel R. Wohfeil found plaintiffs had a substantial likelihood of prevailing on their claims for punitive damages because there was clear and convincing evidence of GirlsDoPorn's force, fraud, and coercion.  On August 19, 2019, the State Court Action proceeded to trial with twenty-two plaintiffs.  After a four-month bench trial, Hon. Kevin A. Enright found GirlsDoPorn used force, fraud, and coercion as part of its customary business practices and awarded the victims compensatory and punitive damages.  The total judgment now exceeds $24 million.

4.      On or about October 9, 2019, the United States Attorney for the Southern District of California charged Pratt, Wolfe, Garcia, Moser, and Gyi with Sex Trafficking by Force, Fraud, and Coercion and Conspiracy to Commit Sex Trafficking.[3]  Wolfe, Garcia, Gyi, and Moser were arrested, but Pratt escaped before he could be apprehended. In September 2022, Pratt was added to the FBI's Top Ten Most Wanted list and, on December 23, 2022, he was arrested at a hotel in Madrid, Spain.

5.      Since the arrests, Wolfe, Garcia, Gyi, Moser and another co-conspirator Alexander Foster have all pled guilty to various sex trafficking crimes, including Sex Trafficking by Force, Fraud, and Coercion (18 U.S.C. § 1591) and Conspiracy to Commit Sex Trafficking by Force, Fraud, and Coercion (18 U.S.C. § 1594). United States District Judge Janis L. Sammartino sentenced Garcia, a GirlsDoPorn recruiter and actor, to 20 years in prison with ten years of supervised and Gyi, a videographer, to four years in prison. Wolfe and Moser pled guilty to Conspiracy to Commit Sex Trafficking by Force, Fraud, and Coercion and await sentencing.  Pratt is currently in custody in Spain fighting extradition to the United States.

6.      Defendants collectively operate dozens of pornographic websites under the trade name Aylo, formerly known as MindGeek.[4]  Aylo's flagship website is

[3] See, *United States v. Pratt et al.*, Southern District of California, Crim. Case No. 3:19-cr-04488-JLS, Dkt. Ent. No. 149.

[4] In August 2023, MindGeek changed its name to "Aylo," claiming it needed a "fresh start" due to a multitude of legal and public relations issues it was facing over the last few years, which included a prior lawsuit by GirlsDoPorn's victims.

PornHub.com.  In 2019, PornHub.com had 42 billion visits, making it the 8th most visited website in the United States and 10th most visited website in the world.

7.      In 2011, Aylo partnered with GirlsDoPorn to advertise, sell, market, edit, and otherwise exploit GirlsDoPorn's illegal sex trafficking videos on its websites, including the wildly popular PornHub.com. Pursuant to its partnership agreement with GirlsDoPorn, Aylo provided dedicated account representatives that actively promoted GirlsDoPorn's videos causing them to be some of the most popular videos on Aylo's sites.  One victim's video was the second most viewed video on PornHub.com during 2014.  The videos have collectively generated billions views on Aylo's websites, from which Aylo has earned millions of dollars.

8.      Soon after it began airing GirlDoPorn's illiegal videos on its sites, Aylo began receiving takedown requests from GirlsDoPorn's victims who reported to Aylo that the videos it was publishing and monetizing were the product of force, fraud, and coercion and were published without the victims' consent.   For example, one victim's takedown request said:

> I WAS SCAMMED. THIS COMPANY LIED TO ME ABOUT THIS BEING ON THE INTERNET! THEY TOLD ME IT WOULD ONLY BE AVAILIBLE ON DVD IN AUSTRALIA. MY WORK FRIENDS AND FAMILY ALL KNOW AND THIS VERY LINK IS BEING SENT AROUND. I WANT TO JUST DIE

9.      Aylo knew the victims' claims of force, fraud, and coercion were legitimate. It nevertheless intentionally ignored the requests, and kept the highly profitable videos published on its sites, despite the harm Aylo knew it would cause the victims.  Over the years, the evidence corroborating the victims' claims of force, fraud, or coercion mounted.  In 2017, the plaintiffs in the State Court Action subpoenaed Aylo seeking all takedown requests submitted for GirlsDoPorn's videos.  Even after learning the detailed accounts of abuse in the State Court Action, Aylo refused to remove victims' videos and continued to partner and do business with GirlsDoPorn.

10.     Aylo partnered with GirlsDoPorn all the way up until GirlsDoPorn's demise in October 2019, when the FBI arrested most of GirlsDoPorn's operators and executed a search and seizure warrant at GirlsDoPorn's office. With GirlsDoPorn's operators in jail or, in Pratt's case, on the run, Aylo's partnership with GirlsDoPorn was finally brought to an end.

11.     Following the FBI's takedown of the GirlsDoPorn operators and business and filing of criminal charges, Aylo finally removed GirlsDoPorn's videos from its websites. But this was too little too late. Aylo had already spent a decade spreading the videos to every corner of the globe where they could be downloaded for free with the click of a button. Whereas GirlsDoPorn published the illegal videos behind a paywall available to about 10,000 subscribers, Aylo's publication of the sex trafficking videos was on its publicly available websites that garnered billions of views.

12.     Plaintiffs bring this action pursuant to 18 U.S.C. § 1595 (victim's private right of action to bring claims for violations of 18 U.S.C. §§ 1591, 1594 (sex trafficking and conspiracy to commit sex trafficking)), 18 U.S.C. § 1962(c) (RICO), 18 U.S.C. § 1962(d) (RICO conspiracy), and California Civil Code § 52.5 (human trafficking) to recover, among other things, restitution, disgorgement of ill-gotten gains, compensatory damages, attorneys' fees, treble damages, and punitive damages.

## II.

## THE PARTIES

### A.  PLAINTIFFS

13.     Plaintiff JANE DOE NO. 60 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

14.     Plaintiff JANE DOE NO. 61 is a United States citizen who resided within the state of California when the actions occurred giving rise to her claims alleged herein and now resides outside the state of California.

15.     Plaintiff JANE DOE NO. 62 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

16.     Plaintiff JANE DOE NO. 63 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

17.     Plaintiff JANE DOE NO. 64 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

18.     Plaintiff JANE DOE NO. 65 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

19.     Plaintiff JANE DOE NO. 66 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

20.     Plaintiff JANE DOE NO. 67 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

21.     Plaintiff JANE DOE NO. 68 is a United States citizen who resided within the state of California at all relevant times alleged herein.

22.     Plaintiff JANE DOE NO. 69 is a United States citizen who, all relevant times alleged herein, resided outside the state of California but now resides in the State of California.

23.     Plaintiff JANE DOE NO. 70 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

24.     Plaintiff JANE DOE NO. 71 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

25.     Plaintiff JANE DOE NO. 72 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

26.     Plaintiff JANE DOE NO. 73 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

27.     Plaintiff JANE DOE NO. 74 is a United States citizen who, at all relevant times alleged herein, resided in the state of California.

28.     Plaintiff JANE DOE NO. 75 is a United States citizen who resided within the state of California when the actions occurred giving rise to her claims herein and now resides outside the state of California.

FIRST AMENDED COMPLAINT

29.     Plaintiff JANE DOE NO. 76 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

30.     Plaintiff JANE DOE NO. 77 is a United States citizen who, at all relevant times alleged herein, resided in the state of California.

31.     Plaintiff JANE DOE NO. 78 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

32.     Plaintiff JANE DOE NO. 79 is a citizen of Canada and , at all relevant times alleged herein, resided outside of this judicial district.

33.     Plaintiff JANE DOE NO. 80 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

34.     Plaintiff JANE DOE NO. 81 is a United States citizen who, at all relevant times alleged herein, resided in the state of California.

35.     Plaintiff JANE DOE NO. 82 is a United States citizen who, at all relevant times alleged herein, resided in the state of California.

36.     Plaintiff JANE DOE NO. 83 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

37.     Plaintiff JANE DOE NO. 84 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

38.     Plaintiff JANE DOE NO. 85 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

39.     Plaintiff JANE DOE NO. 86 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

40.     Plaintiff JANE DOE NO. 87 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

41.     Plaintiff JANE DOE NO. 88 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

42.     Plaintiff JANE DOE NO. 89 is a United States citizen who, at all relevant times alleged herein, resided in the state of California.

FIRST AMENDED COMPLAINT

43. Plaintiff JANE DOE NO. 90 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

44. Plaintiff JANE DOE NO. 91 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

45. Plaintiff JANE DOE NO. 92 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

46. Plaintiff JANE DOE NO. 9 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

47. Plaintiff JANE DOE NO. 94 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

48. Plaintiff JANE DOE NO. 95 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

49. Plaintiff JANE DOE NO. 96 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

50. Plaintiff JANE DOE NO. 97 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

51. Plaintiff JANE DOE NO. 98 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

52. Plaintiff JANE DOE NO. 99 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

53. Plaintiff JANE DOE NO. 100 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

54. Plaintiff JANE DOE NO. 101 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

55. Plaintiff JANE DOE NO. 102 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

56. Plaintiff JANE DOE NO. 103 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

FIRST AMENDED COMPLAINT

57.     Plaintiff JANE DOE NO. 104 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

58.     Plaintiff JANE DOE NO. 105 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

59.     Plaintiff JANE DOE NO. 106 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

60.     Plaintiff JANE DOE NO. 107 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

61.     Plaintiff JANE DOE NO. 108 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

62.     Plaintiff JANE DOE NO. 109 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

63.     Plaintiff JANE DOE NO. 110 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

64.     Plaintiff JANE DOE NO. 111 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

65.     Plaintiff JANE DOE NO. 112 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

66.     Plaintiff JANE DOE NO. 113 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

67.     Plaintiff JANE DOE NO. 114 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

68.     Plaintiff JANE DOE NO. 115 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

69.     Plaintiff JANE DOE NO. 116 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

70.     Plaintiff JANE DOE NO. 117 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

FIRST AMENDED COMPLAINT

71.     Plaintiff JANE DOE NO. 118 is a United States citizen who, all relevant times alleged herein, resided outside the state of California but now resides in the State of California.

72.     Plaintiff JANE DOE NO. 119 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

73.     Plaintiff JANE DOE NO. 120 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

74.     Plaintiff JANE DOE NO. 121 is a United States citizen who, all relevant times alleged herein, resided outside the state of California.

**B.   DEFENDANTS**

75.     Defendant AYLO HOLDINGS S.A.R.L. is a foreign entity (a Société à responsabilité limitée) incorporated in Luxembourg (RCS No. B181337) that, at all relevant times alleged herein, conducted business throughout the United States, including within the Southern District of California.  Aylo Holdings S.a.r.l. was formerly known as "MindGeek S.a.r.l." from May 2011 until August 2023.  Aylo Holdings S.a.r.l. owns and operates over 100 pornographic websites, production companies, and pornography brands, and is believed to own most of the pornography on the Internet, much of which it distributes for free, to any person with a web connection, regardless of age. Although incorporated in Luxembourg, Aylo Holdings S.a.r.l.'s principal place of business is Montreal, Canada.  Approximately 1,000 employees work out of its office located at 7777 Boulevard Décarie, Montreal, QC H4P 2H2 **("Montreal Office")**.  Aylo Holdings S.a.r.l. also has smaller satellite offices and studios in, among other places, San Diego, Los Angeles, San Francisco, London, Bucharest (Romania), and Nicosia (Cyprus).

76.     Plaintiffs are informed and believe Aylo Holdings S.a.r.l. was, at all relevant times alleged herein, owned by Feras Antoon, David Tassillo, and Bernd Bergmair, and that, as of 2022, its directors were Andreas Andreou, Anis Baba, Claude Favre. Plaintiffs are informed that, in March 2023, Feras Antoon, David Tassillo, and Bernd Bergmair transferred their ownership interest in MindGeek S.a.r.l. to a new ownership

group that used three entities incorporated in the British Virgin Islands—ECP One Limited, ECP Three Limited, and ECP Four Limited—to hide their identities.  "The sole director of ECP One, ECP Three and ECP Four is listed as FFP (BVI) Limited, a British Virgin Islands company billing itself as a 'leading offshore firm, providing fiduciary, restructuring, trustee, economic substance and registered office and agent services.'"[5]

77.    Plaintiffs are informed,believe, and allege that, at all relevant times alleged herein, the corporate policies for Aylo Holdings S.a.r.l. and its subsidiaries, including all defendants named herein, were made by the Aylo Holdings S.a.r.l.'s owners Feras Antoon, David Tassillo, and Bernd Bergmair, the carefully selected directors they appointed, including, *inter alia*, Corey Urman, Andreas Andreou, Anis Baba, and Aylo's Chief Legal Officer, Anthony Penhale **(collectively "Aylo Control Group")**.[6]  The directors within the Aylo Control Group are beholden to the owners of Aylo Holdings S.a.r.l. who appointed them, set their compensation, and have the authority to remove them.  Plaintiffs are unaware of any Aylo-related entity that does not act at the direction of or take orders from the Aylo Control Group at all relevant times alleged herein.

78.    Defendant AYLO FREESITES, LTD. is a foreign entity incorporated in the Republic of Cyprus (Reg. No. HE 243057) that, at all relevant times alleged herein, conducted business throughout the United States, including within the Southern District of California.  From its incorporation until August 2023, Aylo Freesites, Ltd. was known as "MG Freesites, Ltd."  Upon information and belief, Aylo Freesites, Ltd. is a wholly owned subsidiary of Aylo Holdings S.a.r.l., was controlled by the Aylo Control Group, and conducts nearly all its daily operations out of the Montreal Office.  Plaintiffs are informed and believe that, as of May 2022, Aylo Freesites, Ltd. directors were Andreas

---

[5] See, *Details of Pornhub's 'transparent' new ownership buried in British Virgin Islands, documents show,* (June 19, 2023) available at https://thelogic.co/news/details-of-pornhubs-transparent-new-ownership-buried-in-british-virgin-islands-documents-show/

[6] Plaintiffs are informed and believe that Corey Urman, Andreas Andreou, and Anis Baba are still managing agents for Aylo and Anthony Penhale is Aylo's Chief Legal Officer after the sale to Ethical Capital Partners.

Andreou, Anis Baba, Constantine Georgoude, and Charme Management Ltd.  Plaintiffs are further informed that Aylo Freesites, Ltd. operates "TrafficJunky," a marketing division of Aylo that charges customers for ad impressions on a Cost Per Millenia (CPM) basis, meaning customers pay TrafficJunky for every 1,000 impressions the ad receives on Aylo's Tubesites.  The more traffic Aylo's Tubesites generate, the more ad impressions they get, and the more Aylo earns from ad sales through TrafficJunky.

79.    Defendant AYLO BILLING US CORP. is a payment processing company that does business as "ProBiller."  Defendant Aylo Billing US Corp. is incorporated in the State of Delaware (File No. 4970189) and was formerly known as "MG US Billing Corp."  Its principal place of business is located at 21800 Oxnard Street, Suite 150, Woodland Hills, CA 91367.  Upon information and belief, Aylo Billing US Corp. is a wholly owned subsidiary of Aylo Holdings S.a.r.l. and, at all relevant times alleged herein, was controlled by the Aylo Control Group.

80.    Defendant 9219-1568 QUEBEC, INC. is a company organized and existing under the laws of the Province of Quebec, with a principal place of business located in Montreal.  Defendant 9219-1568 Quebec Inc. formerly conducted business under the tradename "MindGeek" throughout the United States, including within the State of California and this District and, since August 2023, has been conducting business as "Aylo." Upon information and belief, 9219-1568 Quebec, Inc. is a wholly owned subsidiary of Aylo Holdings S.a.r.l., controlled by the Aylo Control Group, and conducts nearly all its daily operations out of the Montreal Office.    Plaintiffs are informed and believe that, as of May 2022, 9219-1568 Quebec, Inc.'s directors were Andreas Andreou, Constantine Georgoude, Feras Antoon, Polina Hadjivasilliou, and David Tassillo.

81.    Aylo Holdings S.a.r.l and its web of subsidiary companies, including all the defendants named herein, are collectively referred to herein as **"Defendants," "Aylo," or "MindGeek."**

///

///

C. **DEFENDANTS OPERATE AS A SINGLE ENTERPRISE**

82.     Defendants Aylo Holdings S.a.r.l., Aylo Freesites, Ltd., Aylo Billing US Corp., and 9219-1568 Quebec, Inc. operate as a single enterprise that, at all relevant times alleged herein, was controlled by the Aylo Control Group.

83.     Whereas ordinary companies create divisions or departments within the company for marketing, accounting, shipping, billing, customer service, and other functions, the Aylo Control Group incorporated separate entities for each division to avoid liabilities, evade taxes, and hide the identities of the true owners.  The result is a massive web of entities owned by Aylo Holdings S.a.r.l. that the Aylo Control Group operates as a single business enterprise dedicated to producing, distributing, and monetizing pornography.

84.     All entities within the corproate web rely on the same four tubesites and four paysites to generate revenues.  Aylo's tubesites are PornHub.com, YouPorn.com, RedTube.com, and Tube8.com **("Aylo's Tubesites")** and its paysites are PornHubPremium.com, YouPornPremium.com, RedTubePremium.com, and Tube8VIP.com **("Aylo's Paysites")**.  Plaintiffs are informed and believe Aylo Holdings S.a.r.l. owns the domains for Aylo's Tubesites and Paysites.

85.     While contracts exist between the entities, there are no arm's length transactions because Aylo Control Group controls both sides of the supposed negotiations.  To give the appearance of arm's length transactions, Aylo Control Group claims it uses "third parties to conduct transfer pricing studies" to set prices in the contracts between Aylo Holdings S.a.r.l.'s subsidiaries, including all other defendants. The contracts, however, are "cost plus," meaning the "service provider is reimbursed for the cost of providing the service and paid an additional amount representing a percentage of the cost on top," according to Aylo Director Andreas Andreou.[7]  The price set by these

---

[7] See, Declaration of Aylo Director Andreas Andreou filed May 23, 2022 in *Fleitas v. MindGeek S.a.r.l. Cent. Dist. Cal.* Case No. 2:21-cv-04920-CJC-ADS, Dkt Ent. No. 139, at ¶ 9.

supposedly neutral third parties is therefore meaningless because it is a zero-sum game within Aylo Holdings S.a.r.l.'s web of subsidiaries.  Every dollar paid by one subsidiary under the intercompany contracts is a dollar earned by another subsidiary, and in the end all profits flow back to Aylo Holdings S.a.r.l., where the profits are distributed to Aylo Holdings S.a.r.l.'s owners.  Because of this, Plaintiffs are informed and believe Aylo's accountants prepare consolidated financial statements for all entities within the corporate web.

86.     The way Aylo handles its intellectual property further highlights the lack of separateness between the entities.  Aylo Holdings S.a.r.l.'s subsidiary, Licensing IP International, S.a.r.l., is the registered owner for most, if not all, of the trademarks used by the companies in Aylo's corporate web.  For example, defendant Aylo Billing US Corp. processes payments for Aylo's Tubesites and Paysites under the name "Probiller," and defendant Aylo Freesites, Ltd. sells ad space on Aylo's Tubesites and Paysites under the name "TrafficJunky."   Yet, neither entity owns the trademark for their respective trade name.  Instead, Licensing IP International, S.a.r.l. is the registered owner of the trademarks for both "Probiller" and "TrafficJunky" and many other trademarks used by Aylo that are vital to their respective businesses. These include, but are not limited to: "Brazzers" (a paysite operated by subsidiary MG Premium Ltd.); "PornHub" (a tubesite operated by Aylo Freesites, Ltd.); "YouPorn," (a tubesite operated by Aylo Freesites, Ltd.); "RedTube" (a tubesite operated by Aylo Freesites, Ltd.); "ModelHub" (a platform for models to publish content operated by USA MG Billing Limited and Aylo Billing US Corp.); and "SpiceVids" (a website operated by USA MG Billing Limited and Aylo Billing US Corp.).

87.     If it chose to do so, Licensing IP International, S.a.r.l. could upend any of the other Aylo subsidiaries' business operations by refusing to license the trademarks, drastically increasing the licensing fees, or bringing infringement actions against the

companies that use and rely on the marks.  Of course, Licensing IP International, S.a.r.l would never do this because the Aylo Control Group controls Licensing IP International, S.a.r.l. and every other entity within the corporate web.  The licensing structure is simply another mechanism the Aylo Control Group uses to move money around within the web of entities, avoid liabilities, evade taxes, and conceal the true ownership of the entity.

88.     In addition to being controlled by the same group of individuals, upon information and belief, and in particular, Defendants have: (a) commingled their funds and other assets, failed to segregate funds between them, and have without authorization diverted corporate funds and assets for noncorporate uses; (b) treated each other's assets as their own; (c) issued shares of one other to themselves and third parties haphazardly and without authority; (d) held themselves out as being personally liable for the debts of each other; (e) failed to maintain minutes and corporate records, and confused the records of the separate entities; (f) used the same business locations and employed the same employees; (g) failed to adequately capitalize the entities; (h) used each other as a conduit for a single venture of themselves; (i) failed to maintain arm's length relationships among themselves; (j) loan each other money whenever a subsidiary was in need of capital; and (k) diverted assets without consideration from/to one another to the detriment of creditors, including Plaintiffs.

89.     Aylo Control Group could easily restructure the company, "renegotiate" the cost-plus contracts, or reroute the flow of money within the overall enterprise to avoid collection.  The only way to ensure that any judgment issued by this Court is enforceable is to hold Defendants jointly and severally liable as alter egos.

90.     In addition to being alter egos, Defendants were agents, servants, representatives, partners, joint venturers, co-conspirators, affiliates, parents, subsidiaries, and/or employees of each other in the acts and/or omissions herein alleged.  Defendants were acting within the course and scope of their authority as such agents, servants, representatives, partners, joint venturers, affiliates, parents, subsidiaries, and/or employees and with the permission, authorization, consent, and ratification of each other.

### III.

### JURISDICTION AND VENUE

**A.   SUBJECT MATTER JURISDICTION**

91.   This Court has original subject matter jurisdiction over the private right of action for victims of sex trafficking under 28 U.S.C. § 1331.

92.   Plaintiffs' claims arise under 18 U.S.C. § 1595, which states, "[a]n individual who is a victim of a violation of this chapter may bring a civil action…in an appropriate district court of the United States. . ." and under 18 U.S.C. § 1964, which states, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ." 18 U.S.C. §§ 1595(a), 1964(c).

93.   28 U.S.C. § 1367 provides this Court with supplemental/pendent jurisdiction to hear Plaintiffs' California Civil Code § 52.5 cause of action, which arises from the same case or controversy as Plaintiffs' causes of action for violation of 18 U.S.C. § 1595 and 18 U.S.C. § 1962(c), over which this Court has original jurisdiction.

**B.   PERSONAL JURISDICTION**

94.   The Court has jurisdiction over all defendants pursuant to 18 U.S.C. § 1596, which gives this Court "extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section…1591…if…an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.  All corporate defendants have an active presence in the United States.

95.   This Court also has general personal jurisdiction over all defendants. Aylo Billing US Corp. is domiciled and maintains its principal places of business in the State of California—specifically at 1800 Oxnard Street, Suite 150, Woodland Hills, California 91367—and is registered to do business in the state of California with California's Secretary of State.

96.   Each of the remaining foreign defendants conducts significant business activities within the state of California and have purposefully availed themselves of

jurisdiction by: (a) directing their activities at California residents; (b) deriving benefit from their activities in California; (c) creating a substantial connection with California; (d) engaging in significant activities within California; (e) creating continuing obligations between themselves and residents of California; (f) causing liability-producing acts and foreseeable consequences in California, (g) maintaining offices in California, and (h) employing California residents.

97.     Each foreign defendant named herein transacts significant and continuous business within the state of California through Aylo's Tubesites and Paysites, which conduct significant and continuous business within the state of California.  In 2019, the city of Los Angeles was the 4th ranked city in the world for usage of PornHub.com.[8] Plaintiffs are informed and believe defendant Aylo Holdings S.a.r.l. owns the domains for Aylo's Tubesites and Paysites.  According its director Andreas Andreou, defendants Aylo Freesites, Ltd. and 9219-1568 Quebec Inc. "operate" and "service" Aylo's Tubesites, respectively.[9]  Defendant Aylo Freesites, Ltd. also sells advertising space on Aylo's Tubesites under the trade name "TrafficJunky."[10]  And Aylo Billing US Corp., dba Probiller, processes payments on Aylo's Paysites.[11]  As a result, each defendant maintains significant and continuous contact within the State of California by and through Aylo's Tubesites and Paysites.  Exercising general jurisdiction over each of the foreign

---

[8] See, *PornHub's Top 20 Cities*, available at https://www.pornhub.com/insights/top-20-cities (published May 21, 2019).

[9] See, Declaration of Aylo Director Andreas Andreou filed May 23, 2022 in *Fleitas v. MindGeek S.a.r.l.,* Cent. Dist. Cal. Case No. 2:21-cv-04920-CJC-ADS, Dkt Ent. No. 139, at ¶¶ 17 and 32; *see also*, Complaint filed in *MG Freesites, Ltd. v. ScorpCast*, Del. Dist. Ct. Case No. 1:20-cv-01012-CFC at ¶ 2 ("MindGeek operates its freesites, including, PornHub.com, YouPorn.com, RedTube.com, and Tube8.com through its subsidiary, MG Freesites, Ltd.").

[10] See, https://www.trafficjunky.com/online-advertising/who-we-are

[11] See, Probiller.com/about (footnote indicating it's the property of MG Billing US Corp.) and https://www.pornhubpremium.com/information/terms (indicating "MG Billing US Corp., Probiller.com…may appear on your credit card statement, bank statement, or phone bill for all applicable charges.")

defendants—who willfully and deliberately target the State of California—does not offend traditional notions of fair play and substantial justice.

98.     Additionally, this Court maintains specific personal jurisdiction over each foreign defendant because their respective California-based contacts give rise to, or are related to, the Plaintiffs' claims alleged herein, specifically Aylo's contractual relationship with San Diego-based sex traffickers and the publication, sale, and exploitation of videos produced by San Diego-based sex traffickers on Aylo's Tubesites and Paysites.

99.     Aylo Freesites, Ltd. contracted with the San Diego-based sex traffickers GirlsDoPorn through its Content Partner Program and Viewshare Program and, at minimum, made bimonthly payments to GirlsDoPorn's banks located within this jurisdiction, representing GirlsDoPorn's share of the revenues generated by the sale of the illegal videos on Aylo's Tubesites and Paysites.

100.    Further, Aylo Freesites, Ltd. "operates" Aylo's Tubesites and Paysites where GirlsDoPorn's sex trafficking videos (including those featuring Plaintiffs) were published and monetized.  Plaintiffs are informed and believe 9219-1568 Quebec, Inc. hired and managed employees that published, maintained, advertised, edited, and optimized GirlsDoPorn's videos on Aylo's Tubesites and Paysites, including videos of Plaintiffs. Defendant Aylo Billing US Corp. processed payments for the sale of GirlsDoPorn's sex trafficking videos (including Plaintiffs' videos) on Aylo's Paysites.   Defendant Aylo Freesites, Ltd. sold advertising space surrounding Plaintiffs' videos on Aylo's Tubesites, the value of which was expressly tied to the amount of views Plaintiffs' videos received on Aylo's Tubesites since defendant Aylo Freesites, Ltd. (d/b/a TrafficJunky) sells its advertisements on a "CPM" basis.[12]  Plaintiffs are informed and believe and allege

---

[12] CPM stands for Cost per thousand, also referred to as cost per mille, is a marketing term that's used to denote the price of 1,000 advertisement impressions on one web page. An advertiser must pay $2 for every 1,000 impressions of its ad if a website publisher

thereon that Aylo Billing US Corp. and Aylo Freesites, Ltd. received affiliate fees from GirlsDoPorn's credit card processors that processed subscription payments on GirlsDoPorn.com and GirlsDoToys.com, including California based credit card processor Epoch.com (principal place of business Santa Monica, California) and CCBill.com (principal place of business Tempe, Arizona).  As a result, this Court maintains specific personal jurisdiction over all defendants.

101.   Finally, this Court maintains personal jurisdiction over each foreign defendant since each is an alter ego of California-based defendant Aylo Billing US Corp.

**C.   VENUE**

102.   Venue is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(2), and (d) in that a substantial part of the events or omissions giving rise to the claims occurred in this district and the corporate defendants are subject to personal jurisdiction in this district. Additionally, "[a]ny civil action or proceeding under [Chapter 96 of the United States Code] against any person may be instituted in the district court of the United States for any district in which such person . . . transacts his affairs." 18 U.S.C. § 1965(a).

103.   A substantial part of the events giving rise to the claims here occurred in the Southern District of California, and the Defendants have transacted their affairs in the Southern District of California. GirlsDoPorn was headquartered in San Diego, California. Aylo contracted with and maintained a business relationship with GirlsDoPorn, while GirlsDoPorn operated in San Diego, California. Most of the victims were recruited by individuals operating in San Diego, California.  Most of the GirlsDoPorn videos, which appeared on Aylo's websites, were filmed in San Diego, California. Numerous financial transactions between GirlsDoPorn and Aylo were conducted in the Southern District of California. Finally, several Plaintiffs reside within this judicial district.

---

charges $2 CPM. The "M" in CPM represents the word "mille," which is Latin for "thousands."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.

## FEDERAL SEX TRAFFICKING LAWS

104.   Section 1591 defines sex trafficking as "knowingly. . . recruit[ing], entic[ing], harbor[ing], transport[ing], . . . or solicit[ing] by any means a person … knowing, or, . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion[,] or any combination of such means will be used to cause the person to engage in a commercial sex act."  18 U.S.C. § 1591(a)(1). A "commercial sex act" is as "any sex act, on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).

105.   Under subsection (a)(2) of Section 1591, a person also commits criminal sex trafficking if he or she "knowingly . . . benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act [of sex trafficking]" while "knowing or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion[,] or a combination of such means will be used to cause the person to engage in a commercial sex act."   18 U.S.C. § 1591(a)(2). "Participation in a venture" is defined as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." 18 U.S.C. § 1591(e)(4).

106.   In 2008, Congress amended 18 U.S.C § 1595 ("Section 1595") to "ma[ke] it easier for victims of trafficking violations to bring civil suits…by broadening the parties who could be sued for trafficking violations."[13]  Since the amendment, sex trafficking victims may bring a civil action against the "perpetrator" and anyone who "knowingly benefits, financially or by receiving anything of value from participation in" the sex trafficking venture.

107.   The 2008 amendment presents businesses frequented by traffickers a choice when it suspects a customer is using the business as part of a sex trafficking venture:

---

[13]  *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F.Supp.3d 959 (S.D. Ohio 2019).

refuse services and move on to the next customer, or provide services, profit from the transaction, but risk civil liability to the trafficking victims.  Defendants chose the latter.  Defendants' decade-long participation in, knowledge of, and business partnership with the GirlsDoPorn sex trafficking venture was so extensive and continuous that Defendants are liable as both the perpetrators and beneficiaries of sex trafficking under 18 U.S.C. §§ 1591(a)(1), (a)(2), 1594(c), and 1595.

108.   For years, websites that knowingly facilitated and profited from sex trafficking hid behind the Communications Decency Act (47 U.S.C. § 230) **("Section 230")**, which provided immunity against civil suits brought by the sex trafficking victims.  That all changed because of BackPage.com, who "for years, ha[d] been accused of accepting classified ads promoting prostitution which allegedly resulted in sex trafficking of . . . minors."[14]  Despite the obvious crimes being committed by BackPage.com, in 2015, the First Circuit Court of Appeal upheld a district court's dismissal of a sex trafficking victim's civil claims, finding Section 230 immunized Backpage.com despite its knowledge that traffickers were using its site to sell underage women for sex.  The First Circuit Court of Appeal concluded its opinion by indicating the plaintiffs' "remedy is through legislation, not through litigation."  *Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 40 (1st Cir. 2016).

109.   Congress responded to the BackPage.com decision in 2018 by passing the Allow States and Victims to Fight Online Sex Trafficking Act/Stop Enabling Sex Traffickers Act (FOSTA/SESTA), which, among other things, amended the language of Section 230.  The purpose of FOSTA/SESTA was to "clarify that section 230 of such Act does not prohibit the enforcement against providers and users of interactive computer services of Federal and State criminal and civil law relating to sexual exploitation of children or sex trafficking, and for other purposes." Pub. Law, 115-164, 132 Stat. 1253 (2018).  Section 230 "was never intended to provide legal protection to websites that

---

[14]  https://www.forbes.com/sites/larrymagid/2018/04/06/doj-seizes-backpage-comweeks-after-congress-passes-sex-trafficking-law/?sh=42687f0350ba

unlawfully promote and facilitate . . . traffickers." *Id*.  Websites have been "reckless in allowing the sales of sex trafficking victims and have done nothing to prevent the trafficking of children." *Id.*

## V.

## **RELEVANT FACTUAL BACKGROUND**

**A.   GIRLSDOPORN SEX-TRAFFICKED YOUNG WOMEN FROM 2007 UNTIL 2019**

110.   In 2006, Michael Pratt and Matthew Wolfe began the sex trafficking venture known as GirlsDoPorn.  As it grew, Pratt and Wolfe brought others into the venture, including, but not limited to, Garcia (a male actor and recruiter), Moser (administrative assistant and driver), Gyi (a videographer) and Amberlyn Nored Clark ("Clark") (reference model).

111.   GirlsDoPorn's goal was to convince high school and college-aged women to film pornographic videos, which they would monetize by publishing on the Internet, including on the subscription websites, GirlsDoPorn.com and GirlsDoToys.com, and on Aylo's Tubesites and Paysites.  GirlsDoPorn's niche in the industry was to feature "barely legal" "amateurs" who had no desire to enter the adult film industry.  In some instances, GirlsDoPorn groomed sixteen and seventeen-year-olds so they would fly to San Diego and film on their eighteenth birthdays.  Those videos begin with GirlsDoPorn presenting the victim with a birthday cake.  GirlsDoPorn's website boasted that it featured "girls next door" who were "[r]eal amateur girls having sex on video for the very first time...this is the one and only time they do porn" and that it was "the only website out that uses 100% real amateur first timers in all of our videos." (Sics in original.)

112.   The overwhelming majority of high school and college-aged women who have no connection or desire to enter the adult film industry would never agree to appear in pornographic videos that were going to be published anywhere on the Internet, especially to the 8th most trafficked website in the world, PornHub.com.  GirlsDoPorn used a combination of force, fraud, and coercion to overcome this hurdle.  GirlsDoPorn's illegal tactics changed over the years as it learned which worked best, but the goals

remained the same: say or do anything necessary to get victims to fly to San Diego and convince victims that any videos that were made would never be seen by anyone in that woman's life because they would never be released in North America or published on the Internet.

113.  To locate victims, GirlsDoPorn published Craigslist advertisements throughout the United States and Canada seeking young women for *clothed* modeling gigs.  The Craigslist ads invited prospective victims to learn more about the supposed gigs by visiting sham fashion modeling websites GirlsDoPorn had created— www.BeginModeling.com, www.ModelingWork.com, or www.ModelingGigs.com. Each sham website was supported by a suite of social media accounts for the supposed fashion modeling agency, lending further credibility.  The sham modeling sites directed victims to apply for fashion modeling gigs by submitting contact information and photographs through a "Contact Us" portal.  Of course, there were no clothed modeling gigs.  Instead, victims were unknowingly submitting their information and photographs to a sex trafficking venture.

114.  In 2010, GirlsDoPorn publicly admitted to using deceptive modeling advertisements to lure victims to hotel rooms.  The caption for a victim's video published on the public portion of GirlsDoPorn's website read:

> This smokin hot 18 y/o teen named jessica was trying too find some money so that she could get a boob job done.  **She contacted us regarding an add I had placed for beauty models wanted , having no idea it was actually for adult videos instead ha :)**

(Sics in original, emphasis added.) GirlsDoPorn continued to use bogus clothed modeling advertisements to attract victims until it was shut down in October 2019.

115.  GirlsDoPorn graded the submissions to its sham modeling websites based on age and looks.  The younger and more attractive, the higher the grade.  If selected, GirlsDoPorn would send a long email cryptically offering thousands of dollars for an "adult gig."  After sending the lengthy email, GirlsDoPorn called victims using the phone

number the victims were duped into submitting to its sham modeling websites.  Once on the phone, GirlsDoPorn began its campaign of lies and coercion, avoiding a paper trail.

116.   During the calls, GirlsDoPorn gauged victims' willingness to do semi-nude or modeling.  For those who seemed comfortable with nude modeling, GirlsDoPorn would mention that they also produced adult films, but quickly assured the victims the videos they created would be released on DVDs overseas, usually in Australia, and that the videos would never be published online.  GirlsDoPorn routinely booked a flight and a hotel while victims were still on the initial call, and would then email the flight and hotel confirmations to the victims, adding further pressure to agree to fly to San Diego.

117.   Prospective victims were naturally dubious about GirlsDoPorn's claims of anonymity and international distribution, often requiring numerous assurances in response to direct inquiries about where and how the videos would be distributed.  To help solidify this lie, GirlsDoPorn paid and coached "reference models" to confirm the video would never be published online and to assuage any other concerns the victim may have had.  The reference models shared their social media accounts and other personal details with the victims to earn their trust and as proof that they were who they said they were.

118.   Unbeknownst to the victims, GirlsDoPorn coached its reference models to falsely claim they had already filmed videos for the company, received thousands of dollars in cash, and that no one in that woman's life had ever seen the video because they were distributed on DVDs overseas.   The following text exchange is between GirlsDoPorn's reference model Kailyn Wright and a GirlsDoPorn victim shortly after GirlsDoPorn's initial phone call to the victim:

///
///
///
///
///

> These aren't distributed in America right?

> No prob! And no they aren't!

> Wed, Feb 24, 9:17 PM

> Is there anyway they can get back to the US? I just have this shaky thing with this guy I like love and I can't have anyone find out

> No no no you're totally fine!
> That's what I was worried about but there is absolutely no way anyone will find out

> Where are the videos going exactly? Like DVDs I think he said in Australia UK, but like DVDs or..?

> Yeah so it goes out to wealthier countries; yea DVDs and stuff like that but nothing online!

119.   Ms. Wright testified in the State Court Action that she lied to this victim "[b]ecause that's what they told me to say. That's what they were paying me to say."

120.   Amberlyn Clark, who served as a reference for GirlsDoPorn, testified in the State Court Action that Garcia helped her create a fake backstory about how she was from a small town, filmed several videos for the company, and no one in her small town knew of the videos because none of them were ever published online or available in the United States.  Clark was told to say the videos "wouldn't be put online and that they would go to private collectors" located "[o]utside of the U.S."  Garcia advised Clark to reassure models that "no one would find out."

121.   GirlsDoPorn would initially offer victims around $5,000.  If that was not enough to get the victim to commit, GirlsDoPorn would keep increasing the offer until

they agreed to fly to San Diego, even though GirlsDoPorn knew it would never pay the increased amount once the victims arrived.  Once a victim was alone in a hotel room in San Diego, GirlsDoPorn would routinely fabricate supposed imperfections to use as a pretext to reduce the offer, such as claiming the victim had cellulite, uneven breasts, bruises, or some other made-up flaw.  GirlsDoPorn would angrily accuse victims of sending misleading pictures and become upset.  Alone in a hotel room far from home, a victim would have no choice but to relent, afraid of what would happen if she said no.

122.   Pratt asked his assistant, Valorie Moser, to make recruiting calls for him, hoping a female's voice would be more reassuring than his.  Pratt directed Moser to keep making "highball" offers "to get [the victim] on the plane," knowing that GirlsDoPorn could coerce her into filming the video for less money.  During the State Court Action, Moser testified that "at least half the models [she] interacted with were paid less than they were quoted."

123.   If the false promises of anonymity, highball offers, assurances from reference models, and litany of lies did not work—or if the woman did not seem open to pornography in the first place—GirlsDoPorn would offer prospective victims a clothed modeling gig in San Diego.  One of GirlsDoPorn's boilerplate emails stated: "The first offer is $5,000 for the shoot with the guy, $1,500 for a solo by yourself and $300 if you want to do clothed modeling."  There was never an option to do clothed modeling. The offer was simply a way to "get the victim on a plane" so GirlsDoPorn could coerce her into filming pornographic videos once she was alone in a hotel room in San Diego. Many of GirlsDoPorn's victims boarded flights to San Diego believing they would be modeling fitness clothes, swimsuits, or lingerie, only to be coerced into pornography once they were alone in a hotel room in San Diego.

124.   Immediately before filming began, GirlsDoPorn would present victims with a contract to sign.  As Garcia admitted in his Plea Agreement, GirlsDoPorn intentionally

///

///

"did not give [victims] an opportunity to read [the contracts]."[15]  GirlsDoPorn would act like they were behind schedule and rush the victims through the contracts, telling them "the contracts simply said what the victims had already been told, including that the videos would not be posted on-line."[16]  GirlsDoPorn refused to give any victims a copy of the documents they signed.

125.   Filming was often an extremely long and painful process.  Victims who displayed pain or disinterest while filming were forced to reshoot scenes until GirlsDoPorn had five consecutive minutes of usable footage in each of the five different sexual positions.  Because of this, filming sometimes lasted six to eight hours.  Despite its best efforts to refilm scenes or edit out incriminating footage, many of GirlsDoPorn's final videos depict obvious signs of the pain and suffering, including bloodstained sheets, shouts of pain, and tear tracks visible in the victim's makeup.

126.   GirlsDoPorn used veiled and direct threats throughout the entire process to ensure victims complied with their demands. GirlsDoPorn often blockaded the hotel room doors with furniture or camera equipment, so the idea of leaving was never an option.  GirlsDoPorn had a strict policy of never letting the victim leave the room for any reason, even to get fresh air or food—obviously knowing many victims would never return if allowed to leave the room.  In some instances, GirlsDoPorn's cameraman and actor physically blocked the door if the victim tried to leave.

127.   If a victim refused to film, tried to stop once filming began, or would not perform a sex act demanded of her, GirlsDoPorn would, among other things: falsely claim the contract the victims signed legally required the victim to perform the act she was refusing to perform; threaten to sue the victim for the cost of the hotel, flights and time she allegedly "wasted"; threaten to cancel the victim's return flight or actually do so; and threaten to release any footage it had already filmed online. In at least one instance,

---

[15] See, Plea Agreement of Andre Garcia, filed on December 17, 2020 in *United States v. Pratt et al.*, Southern District of Cal. Case No. 3:19-cr-04488-JLS, Dkt. Ent. No. 149.
[16] *Id.*

Pratt sent text messages to a victim threatening to kill her if she did not fly to San Diego the next day to film a video for GirlsDoPorn.

128.   For GirlsDoPorn's scheme to work, it was critical that victims never learned they were dealing with the operators of GirlsDoPorn before filming. The Google search results for "GirlsDoPorn" included the GirlsDoPorn website, dozens of free websites featuring GirlsDoPorn's videos, and www.PornWikiLeaks.com, where GirlsDoPorn doxed its victims by publishing the victims' and their families' personal information and social media accounts.  No amount of force, fraud, and coercion could overcome the will of a victim who knew that she was dealing with GirlsDoPorn.

129.   GirlsDoPorn therefore had to actively conceal its true identity from the victims.  To accomplish this, GirlsDoPorn coached its reference models, makeup artists, drivers, and cameramen how to answer victims' questions about who the company was or where the videos would be published.  GirlsDoPorn also directed everyone to falsely assure victims the videos would not be published online and to never mention the name GirlsDoPorn.

130.   To ensure employees complied with these demands, GirlsDoPorn's long-time attorney, Aaron Sadock, forced anyone providing a service to GirlsDoPorn (employees, DMCA agents, makeup artists, chaffeurs, etc.) to sign onerous Non-Disclosure Agreements and told them they would be in breach of the agreements if they told any victim the name of the business or its website.

131.   After the State Court Action was filed in June 2016, Sadock personally coached GirlsDoPorn's employees how to give false answers when victims inevitably asked about the company's identity or where the videos were distributed.

132.   Once the videos were published on the Internet, GirlsDoPorn used an aggressive marketing strategy to get people to visit their paysites.  GirlsDoPorn sent, and knew others would send, links for victims' video trailers to social media accounts to the victims' friends, family, co-workers, employers, teachers, and classmates. GirlsDoPorn believed that people who knew the victims were much more likely to purchase a

subscription to view the full-length video on GirlsDoPorn.com and GirlsDoToys.com. This caused the videos to go viral amongst everyone the victims knew within 24 to 48 hours of the video being released online.  By making the video go viral like this, GirlsDoPorn was able to sell monthly subscriptions to customers who otherwise had no interest in subscribing to GirlsDoPorn (or any other monthly pornography paysite for that matter) but who simply wanted to see the victims' full-length video out of curiosity.

133.   GirlsDoPorn had a cult following.  Numerous websites and forums existed for the sole purpose of doxing GirlsDoPorn's victims.  Internet trolls created and congregated on online forums where the sole purpose was to identify GirlsDoPorn's victims by name, glean personal information about them, and harass them.  The trolls shared any information they could find on the forums, including the model's name, email addresses, high school, biographical information, and links to the victims and their families' social media accounts.  Armed with victims' social media and contact information, trolls sent links to the victims' video to people connected to the victims on social media.  Other trolls contacted the victims personally to attack, bully, shame, and sexually proposition them.  Some trolls contacted and harassed victims' family members, friends, classmates, and church members.

134.   PornWikiLeaks.com was the most notorious doxing website in the pornography business.  Pornography actors try to keep their personal information private to avoid harassment (or worse) from stalkers and trolls.  PornWikiLeaks' business model was to publish personal information of people in the pornography industry (i.e., "dox" them) and charge them a fee to remove the personal information.

135.   GirlsDoPorn began doxing its victims on PornWikiLeaks.com as early as 2012.  The doxing in the general forum on PornWikileaks became so regular that, in July 2015, the owner of PornWikiLeaks, Donald Seoane, created forum dedicated solely to GirlsDoPorn's victims that he titled, "Girlsdoporn.com GDP Girls Do Porn Exposed real names and personal family info."

///

136.   The dedicated forum on PornWikiLeaks was so heavily trafficked that, in November 2015, GirlsDoPorn purchased PornWikiLeaks.com from Donald Seoane to use the website as a marketing tool.  Once under its control, GirlsDoPorn began placing advertisements in the forum with hyperlinks to GirlsDoPorn's paysites.  By early 2016, the forum had hundreds of thousands, if not millions, of posts discussing the personal lives and information of GirlsDoPorn's victims.

137.   Plaintiffs are informed and believe Aylo, like everyone else in the pornography industry, was acutely aware of PornWikiLeaks.com, its doxing practices, and GirlsDoPorn forum on that site.  PornWikiLeaks.com was so universally known and hated by the pornography industry that, in 2019, BangBros, one of Aylo's biggest competitors, allegedly bought the servers for the website and released a video on YouTube setting the servers on fire, something that was covered by mainstream media and which Aylo was certainly aware of.[17]

138.   Some of the posts on PornWikiLeaks.com were narratives from GirlsDoPorn's victims detailing the force, fraud, and coercion used by GirlsDoPorn in its recruitment and filming process.

139.   The doxing forums, virality of the videos, and publicly available videos on Aylo's Tubesites and Paysites, created significant traffic to GirlsDoPorn's paysite, which averaged between ten to fifteen thousand subscribers per month.

140.   The Federal Bureau of Investigation estimates GirlsDoPorn made over $17 million from its sex trafficking operation between 2009 and 2019.

**B.   THE AFFILIATE MARKETING RELATIONSHIP BETWEEN PAYSITES AND FREESITES**

141.   The online pornography industry consists of two types of websites: "paysites" and "freesites."  "Paysites" are websites where, as the name suggests, the user

---

[17] See, https://news.yahoo.com/bangbros-bought-porn-doxxing-just-083644759.html; https://www.businessinsider.com/pornwikileaks-closed-by-bang-bros-2019-8; https://www.vice.com/en/article/9keb4d/bang-bros-bought-pornwikileaks-doxing-forum-and-set-fire-to-it

must pay to view the pornographic content.  The videos on paysites are commonly said to be behind a "paywall."  Paysites are usually owned and operated by the companies that produce the pornography behind the paywall.  For example, GirlsDoPorn operated two paysites where it sold its full-length videos featuring its sex trafficking victims, GirlsDoPorn.com and GirlsDoToys.com.  GirlsDoPorn, like most paysites, generated revenues by selling subscriptions, which were between $30 to $60 per month.

142.   "Freesites" allow the public to view videos on the site for free.  Freesites contain massive libraries of videos uploaded by members of the public, commonly referred to as "user generated content" or "UGC."  Freesites are referred to as "tubesites" because they mimic the business model made popular by YouTube.  Freesites attract significant traffic with the allure of free pornography.

143.   Freesites generate revenue in several ways.  The massive amount of web traffic on freesites allows them to earn significant revenues by selling advertising space on the sites.  Freesites also generate significant revenue from "affiliate fees." In essence, an "affiliate fee" is a customer referral fee paid by paysites to freesites for helping paysites attract customers to their websites. When a freesite redirects a customer from the freesite to a paysite by using a hyperlinked advertisement, and the customer pays to view or to subscribe to the paysite, the operator of the freesite that directed the customer to the paysite is paid an "affiliate fee."

144.   The payment of affiliate fees is administered by payment processors, who process the subscription payments on the paysites. Freesites can register as an affiliate for a paysite with the payment processor.  For example, if a paysite like GirlsDoPorn opts into the affiliate program operated by the payment processor for its paysite, then third party freesites are authorized to publish *trailer* versions of the paysite's videos on its website, which the third-party affiliate surrounds with hyperlinked advertisements for the paysite.  If a customer clicks the hyperlinked advertisement and is redirected to the paysite, the payment processor tracks which affiliated freesite directed the customer to the paysite.  Then, if the customer subscribes to the paysite, the payment processor

automatically splits the customer's subscription payments between the paysite and the registered affiliate freesite, often in perpetuity and often 50/50.  The money the third party freesite earns by redirecting customers to a paysite is called an "affiliate fee."

## C.   AYLO OWNS AND OPERATES DOZENS OF PORNOGRAPHIC WEBSITES, INCLUDING THE 8TH MOST POPULAR WEBSITE IN THE WORLD, WWW.PORNHUB.COM

145.   Aylo owns and operates dozens of pornographic websites and brands.  Over the last twenty years, it has purchased its competition and now holds a monopoly over internet pornography.[18]  Aylo generates revenues in many different ways, including through subscription sales to its paysites, affiliate fees generated by its freesites, advertising, and the sale of user data.

146.   PornHub.com is Aylo's flagship tubesite and PornHubPremium.com is its flagship paysite.  In 2019, PornHub.com had roughly 42 billion visits (an average of 115 million per day), making it the 8th most popular website in the world and the United States), behind Google.com (1st), YouTube.com (2nd), Facebook.com (3rd), Amazon.com (4th), Yahoo.com (5th), Twitter.com (6th), and Instagram.com (7th).  Today, PornHub.com is the 9th most trafficked site in the United States and has more visitors than the Internet staples Amazon.com, Reddit.com, NetFlix.com, Craigslist.org, and Bing.com.  According to analytics published by Aylo, the United States is the top country by volume of PornHub.com usage and, as for top cites, Los Angeles, California is ranked the 4th highest in the world.  Aylo's other tubesites currently generate tens of millions of views per month—YouPorn.com (173 million visits per month), RedTube.com (112 million visits

---

[18] See, *Vampire Porn: MindGeek is a cautionary tale of consolidating production and distribution in a single, monopolistic owner,* The Slate (Oct. 2014) available at https://slate.com/technology/2014/10/mindgeek-porn-monopoly-its-dominance-is-a-cautionary-tale-for-other-industries.html

See also, *The Porn Monopoly,* The Medium (Sept. 2016) available at https://medium.com/five-guys-facts/8-19-16-davis-ce6771141589

See also, *MindGeek: A Deep Dive on the Monopoly of Internet Pornography* (Dec. 2022) available at https://voxdextra.substack.com/p/mindgeek-a-deep-dive-on-the-monopoly

FIRST AMENDED COMPLAINT

per month), and Tube8.com (16 million visits per month).  Aylo's paysite PornHubPremium.com generates roughly 23 million visits per month.[19]

147.    Aylo's Tubesites and Paysites are interactive, robust, and multi-faceted e-commerce websites designed to attract and sell various sex related products and services, primarily pornographic videos, to a high volume of sex industry customers, production companies, and performers.  They do extensive business over the Internet, where Aylo knowingly and repeatedly receives and transfers funds for various purchases and services, transfers computer files, and enters contracts with individuals and entities throughout the world, including residents of every state.

148.    Aylo's Paysites reportedly generated $1.3 billion in subscription revenue between 2012 and 2018.[20] Aylo's revenue from subscriptions for 2018 alone totaled $220.9 million – or a weekly average of $4.2 million.[21]

149.    The most popular feature on Aylo's Tubesites is the expansive searchable video library.  As of December 8, 2020, PornHub.com had approximately 14,000,000 pornographic videos in its free video library.  Most videos are between five and twenty minutes long.  If each of these 14,000,000 videos were just four minutes long, a highly conservative estimate, it would take over 106 years for one person to watch all the footage.  The videos in these massive libraries come from several different sources, including members of the public, third party pornography production companies, and Aylo itself, who produces its own content sold under brand names such as Reality Kings, Brazzers, and Digital Playground. Until December 2020, Aylo permitted members of the public to upload videos to the general library on its Tubesites anonymously. Aylo did not

---

[19] See, https://www.similarweb.com/

[20] See, *Grant Thornton has resigned as auditors to firms owned by operator of Pornhub* (Feb. 9, 2021) available at https://www.thejournal.ie/grant-thornton-pornhub-5350441-Feb2021/

[21] *Id.*

collect or verify any personal information that would allow Aylo or authorities to identify or locate the person who uploaded videos to its Tubesites.

150.   As part of the interactive experience offered on Aylo's Tubesites, customers and viewers can create accounts, post comments under videos, and communicate with one another.  Accountholders can subscribe to follow certain performers and send performers compensation through the websites.  Finally, prior to December 8, 2020, Aylo's Tubesites also allowed its users to easily download the videos from its public library for free, thereby turning it into a free content sharing platform for its users.

151.   In early December 2020, multiple news outlets published reports about Aylo permitting and facilitating sex trafficking on its Tubesites, including a New York Times article entitled "The Children of Pornhub." In response to the reports, Visa and Mastercard publicly terminated their relationships with Aylo.  Several days later, on December 8, 2020, Aylo announced several changes to its policies, including (1) allowing "Verified Uploaders Only," (2) "Banning Downloads," and (3) "Expand[ing] Moderation."[22]  Aylo also removed roughly ten million videos from its general library.[23]

**D.    AYLO IS A DEVELOPER AND RETAILER OF THE CONTENT ON ITS SITES**

152.   Aylo's Tubesites are distinguished from passive tubesites because Aylo actively curates users' experiences by monitoring, influencing, creating, editing, developing, and promoting content created by its Content Partners.[24]  Aylo offers pornography production companies the opportunity to partner with Aylo through several

---

[22] *See* Our Commitment to Trust and Safety, PORNHUB HELP CENTER, *available at* https://help.pornhub.com/hc/en-us/categories/360002934613 (last visited Mar. 25, 2021).

[23] See, *Pornhub removes a majority of its videos after investigation reveals child abuse* (Dec. 15, 2020) *available at* https://www.cnn.com/2020/12/15/business/pornhub-videos-removed/index.html

[24] The "About" page of MindGeek's website declares, "[w]e're designers, analysts, developers, editors, marketers and so much more, sharing a drive for excellence working alongside the brightest in our fields."  *About MindGeek*, MindGeek.com/about/ (last visited Mar. 31, 2021).

programs that give Aylo to advertise, market, sell, and otherwise exploit the partners' content in exchange for splitting the profits derived therefrom. These programs include the **"Content Partner Program"** and **"Premium Viewshare Program."**

153.   Aylo describes its Content Partner Program as follows:

> The Content Partner Program is designed for studios with a pay-site to expose their content to millions of visitors.  Once partnered, you receive a personalized channel that includes free ad space both on your channel and on your videos.  Through the use of video features on our homepage, your content is promoted to our users which will direct traffic back to your pay-site, with the intention of converting them into paying members.  In turn, we would receive a share of this revenue through your affiliate program.  There is no compensation based on views in this program.[25]

154.   Aylo markets its Content Partner Program as providing "100+ milion [sic] visits per day, Dedicated account reps, Most ad space in the industry, Exposure across the Pornhub network (PornHub.com, YouPorn.com, RedTube.com and Tube8.com)."[26]

155.   Aylo's also claims:

> The Pornhub Content Partner Program has a global reach of over 100 million daily users with world-leading, high-quality adult traffic and has been a proven program for hundreds of studios and content producers who take part.  We have helped boost the branding and exposure of content partners from a variety of niches, turning our traffic into your earnings![27]

156.   Pornography production companies must apply to join Aylo's Content Partner Program.  Aylo vets the companies before it allows an applicant to become a

---

[25] *See What is the Content Partner Program?* PORNHUB HELP CENTER, https://help.pornhub.com/hc/en-us/articles/360048496113-What-is-the-Content-Partner-Program- (last visited Mar. 26, 2021) (emphasis added).

[26] Pornhub Network Content Partner Program, PORNHUB, https://www.pornhub.com/partners/cpp (last visited Mar. 26, 2021) (emphasis added).

[27] *Id.*  (emphasis added).

Content Partner and become part of Aylo's brand.  If accepted, Aylo creates a "channel" on Aylo's Tubesites centralizing the Content Partner's videos in a single location where Aylo's potential customers can search the Content Partner's videos, organize them by ratings and recentness, and receive email notifications when a Content Partner posts a new video or takes other actions on the channel.

157.   Aylo provides the Content Partner with a dedicated account representative who actively promotes the Content Partner's videos.  Aylo's Content Partner account representatives, to use Aylo's own job description, "create, optimize and maintain content partner ad campaigns[.]"  Aylo's dedicated account representatives help its Content Partners design channels in ways that, among other things, keep prospective customers interested in the Content Partner's niche of pornography for as long as possible.  The longer Aylo can keep the potential customer engaged on the Content Partner's channel, the more advertisement impressions it can sell, and the greater the chance it can earn affiliate fees by redirecting customers to the Content Partner's paysite.

158.   Plaintiffs are informed and believe that Aylo provides more attention, staff, and resources to those Content Partners generating the most user traffic and affiliate fees for Aylo.

159.   The Content Partners' channels on Aylo's Tubesites contain five to ten minute *trailer versions* of the Content Partners' videos that may be viewed for free. Aylo's Tubesites each offer "premium" subscriptions that give users access to a companion paysite that includes *full-length* videos produced by Aylo's Content Partners. Aylo describes its Viewshare program as follows:

> The Viewshare program, also known as Pornhub Premium, is designed to earn you revenue based on the number of views your content receives.  In this program you will upload full-length, HD videos which are locked behind our paywall, and you are compensated every time a Premium user watches your video. While Premium is an ad-free environment, partners receive a prominent "Join" button on their channel and below their videos to drive traffic back to their pay-site.

> Are you a studio or producer without a pay-site?  No problem!
> The only requirement to be eligible for the Viewshare program
> is that you are producing HD, adult video content.[28]

160.   By contracting with Aylo in its Viewshare Program, third party production companies license their pornographic videos to Aylo, which Aylo then advertises, markets, edits, and sells behind paywalls on Aylo's Paysites.  Aylo's Tubesites offer "premium" or "VIP" memberships, which give access to Aylo's Paysites. For the Content Partners participating in Aylo's Premium Viewshare Program, Aylo acts as a traditional retailer of the third party production companies' pornographic videos.  Aylo's customers pay to see the videos housed behind Aylo's paywall, and Aylo shares the revenue with the third parties supplying Aylo with videos to sell to Aylo's customers.

161.   Aylo also provides search engine optimization services for those participating in its Content Partner Program and Viewshare Program, increasing traffic from external search engines such as Google.  Aylo also actively "suggests" content from its Content Partner Program and Viewshare Premium to users of its Tubesites, which internally drives traffic to and generates revenue for Aylo and its Content Partners and Viewshare Program members.

162.   Aylo describes the collaboration with its Content Partners and Viewshare Program Members as follows:

> We work closely with our clients to clearly understand their
> business requirements, vision, and needs in order to provide the
> best customized solution. We grow online brand exposure by
> developing and collaborative social media with search engine
> marketing tactics. Our Search Engine Optimization team is
> dedicated to uncovering the best keyword combinations to target
> exposure, ensures sites are compliant with search engine

---

[28] *What is the Viewshare program?* PORNHUB HELP CENTER, https://help.pornhub.com/hc/en-us/articles/360047765034-What-is-the-Viewshare-program- (last visited Mar. 26, 2021).

behavior, checks for the best user experience, and provides performance optimization and website architecture tactics.[29]

163.   "The MindGeek Social Media Services exposes and grows a brand by developing customized content strategies to cater to each platform and audience."[30]

164.   If the Content Partner also uses Aylo's Viewshare Program, Aylo creates advertisements, tags, and hyperlinks on the Content Partner's channel soliciting potential customers to view the Content Partner's full-length videos on Aylo's Paysites.

165.   On information and belief, Aylo's representatives help create trailers to use in advertisements for the Content Partner's paysite and Aylo's Viewshare Program.  In so doing, Aylo edits and modifies the video content, as well as uniquely names, titles, describes, and tags the videos.

166.   Aylo contributes to the creation of its Content Parnters' videos by having its Content Partners follow a "Playbook" that directs the Content Partner on how to create, edit, film, name, tag, brand, optimize, title, and thumbnail its content.

167.   Aylo also contributes to the creation of the content on its Tubesites and Paysites for videos uploaded by members of the public to its general library by forcing them to comply with several requirements before the video will be published.  When a user uploads a new video, Aylo requires the user to choose a minimum number of tags to describe the content from provided options, and when users choose certain tags, Aylo suggest related tags to increase traffic to the video. Aylo also creates thumbnails for the videos, which are a key component for attracting viewers, advising uploaders to carefully choose a thumbnail from provided options that will appeal to viewers.

168.   Aylo creates timelines placed underneath videos to demonstrate the level of intensity of activity within the video, which enables users to identify and quickly "skip" to various activity within the video. Aylo also controls the comments surrounding videos,

---

[29] See, https://www.mindgeek.com/services/  (as of July 2023).

[30] Id.

the process for viewing, posting, and creating accounts, and the process for encouraging and rewarding income and fees for downloaded and viewed content. Aylo advises uploaders on what types of videos and images to post, specifically suggests keywords and categories, and will edit non-compliant posts.

E.   **AYLO KNOWINGLY PARTICIPATED IN AND BENEFITED FROM GIRLSDOPORN'S SEX TRAFFICKING VENTURE**

169.   In or around 2009, GirlsDoPorn created accounts on Aylo's Tubesites and began posting its trailer videos as ads for its paysite.

170.   In or around 2011, GirlsDoPorn applied to participate in Aylo's Content Partner Program and Viewshare Program. Aylo accepted GirlsDoPorn's application and from then on, Aylo assisted the GirlsDoPorn sex trafficking venture by developing and promoting its content, enhancing the visibility and popularity of its brand, processing financial transactions for the sale of its illegal videos, increasing the traffic to and the sale of subscriptions for GirlsDoPorn's paysites, and selling GirlsDoPorn videos through Aylo's Viewshare Program.

171.   Aylo assisted GirlsDoPorn in developing content and creating trailer versions of victims' videos, including those featuring Plaintiffs, to post on its dedicated channel.  Aylo representatives assisted GirlsDoPorn in naming, editing, and tagging these illegal videos.

172.   Aylo designed and created hyperlinks and other advertisements to encourage users to view GirlsDoPorn's channels on Aylo's Tubesites and to entice users to navigate either to Aylo's premium pages or to GirlsDoPorn's paysites to purchase subscriptions and watch full-length videos.

173.   Aylo also created search engine optimization campaigns to promote and maximize the exposure of GirlsDoPorn's sex trafficking videos, including of the Plaintiffs.

174.   Aylo created tags and search terms for GirlsDoPorn to make their videos easier to find on its own websites and on other search engines.

175. Aylo actively suggested GirlsDoPorn's videos and channels to users of its Tubesites.

176. Aylo processed payments generated by the sale of the illegal videos on Aylo Paysites, including those of the Plaintiffs, and then transferred a portion of those funds to GirlsDoPorn.

177. The GirlsDoPorn channel on Pornhub.com had around 70 videos published on it at any given time. As of May 2019, GirlsDoPorn's channel had more than 700,000 subscribers and the 77 videos published on the channel were collectively viewed almost 700 million times. GirlsDoPorn channels on YouPorn.com, Tube8.com, and RedTube.com contained between 100 to 200 videos of sex trafficking victims, which also collectively had hundreds of millions of views. By the fall 2019, the videos on GirlsDoPorn's *channels* on Aylo's Tubesites collectively had over one billion views. This total does not account for the hundreds of videos featuring GirlsDoPorn's victims that were uploaded to the general libraries on Aylo's Tubesites. Many of those videos had millions of views each. Plaintiffs estimate that GirlsDoPorn's illegal videos generated more than 2 billion views on Aylo's Tubesites, which in turn generated millions of dollars in affiliate fees, advertising revenue, and data sales for Aylo.

178. As of 2020, there were more than 4,000 channels on PornHub.com. Aylo ranks the channels by popularity. The rankings fluctuate but GirlsDoPorn's channel on PornHub.com was at least the 25th highest ranking channel on PornHub.com and 5th highest ranking channel on YouPorn.com. Many of the channels that ranked higher than GirlsDoPorn were channels for pornographic brands that Aylo owned and produced, such as Brazzers and Reality Kings, and for which Aylo had more incentive to expend time and money on since Aylo retained 100% of the proceeds from those brands. Plaintiffs are informed and believe that GirlsDoPorn was one of Aylo's top ten most profitable Content Partners.

///

///

179.   Upon information and belief, GirlsDoPorn's sex trafficking videos were viewed on Aylo's Tubesites significantly more than on any other website.[31]

180.   Upon information and belief, Aylo referred and linked more users to GirlsDoPorn's paysites than any other affiliate website.  Accordingly, Aylo is responsible for more of GirlsDoPorn's subscription revenue than any other affiliate website.

181.   As a result of the significant traffic GirlsDoPorn's illegal videos were generating, Aylo refused takedown requests submitted by its victims, allowing the videos to be published and sold on Aylo's Tubesites and Paysites until the Department of Justice arrested and jailed GirlsDoPorn's operators in October 2019.

182.   In 2014, one of GirlsDoPorn's victims' videos was the second most viewed video on PornHub.com that year.  When she asked Aylo to remove the video, Aylo told her "we take false claims very seriously and dissuade you from pursuing legal action with this allegation."

183.   GirlsDoPorn would have never been profitable absent its partnership with Aylo.  GirlsDoPorn's success and longevity were a direct result of Aylo actively assisting, supporting, and facilitating the sex trafficking venture.

F.   **AYLO KNOWINGLY BENEFITTED FROM ITS PARTICIPATION IN GIRLSDOPORN'S SEX TRAFFICKING VENTURE**

184.   The Aylo-GirlsDoPorn partnership allowed Aylo to sell, market, and otherwise exploit the illegal videos featuring GirlsDoPorn's victims, including of the Plaintiffs, for its own financial gain.

185.   Plaintiffs are informed and believe Aylo generated millions of dollars in affiliate fees and premium subscriptions from selling, marketing, and exploiting videos featuring victims of GirlsDoPorn's sex trafficking venture, including Plaintiffs.

---

[31] The ease with Aylo permitted free videos to be shared and downloaded on its Tubesites allowed users to obtain copies and widely circulate videos of GirlsDoPorn's victims among victim's friends, family, colleagues, and classmates through social media, email, text, and internet forums.

186.   With more than one billion views of GirlsDoPorn's videos on Aylo's Tubesites, GirlsDoPorn's videos generated an enormous amount of traffic for Aylo's Tubesites, increasing Aylo's advertising revenues, data collection, and sales for its own products advertised for and sold on Aylo's Tubesites.

187.   GirlsDoPorn's infamous practice of doxing its victims also increased traffic to Aylo's Tubesites as the victims' friends, family, colleagues, classmates, and acquaintances scrambled to view GirlsDoPorn's videos of women they knew and shared the videos with others.

**G.   AYLO KNEW AS EARLY AS 2009 THAT GIRLSDOPORN USED FORCE, FRAUD, AND COERCION AS PART OF ITS CUSTOMARY BUSINESS PRACTICES**

188.   Beginning as early as 2009, Aylo knew, or acted in reckless disregard of the fact that, GirlsDoPorn used force, fraud, and coercion to get its victims to engage in commercial sex acts.

*i.*      ***Many Victims Reported to Aylo That the GirlsDoPorn Recordings Published on PornHub were Obtained using Force, Fraud, and Coercion and Were Published Without Consent***

189.   GirlsDoPorn's victims sent countless takedown requests to Aylo demanding the videos be removed due to lack of consent.  Some of the takedown requests included descriptions of the force, fraud, and coercion GirlsDoPorn used and the significant emotional distress and harassment they suffered from Aylo's continued publication of their videos.

190.   For example, on August 8, 2016, a victim submitted the following request to PornHub.com's takedown portal.

> Reason:  Im going to kill myself if this stays up here.  I was scammed and told this was only going to be on dvds in another country.  Please im begging you please ill pay!
>
> Agree to Distribution: No.

(All sics in original.)

191.   On August 13, 2016, this victim sent Aylo another takedown request for her video published on Aylo's website www.Tube8.com: "They scammed me and told me it was only going to dvds in another country.  Please this is ruining my life."

192.   On May 31, 2017, after Aylo continued to publish her video on PornHub.com, the victim sent another request to remove her video.

> I WAS SCAMMED. THIS COMPANY LIED TO ME ABOUT THIS BEING ON THE INTERNET! THEY TOLD ME IT WOULD ONLY BE AVAILIBLE ON DVD IN AUSTRALIA. MY WORK FRIENDS AND FAMILY ALL KNOW AND THIS VERY LINK IS BEING SENT AROUND. I WANT TO JUST DIE

(All sics and capitalization in original.) The continued publication of this video caused this victim to attempt suicide multiple times, cutting her arm from wrist to her elbow.

193.   In another instance, a victim sent a takedown request on December 14, 2016, advising Aylo:

> I was told this video went to a private viewer, and now it is all over the internet.  I was lied to, and this isn't okay.  I have reached out to them with no response.

194.   In January 2016, another victim submitted a content removal request to Aylo, begging to have her video removed because of the lack of consent and harassment she was under.

> That's what I am trying to explain is that I did not consent to being online!!!   :(((( me and other girls are being brutally harassed."

(Sics in original.)

195.   The victim followed up a few days later telling Aylo she and her boyfriend were in therapy because of the continued publication of the videos.

///

///

196.   Plaintiffs are informed and believe Aylo received dozens of similar takedown requests from GirlsDoPorn's victims over the years.

197.   Plaintiffs are informed and believe Aylo never once investigated the repeated complaints of force, fraud, and coercion victims submitted.

### ii.       Third Parties Reported to Aylo that the GirlsDoPorn were Published Without the Victims' Consent

198.   In addition to hearing directly from GirlsDoPorn's victims, GirlsDoPorn's victims hired takedown companies that submitted requests to Aylo indicating the women in the videos did not consent to their videos being published on Aylo's Tubesites and Paysites.

199.   These third-party companies sent hundreds, if not thousands, of notices to Aylo advising Aylo that it was publishing the victims' GirlsDoPorn videos without the victims' consent.

### iii.      GirlsDoPorn Publicly Admitted to Using Fraudulent Tactics to Lure Young Women into a Hotel Room Under False Pretenses

200.   From the time GirlsDoPorn launched in 2009, anyone paying the slightest attention to the pornography business or doing the slightest due diligence of its business partners understood GirlsDoPorn used force, fraud, and coercion to get its high school and college-aged victims to appear in its pornographic videos.  As of 2010, GirlsDoPorn's homepage indicated:

> Girlsdoporn is the only website that uses only 100% amateur girls.  There are a lot of websites out there that claim they have first timers only . I myself have joined these kinda websites and then days later started recognising the girls on other websites all over the internet and been dissapointed . This is why I built Girlsdoporn.com here you will find nothing but amateurs. I refuse too shoot any girls who have prior exerience . All the girls you will finrised d on my site are normal everyday girls you would find in the city streets - malls - colleges and normal 9-5 jobs . I personally hunt out each and every one for your viewing pleasure. You would be suphow quickly the offer of quick cash

> turns these girls into part time pornstars. Everything you read or see on this website is 100% real and true. We have no need too trick or lie too you.. ENJOY GUYS !

(Emphasis and sics in original.)

201.   Not long after GirlsDoPorn launched its website in 2009, GirlsDoPorn publicly mocked a victim who had been lured to a hotel room to film a sex video under the false pretense of a clothed modeling job.  A caption to a video read:

> This smokin hot 18 y/o teen named jessica was trying too find some money so that she could get a boob job done. **She contacted us regarding an add I had placed for beauty models wanted , having no idea it was actually for adult videos instead ha** :)

(Sics in original, emphasis added.)

202.   These damning admissions were available to Aylo in 2011 when it accepted GirlsDoPorn into its Content Partner Program and ViewShare Program and began selling, marketing, and exploiting videos featuring GirlsDoPorn's victims.  It was also available to Aylo when Aylo was receiving complaints about GirlsDoPorn's fraud and coercion.

### iv.   The GirlsDoPorn Videos Contain Obvious Indicia of Fraud

203.   The GirlsDoPorn videos themselves show GirlsDoPorn lied to the young women about the publication of the video, and Aylo admits reviewing all video submissions.

204.   All GirlsDoPorn videos begin with a five to ten-minute "interview" of the victims.  The victims' responses in the interviews made clear they believed the video would not be published on the Internet or available to anyone in the United States.

205.   No content or dialogue in the interviews clarified the production company was GirlsDoPorn or that the videos would be posted on on GirlsDoPorn.com or any website, for that matter.

206.   In these interviews, victims often expressed how they would be ostracized if the video were made public, demonstrating that the victims did not know about, or

consent to, the release of the videos on GirlsDoPorn or any of Aylo's websites, which are some of the most widely-viewed websites in the world.

207.   Both Aylo and GirlsDoPorn knew the victims would be brutally harassed once the videos were published and marketed on Aylo's Tubesites, especially considering the doxing occurring on PornWikiLeaks.com, which, as mentioned above, was a notorious website known to all in the pornography industry.

### v.   *The Videos Contain Obvious Indicia of Coercion*

208.   The video content made clear victims were subjected to coercion and did not consent to all the sex acts portrayed in the videos.  Some GirlsDoPorn videos depict victims who are in visible distress. Bloodstained sheets and condoms can been seen in some footage.  Tracks of the victims' tears can be seen in the victims' makeup, showing that victims had been in tears during the video production.  In other videos, furniture can be seen piled in front of the hotel room door.  Aylo claims that it reviews all content, so it should have seen and been alarmed by this content.  Since at least 2016, numerous online forums available from a simple Google search of "girlsdoporn" detailed these signs of duress at length.

### vi.   *The Videos Contain Obvious Use of Alcohol and Drugs by Minors*

209.   GirlsDoPorn's videos on Aylo' Tubesites and Paysites include women under 21-years-old who were clearly under the influence of drugs and/or alcohol based on the victims' gait, blurred eyes, and slurred speech.  Alcohol and marijuana paraphernalia can be seen visibly strewn about the hotel room in the background of numerous videos.  Since Aylo claims that a human content moderator reviews every video, it was or should have been aware women in GirlsDoPorn's videos were frequently under the influence.

### vii.   *GirlsDoPorn Made Publicly Available Statements Containing Admissions of Unlawful Acts*

210.   Beginning in or around 2014, GirlsDoPorn operated an online forum that included firsthand accounts of the fraudulent and coercive tactics it used.  For example, the forum included an account directly from GirlsDoPorn's owners of a woman who

"flip[ed] out in the middle of the shoot [and] had a panic attack" when she "had enough" and locked herself in the bathroom to avoid continuing with the filming process. In the narrative, GirlsDoPorn mocked the victim for calling her mother for help and described their efforts to convince her to finish the scene. GirlsDoPorn joked about the woman being so upset that she disappeared from the hotel room and was never heard from again.

211. GirlsDoPorn published this post in its public forum in or around March 2015, where it remained until the forum was taken down in or around January 2020.

### viii. *Several Victims Publicly Posted Survival Stories Describing GirlsDoPorn's Unlawful Acts*

212. Numerous victims have also come forward publicly to detail the force, fraud, and coercion GirlsDoPorn's used throughout the recruiting and filming process. In 2016, one victim published a detailed account of the fraud on Reddit. It reads:

> One day, I answered an ad for "beginmodeling.com" and after that, my life would never the same. From the minute Johnathan contacted me, I was lied to repeatedly, manipulated, and coerced into filming. A fake website, fake references from "past models", the entire premise is a lie.
>
> […]
>
> He'll convince you that no one will ever see it, it's for Australia/foreign markets only, it's only released on DVDs, etc. I knew nothing about the industry before this, how was I to know I was being naive? If you refuse, they tell you you'll have to reimburse them for the flight/hotels. You're all alone, surrounded by people you don't know, and you only have one choice.
>
> Dre will offer to smoke with you, Johnathan will offer you a drink, before you know it, they've got cameras out and they're recording you. They read you lines. "I am not under the influence and I consent to the filming.." They're pulling out contracts. They don't give you time to read them. "Begin Modeling" is written at the top. Why? This isn't modeling at all!

> They give you a little script for your pre-interview. They tell you exactly what to say if you won't say what they want you to. It's all fake. They are extremely smart. And extremely manipulative.
>
> […]
>
> I cry at one point. They switch angles so you can't see my face. I start to bleed. They switch again, and then abandon the sex all together. "Do you know what a facial is?" I didn't.

213.   Another victim detailed her account with GirlsDoPorn online explaining how GirlsDoPorn lured her to San Diego under the guise of modeling only to be forced to film pornography.

214.   Numerous stories like these were included in Google search results for GirlsDoPorn. Aylo's role under its partnership agreement was to perform SEO services for GirlsDoPorn. Accordingly, Plaintiffs are informed and believe Aylo was acutely aware of these posts by GirlsDoPorn's victims.

### ix.   *In 2013, Miss Delaware Teen USA Was Publicly Maligned After Her GirlsDoPorn Video was Leaked; Instead of Removing her Video, Aylo Offered her $250,000 to be a Spokesperson for its Tubesite YouPorn.com*

215.   In or around June 2012, a woman actively competing in beauty pageants such as Miss Teen USA responded to a modeling advertisement and, like its other sex trafficking victims, ended up filming a pornographic video for GirlsDoPorn as a result of force, fraud, and coercion.

216.   In November 2012, that woman won the "Miss Delaware Teen USA" pageant.

217.   In February 2013, GirlsDoPorn publicly released this woman's video on its website and a trailer of the video on its channels on Aylo's Tubesites. Her identity and status as Miss Delaware Teen USA were quickly discovered and spread across the internet.

218.   The Miss Delaware Teen USA Organization learned about the video, and the woman was forced to resign her position as Miss Delaware Teen USA.

219.   Aylo released a public statement on its YouPorn.com Official Blog coyly acknowledging that the woman's video had "found it's (sic) way online" and that the woman had attempted to "den[y] any involvement in the video."  These statements demonstrate Aylo's understanding that the woman had been defrauded by GirlsDoPorn and, like all other victims who had complained to GirlsDoPorn and Aylo at the time, believed whatever photographs and footage taken in San Diego, the video would be distributed outside North America and not be release online.

220.   Aylo also praised GirlsDoPorn and bragged about its connection with the studio that released a pornographic video apparently without the woman's knowledge or consent: "Luckily for us, Girls Do Porn, the studio responsible for the video, just so happens to be a YouPorn partner and have been kind enough to upload a preview of the Miss Teen Delaware sex tape for our viewing pleasure!"

221.   Aylo also acknowledged that the release of the video had caused the woman real harm: "Though [she] has resigned her title of Miss Teen Delaware, YouPorn has stepped in to take the sting out of the situation, offering her a $250,000 deal to become the first ever Miss YouPorn!"

222.   Despite its knowledge of the obvious force, fraud, and coercion, instead of investigating further or taking steps to remove the non-consensual content, Aylo used the buzz created by the teenager's humiliation to further promote the video, its Content Partner GirlsDoPorn, and its own Tubesites—notwithstanding the ruin it would cause the eighteen year old woman.

**x.     *GirlsDoPorn Responded to DMCA Takedown Requests Using a Fake Name and an Entity Based in a Third World Nation Known for Facilitating Money Laundering and Tax Evasion***

223.   As a part of the takedown process provided for by the Digital Millenium Copyright Act, when a victim sent a takedown notice to Aylo, GirlsDoPorn had the

opportunity to respond to the takedown request. GirlsDoPorn's responses should have put Aylo on further notice that GirlsDoPorn was a criminal enterprise. Instead, Aylo ignored the obvious red flags in GirlsDoPorn's response, it did not investigate further, and it did not take down the videos.

224.   GirlsDoPorn responses to takedown requests submitted to Aylo purported to come from from "Jordan Powers," who was identified as the CEO of BubbleGum Films. The signature block for "Jordan Powers" was listed as follows:

> BUBBLEGUMFILMS INC
> c/o GT Group Limited
> 1st Floor Pacific Building
> Port Vila, Vanuatu 65774
> DMCA@MOMPOV.COM

225.   The response undoubtedly raised alarms for Aylo for several reasons.  First, "Jordan Powers" did not exist.  It was a fake name and Aylo could have uncovered this fact through simple due diligence that it chose not to undertake. Second, the response should have caused Aylo serious concern about its business partner because it was sent from a business located in Vanuatu. Vanuatu is a tiny third world nation, widely known for serving as a haven for money laundering, tax evasion, and other criminal activity. Third, if the mere affiliation with Vanuatu was not enough to have caused Aylo to investigate further, GirlsDoPorn identified the GT Group Limited as its point of contact in Vanuatu. In 2011, there were widespread media reports about how the GT Group Limited was helping launder money for criminal enterprises, such as drug cartels and gunrunners.[32]

226.   Furthermore, on information and belief, neither "Bubblegum Films, Inc." nor any other dubious Vanuatu entities GirlsDoPorn named in the responses was a party to GirlsDoPorn's contracts with Aylo for the Content Partner Program and Viewshare

---

[32] *See* Gerard Ryle, *Inside the shell: Drugs, arms and tax scams,* INTERNATIONAL CONSORTIUM OF INVESTIGATIVE JOURNALISTS (Feb. 7, 2013), *available at* https://www.icij.org/ investigations/offshore/geoffrey-taylor/.

Program.  Rather, the parties and signatories to these agreements were Pratt and/or his San Diego, California-based GirlsDoPorn entity, BLL Media, Inc.  GirlsDoPorn also listed Bubblegum Films, Inc. and the Vanuatu address as its 2257 location. Consequently, Aylo was aware that GirlsDoPorn maintained a fake international front for its operation out of the island of Vanuatu—a nation where the mere possession of pornography is illegal.

> ### xi.    Twenty-Two Victims Publicly Filed a Lawsuit Detailing GirlsDoPorn's Unlawful Practices, Which Received Extensive Media Coverage, Putting Aylo on Further Notice

227.   In June 2016, four victims filed an action in the Superior Court of California, County of San Diego against GirlsDoPorn for, among other things, intentional misrepresentation, concealment, and misappropriation of likeness.  On September 19, 2017, the plaintiffs in the State Court Action subpoenaed Aylo seeking documents related to takedown requests for PornHub.com, YouPorn.com, and Redtube.com.  Aylo was aware of the lawsuit and the allegations of such.  By November 2017, an additional eighteen victims joined the State Court Action, for a total of twenty-two plaintiffs.[33]   The lawsuit garnered significant press, some of which targeted Aylo's role in publishing the victims' videos.[34]  Each of the plaintiffs in the State Court Action filed numerous public declarations detailing the force, fraud, and coercion they underwent.

228.   As early as 2017, the San Diego Superior Court found that plaintiffs were more likely than not going to prevail at trial.  By January 2019, the publicly filed evidence was so overwhelming the San Diego Superior Court found clear and convincing evidence that there was a "substantial probability" that plaintiffs would prevail on their

---

[33] The complaints from the State Court Action (San Diego Superior Court Case Nos. 37-2016-00019027-CU-FR-CTL, 37-2017-00033321-CU-FR-CTL and 37-2017-00043712-CU-FR-CTL) are hereby incorporated by reference as though set forth fully herein.

[34] See, Samantha Cole, *Pornhub Is Still Working With Company Sued for Manipulating Women Into Porn* (August 12, 2019) *available at* https://www.vice.com/en/article/8xw9dx/pornhub-still-hosting-girls-do-porn

FIRST AMENDED COMPLAINT

fraud claims.  Based on the findings, the San Diego Superior Court issued an order allowing plaintiffs to do pretrial financial discovery for punitive damages under Civil Code section 3295—the highest standard of proof for any civil motion.

229.   On August 19, 2019, the State Court Action proceeded to a bench trial before Honorable Kevin A. Enright, which concluded on November 26, 2019.  On January 2, 2020, Honorable Kevin A. Enright issued a nearly two-hundred-page statement of decision detailing the "fraud, intimidation and coercion" GirlsDoPorn used to get its victims to film adult videos.  The decision collectively awarded the twenty-two plaintiffs almost $13 million in compensatory and punitive damages, voided all contracts as part and parcel of the fraudulent and coercive scheme, and enjoined GirlsDoPorn from using their fraudulent and coercive practices in any future business dealings.  Later, nearly $8 million in attorney fees and costs were added to the judgment.

230.   Plaintiffs are informed and believe and thereon allege that, as early as 2016, Aylo's managing agents and directors knew of the State Court Action, the allegations made therein, and the evidence submitted by the victims.  Plaintiffs are informed and believe and thereon allege Aylo's managing agents and directors discussed the State Court Action in meetings and emails and, despite the evidence, chose to continue assisting, supporting, or facilitating the sex trafficking venture due to the immense profits it was generating for Aylo.

### xii.   Aylo's Own DMCA Attorney Provided Expert Testimony in the State Court Action

231.   In March 2019, GirlsDoPorn designated Aylo's very own DMCA attorney, Lawrence Walters, as an expert on affiliate marketing issues.  The plaintiffs deposed Mr. Walters.  He was scheduled to testify in person but did not appear after the criminal charges were filed.  His deposition transcript and video were admitted instead.

232.   Despite its knowledge of the ongoing State Court Action, Aylo continued to publish and profit from the GirlsDoPorn victim's videos, completely ignoring the dozens of public declarations and hard evidence of GirlsDoPorn's force, fraud, and coercion

233.    Plaintiffs are informed and believe and thereon allege Mr. Walters discussed the State Court Action with Aylo's managing agents and directors.

234.    In July 2019, under pressure from the media and the plaintiffs' attorneys, Aylo agreed, grudgingly, to remove videos of the twenty-two plaintiffs in the State Court Action. Aylo, did not, however, remove the hundreds of other GirlsDoPorn videos from its sites, including one of the Plaintiffs, even though the videos were clearly the product of the same pattern and practice by Aylo's business partner, GirlsDoPorn.

### xiii.    *Aylo Attempted to Purchase GirlsDoPorn During the State Court Action*

235.    Upon information and belief, around 2018, while the State Court Action was pending, Aylo entered into a Letter of Intent with GirlsDoPorn to purchase GirlsDoPorn's video library and brand and that, during the diligence process, learned further details of the force, fraud, and coercion that GirlsDoPorn used to get its victims to participate in the videos.

### H.    IF AYLO'S MANAGING AGENTS DID NOT HAVE ACTUAL KNOWLEDGE GIRLSDOPORN WAS A SEX TRAFFICKING VENTURE, IT WAS DUE TO THEIR DELIBERATE IGNORANCE OR RECKLESS DISREGARD

236.    Even if Aylo's managing agents did not have actual knowledge of GirlsDoPorn's force, fraud, and coercion, the managing agents' lack of actual knowledge was a result of their own deliberate ignorance and/or reckless disregard.[35]

237.    Aylo's policy makers were aware of the rampant use of its websites by sex traffickers, rapists, hackers, and revenge pornographers. Aylo's policymakers, however,

---

[35] "A statutory requirement that a criminal defendant acted "knowingly" is not limited to positive knowledge, but includes the state of mind of one who does not possess positive knowledge only because he or she consciously avoided it." *United States v. Nosal*, 844 F.3d 1024, 1039-40 (9th Cir. 2016). "Reckless disregard of whether something occurred, or a conscious effort to avoid learning the truth, can be construed as acting 'knowingly.'" *United States v. Evans*, 559 F.2d 244, 246 (5th Cir. 1977), *cert. denied*, 434 U.S. 1015 (1978).

deliberately created internal policies to keep them ignorant of specific instances of such, including refusing to hire enough moderators to review the content uploaded to its site, providing no channels for lower-level employees to report the presence or amount of illegal content on Aylo's sites to its policymaking, and dissuading or berating employees that took it upon themselves to report the presence of such.

238.   Plaintiffs have been informed and believe that, from 2009 until October 2019, Aylo had no policies in place to review or moderate the content uploaded to its websites.  Plaintiffs have been informed and believe that Aylo had a strict policy of never reviewing or removing videos uploaded by its Content Partners.  Plaintiffs have been further informed and believe that, in the chance that Aylo did consider removing a video, the decision was based primarily on the videos' popularity rather than the evidence of the victim's lack of consent.

239.   In December 2020, Aylo was excoriated in the New York Times for the amount of videos on its sites featuring rape victims, minors and sex trafficking victims, and its failures to remove them after victims alerted Aylo to the videos.  As a result, Mastercard and Visa dropped Aylo as a merchant and opened investigations into Aylo's policies (or lack thereof) relating to non-consensual pornography on its sites.  The inability to process credit card transactions on it sites was devastating to Aylo.  In response, Aylo removed almost 80% of its videos and claimed to enact policies hoping to woo Mastercard and Visa back to its platform.

240.   Internal communications that have been released since Aylo claimed to have cleaned up its act show the new policies were nothing more than window dressing.

241.   Communications from Aylo's lower level employees and its policymakers themselves depict the reckless indifference the policymakers have towards the amount of videos of sex trafficking and rape victims on Aylo's websites and their efforts to remain deliberately ignorant of such.

242.   A content moderator was instructed to stop cc'ing Aylo's Director of Product Management on emails containing Aylo's CSAM (child sex abuse materials)

reports because he did not want to know how much child pornpgraphy (cp) was on Aylo's websites.



243.   Aylo's lower level employees also discussed how, even after the fallout from the New York Times article, its management still did not want the rules it had implemented to be enforced.



244.   Aylo's internal emails also reveal that, as of May 2020, it had 700,000 flagged videos and only a single employee to review them.  The emails also reveal Aylo had a policy to only review a video after it had been flagged 15 times.



245.   Employees whose job it was to implement the new policies aimed to preventing non-consensual pornography on its sites approached Aylo's Chief Product Officer and Chief Legal Officer to advise them that the new policies were ineffective and contained loopholes that rapists and sex traffickers could easily exploit.  When an employee approached them about the ineffectiveness of the policies and closing these

loopholes, Aylo's Chief Product Officer response was to "F*ck off. It's all good. Stop. Like, shut up."

246.   The employee and his superior then recorded a meeting with Aylo's Chief Product Officer and Chief Legal Officer so they would have proof that they tried to warn them in case "sh*t hits the fan."  Even after the supposed policy changes in the wake of the New York Times article, Aylo was still airing videos not knowing whether it has the consent of the people in the video. The employee further expressed concerns that, "as a business, we're monetizing content that we don't know where this comes from, we don't know who is on that video, we don't know the age of the person on that video… So, we weren't very compliant."

247.   This is Aylo's policymakers attitude *after* Aylo claimed to have made the policy changes in December 2020. Before December 2020, Aylo did not even have any policies in place to address these issues.  Put simply, it did not even have the window dressing.  Aylo's managing agent's policy was simply to remain deliberately ignorant.

248.   Aylo's backlog of more than 700,00 flagged videos and the fact that only a single Aylo employee was reviewing the flagged videos demonstrates that Aylo's public statements about removing non-consensual material were disingenuous, false, and misleading. In July, 2019, Vice published an article entitled, "*How PornHub Enables Doxing and Harassment*."[36] The article said, "Pornhub is hosting videos that have been viewed hundreds of millions of times. The women in them say they thought the videos would never reach the internet, and that being doxed has ruined their lives." Aylo responded to the allegations by touting its policies and practices allowing for the flagging and removal of non-consensual material. Corey Price, VP at PornHub, said "We here at Pornhub have always been proactive about providing individuals and performers with the resources to flag non-consensual material so that it may be taken down expeditiously."

---

[36] See, Samantha Cole, Emanual Mailberg, "*How Pornhub Enables Doxing and Harassment*," July 16, 2019, https://www.vice.com/en/article/mb8zjn/pornhub-doxing-and-harassment-girls-do-porn-lawsuit

249.   Given the backlog of videos, lack of Aylo personnel reviewing flagged content, and Aylo's requirement that a video must be flagged fifteen times before it was reviewed, PornHub's statement was false and misleading. Aylo falsely assured the public and sex trafficking victims that it was taking steps to remove unlawful content from its site, when in fact it did not have the policies, employees, or desire to do that. Flagged, non-consensual material was featured on PornHub, and not reviewed by Aylo, while Aylo told the public and sex trafficking victims that it was "expeditiously" reviewing and taking down non-consensual material.

I.   **DESPITE ITS KNOWLEDGE, AYLO PARTICIPATED IN THE SEX TRAFFICKING VENTURE UNTIL THE DEPARTMENT OF JUSTICE INDICTED GIRLSDOPORN**

250.   Despite its knowledge of GirlsDoPorn's use of force, fraud, and coercion, Aylo participated in GirlsDoPorn's sex trafficking venture from 2011 until October 2019, when GirlsDoPorn's principals were arrested for sex trafficking. By maintaining its decade-long business relationship with GirlsDoPorn and refusing to investigate victims' reports of fraud and coerion, Aylo encouraged, aided, and financially benefited from GirlsDoPorn's sex trafficking of more and more women.

251.   Aylo technically ended its partnership with GirlsDoPorn after the indictments, but this was not by choice—there was simply no company left to partner with. Aylo still found ways to exploit GirlsDoPorn's popular sex trafficking videos after the indictments.

252.   Upon information and belief, when the criminal indictment was filed and members of GirlsDoPorn were arrested, the media coverage that followed caused a spike in the public's interest in GirlsDoPorn's videos. Accordingly, Aylo enjoyed the financial benefit of increased traffic to its Tubesites as more people learned about GirlsDoPorn through the media reports and sought out its content.

253.   Similarly, when Hon. Kevin Enright issued his preliminary statement of decision on January 2, 2020 finding GirlsDoPorn liable for nearly $13 million in damages for various forms of fraud, misappropriation of likeness, deceptive business practices,

another spike in media coverage and public interest occurred.  Upon information and belief, because Aylo's Tubesites still hosted many GirlsDoPorn videos at this time, Aylo enjoyed the financial benefit of increased traffic to its Tubesites from those searching for GirlsDoPorn videos in early 2020.

254.   As of December 12, 2020—more than 14 months after the criminal indictments—Aylo still hosted GirlsDoPorn's videos on its websites.  The URLs for the victims' videos contained affiliate tails[37] and were surrounded by hyperlink advertisements that, if clicked, redirected the visitors to various paysites.  Most of the hyperlink advertisements on these victim's videos redirected the visitor to Aylo's paysite, www.Brazzers.com.  Others redirected the visitor to third party paysites, such as JerkMate.com. Accordingly, Aylo continued to benefit from GirlsDoPorn's sex trafficking venture throughout 2020.  Aylo finally removed those videos after 40 GirlsDoPorn victims sued Aylo in December 2020.

**J.**    **AYLO CONTINUES TO EXPLOIT GIRLSDOPORN'S VICTIMS BY USING PLAINTIFFS' NAMES AND LIKENESS TO ADVERTISE FOR ITS TUBESITES**

255.   Even now, after everything Aylo knows about GirlsDoPorn and the harm GirlsDoPorn and Aylo have caused their victims, Aylo continues to exploit the victims in at least two ways.

256.   First, numerous foreign websites exist containing GirlsDoPorn videos.  The sites have website addresses that make it clear that the sites contain GirlsDoPorn videos, for example, www.GirlsDoPornVideos.com. Disturbingly, Aylo published advertisements on these websites, including video ads which appear before the victims' videos play on these websites and banner ads next to the videos.

257.   Second, Aylo continues to exploit their victims by using victims' names metadata of its site so that when a Google search is done for a victim's name, the results include a link to PornHub.  For example, if a victim's name was Jane Doe, the results for

---

[37] The affiliate tails signify that Aylo was a generating affiliate fees from the videos.

a Google search for "Jane Doe" would include an response for "Jane Doe Porn Videos" like the one below that if clicked would lead to PornHub.com:



**K.      AYLO ADMITTED TO KNOWINGLY LAUNDERING SEX TRAFFICKING PROCEEDS FOR GIRLSDOPORN**

258.   On December 21, 2023, Aylo Holdings, S.a.r.l. and its subsidiaries Aylo USA Inc. and Aylo Freesites Ltd. entered into a Deferred Prosecution Agreement ("DPA") with the United States Attorney's Office for the Eastern District of New York following a .

259.   As a part of the DPA, Aylo made admissions contained in a twelve-page Statement of Facts, which was appended to Aylos' agreement with the United States Attorney's Office. Aylo admitted that the facts contained in the Statement of Facts were "true and accurate" and that Aylo was "responsible under United States law for the acts of its officers, directors, employees and agents with respect to the conduct described in the . . .  Statement of Facts."

260.   In a section of the Statement of Facts entitled, "The Unlawful Monetary Transactions," Aylo made many incriminating admissions about its knowledge of GirlsDoPorn's sex trafficking during their partnership, including the following:

> In or about and between September 15, 2017 and October 2019, MindGeek operated and hosted GDP and GDT content on its Free Sites, including on Pornhub, and knowingly received payments of approximately $106,370.05 through United States financial institutions, from the GDP Operators.  Those proceeds were criminally derived from the GDP Operators' sex trafficking.  All the above-mentioned monetary transactions occurred in the United States, including in the Eastern District of New York.  Moreover, between September 2017 and December

2020, MindGeek received payments from advertisers attributable to GDP and GDT content totaling approximately $763,890.72.

261.   Aylo's board—Anis Baba, Andreas Alkiviades Andreou, and Claude Favre—reviewed and approved the DPA and all schedules attached thereto, including the Statement of Facts admitted by Aylo.

262.   Plaintiffs incorporate by reference the Statement of Facts, attached to the First Amended Complaint as Exhibit 1, as though fully set forth herein.

## VI.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Sex Trafficking (18 U.S.C. §§ 1591, 1594, and 1595)

### (All Plaintiffs Against All Defendants)

263.   Plaintiffs incorporate by reference all paragraphs above as though fully set forth herein.

264.   GirlsDoPorn was a "sex trafficking venture" within the meaning of Section 1591.  Wolfe, Garcia, Moser, and Gyi have pled guilty to various sex trafficking crimes, including violating 18 U.S.C. §§ 1591 and 1594.  They each admitted under oath in their respective plea agreements to using a combination of force, threats of force, fraud, and coercion, including threatened abuse of law or the legal process,  to cause Plaintiffs to engage in commercial sex acts.

265.   Plaintiffs are all victims of GirlsDoPorn's sex trafficking venture within the of meaning of 18 U.S.C. § 1591.

266.   Plaintiffs' videos were all sold and monetized on Defendants' Tubesites and Paysites within the last ten years.

267.   As early as July 2009, and definitely by June 2016, Aylo's managing agents knew, were deliberately ignorant, or acted in reckless disregard of the fact that, GirlsDoPorn used a combination of force, fraud, and coercion to get its victims to engage in commercial sex acts on film.

268.   Despite this knowledge, Aylo participated in GirlsDoPorn's sex trafficking venture by, *inter alia*:

a.    Partnering with GirlsDoPorn through its Content Partner Program and Viewshare Program;

b.    Uploading GirlsDoPorn's sex trafficking videos to websites across its vast pornography empire including, Aylo's Tubesites and Paysites;

c.    Hyperlinking, advertising, promoting, marketing, selling, and exploiting videos featuring victims of GirlsDoPorn's sex trafficking venture, including Plaintiffs;

d.    Permitting users to download GirlsDoPorn's sex trafficking videos;

e.    Providing dedicated account representatives to work with GirlsDoPorn whose job was to maximize exposure and revenues from the videos featuring Plaintiffs;

f.    Assisting GirlsDoPorn in monetizing sex trafficking videos by acting as an affiliate for GirlsDoPorn.com and other paysites;

g.    Providing search engine optimization services to GirlsDoPorn;

h.    Actively suggesting GirlsDoPorn content to users of Aylo's Tubesites;

i.    Creating, drafting, developing, and designing trailers, titles, descriptions, tags, advertisements, logos, images, and other content for GirlsDoPorn's videos and Channel(s);

j.    Refusing to remove GirlsDoPorn's sex trafficking videos from its Tubesites or Paysites;

k.    Refusing to fingerprint GirlsDoPorn videos, including Plaintiffs' videos, after removing the videos, thereby allowing the videos to be re-uploaded;

l.    Removing user comments containing references to fraud, force, or coercion being used in filming the videos;

m.    Facilitating financial transactions and distributing funds to GirlsDoPorn for the illegal videos; and

n.      Failing to report GirlsDoPorn's sex trafficking venture to law enforcement authorities; and

o.      Using the victims' videos to advertise its other pornography brands.

p.      Reposting and republishing GirlsDoPorn's sex trafficking videos;

q.      Continuing to use Plaintiffs' videos, name, images, and/or identity through 2023, without authorization or consent, for its own financial gain and profit; and

r.      Failing to report the GirlsDoPorn sex trafficking venture to law enforcement.

269.    Aylo knowingly benefitted from GirlsDoPorn's sex trafficking venture in general and from the sex trafficking of Plaintiffs in particular by, *inter alia*:

a.      Earning millions of dollars in affiliate fees through the Content Partner program by sending user traffic from Aylo's Tubesites to GirlsDoPorn's paysites;

b.      Earning millions of dollars by selling "premium" subscriptions through the ViewShare Program using videos featuring GirlsDoPorn's victims, including Plaintiffs;

c.      Enjoying the increased traffic to its Tubesites created by the presence of GirlsDoPorn content, including Plaintiffs' videos, on its Tubesites, which provided Aylo increased advertisement revenue and increased sales of Aylo's own products; and

d.      Hosting GirlsDoPorn's victims' videos in the general library of its freesites, which resulted in increased web traffic to Aylo's Tubesites which, in turn, generated affiliate fees and subscriptions from third party paysites and Aylo's own paysites, such as Brazzers.com and RealityKings.com.

Defendants and GirlsDoPorn had a continuous business relationship from at least 2011 until October 2019 that included bimonthly payments from Aylo to GirlsDoPorn for its cut from the sale of the illegal videos on Aylo's Paysites, which were processed by defendant Aylo Billing US Corp (d/b/a "Probiller").

///

///

270. A tacit agreement existed between Aylo and GirlsDoPorn to produce, market, sell, and otherwise benefit from videos featuring sex trafficking victims, which garnered billions of views on Aylo's Tubesites and Paysites.

271. As a result of the foregoing actions, Aylo violated 18 U.S.C. §§1591(a)(1) and (2) by knowingly participating in and benefitting from a sex trafficking venture; Aylo aided and abetted GirlsDoPorn's violations of 18 U.S.C. § 1591(a)(1) and (2); and Aylo violated 18 U.S.C. § 1594(c) by conspiring with GirlsDoPorn to violate 18 U.S.C. §§ 1591(a)(1) and (2).

272. As a proximate result of Aylo's actions described herein, Plaintiffs have suffered damages, including, but not limited to, severe emotional distress, significant trauma, attempted suicide, and social and familial ostracization. Further, Aylo has received ill-gotten gains by selling, marketing, and exploiting videos featuring Plaintiffs' likenesses.

273. Aylo officers, directors, and managing agents had knowledge, were deliberately ignorant, or acted in reckless disregard of the fact that Aylo was a sex trafficking venture, and approved, consented to, and ratified Aylo's participation in the sex trafficking venture despite such knowledge.

274. Aylo's actions were intentional, malicious, fraudulent, oppressive, outrageous, despicable, and taken in reckless disregard of the Plaintiffs' rights. Plaintiffs are entitled to punitive damages to punish Aylo for its actions and to deter others from acting similarly in the future.

## SECOND CAUSE OF ACTION
### Racketeering (18 U.S.C. § 1962(c))
### (All Plaintiffs Against All Defendants)

275. Plaintiffs incorporate by reference all paragraphs above as though fully set forth herein.

///

---

64

FIRST AMENDED COMPLAINT

**A.    THE AYLO-GDP ENTERPRISE**

276.    Beginning at least as early as 2011 through the present, Defendants participated, directly and indirectly, in the conduct of the affairs of the "Aylo-GDP Enterprise" through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

277.    The "Aylo-GDP Enterprise" (or "Enterprise") was an "enterprise" within the meaning of 18 U.S.C. § 1961(3). The members of the Aylo-GDP Enterprise were Aylo Freesites, Ltd., Aylo S.a.r.l., Aylo USA Incorporated, Aylo Billing US Corp., the Aylo Control Group, Michael Pratt, Matthew Wolfe, Andre Garcia, and the following entities which Pratt, Wolfe, and Garcia used to operate the GirlsDoPorn sex trafficking venture: Bubblegum Films, Inc., EG Publications, Inc., M1M Media, Inc., BLL Media, Inc., BLL Media Holdings, LLC, Domi Publications, LLC, Oh Well Media, Limited, Merro Media, Inc., and Merro Media Holdings, LLC.

278.    The members of the Aylo-GDP Enterprise associated for the common purpose of creating pornographic videos of high-school and college students, obtained using force, fraud, and coercion, and then monetizing the videos by publishing them on commercial websites controlled and operated by Defendants and GirlsDoPorn to enrich the members of the Enterprise. Members of the Aylo-GDP Enterprise engaged in activities with the shared and common purpose of profiting from the creation, advertisement, and sale of GirlsDoPorn videos, developing and promoting GirlsDoPorn videos, enhancing the visibility and popularity of the GirlsDoPorn brand, increasing the sale of GirlsDoPorn videos on Pornhub Premium, and increasing traffic and subscriptions on GirlsDoPorn's paysites.

279.    The GirlsDoPorn–Aylo Enterprise engaged in activities which affected interstate and foreign commerce. Members of the GirlsDoPorn–Aylo Enterprise recruited Plaintiffs to travel from throughout the United States and Canada to San Diego, California, to film adult videos, the videos were published on websites that were viewed throughout the world, and members of the GirlsDoPorn–Aylo Enterprise engaged in thousands of interstate and foreign financial transactions in support of the Enterprise.

280.   All the members of the Aylo-GDP Enterprise are "persons" as defined in 18 U.S.C. § 1961(3).

**B.   DEFENDANTS PARTICIPATED IN THE AYLO-GDP ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY**

281.   Defendants conducted and participated, directly and indirectly, in the conduct of the Aylo-GDP Enterprise affairs through a pattern of racketeering activity, specifically: Sex Trafficking by Force, Fraud, and Coercion, in violation of 18 U.S.C. § 1591; Conspiracy to Commit Sex Trafficking by Force, Fraud, and Coercion, in violation of 18 U.S.C. § 1594(b); Laundering of Monetary Instruments, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i); Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h); and Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957

282.   Defendants participated in, directly and indirectly, the Aylo-GDP Enterprise's affairs in numerous ways designed to promote the Enterprise's goal of producing, publishing, and monetizing GirlsDoPorn illicit videos, obtained using force, fraud, and coercion, on commercial websites controlled and operated by Defendants and GirlsDoPorn.

283.   Defendants dedicated account representatives to help GirlsDoPorn create, name, and design dedicated channels for GirlsDoPorn's videos on Aylo's Tubesites.

284.   Defendants assisted GirlsDoPorn in developing content and creating trailer versions of victims' videos, including those featuring Plaintiffs, to post on its dedicated channel.

285.   Defendants dedicated Aylo representatives to title, edit, and tag these videos, including those of the Plaintiffs.

286.   Defendants designed and created hyperlinks and other advertisements to encourage users to view GirlsDoPorn's channels on Aylo's Tubesites and to entice users to navigate either to Aylo's premium pages or to GirlsDoPorn's paysites to purchase
///

subscriptions and watch full-length videos—which enriched Defendants through affiliate fees and premium payments.

287.   Defendants created search engine optimization campaigns to promote and maximize the exposure of GirlsDoPorn's sex trafficking videos, including of the Plaintiffs.

288.   Defendants created tags and search terms for GirlsDoPorn to make their videos easier to find on its own websites and on other search engines.

289.   Defendants actively suggested GirlsDoPorn's videos and channels to users of its Tubesites.

290.   Defendants hosted around 70 videos, including many of Plaintiffs', on the GirlsDoPorn channel on Pornhub.com alone; as of fall 2019, those 70 videos had more than 700,000 subscribers and were collectively viewed almost 700,000,000 times.

291.   Defendants featured anywhere from 100 to 200 videos featuring Plaintiffs and other sex trafficking victims on its tubesites, including YouPorn.com and RedTube.com, which also collectively had hundreds of millions of views.

292.   Defendants engaged in monetary transactions in property constituting proceeds from the creation, advertisement, and sale of GirlsDoPorn content to promote the Enterprise and its common purpose.

293.   Defendants contracted and partnered with GirlsDoPorn to split revenues that Defendants generated by advertising, marketing, selling, and exploiting videos it solicited from GirlsDoPorn featuring victims of the GirlsDoPorn sex trafficking venture.

294.   Pursuant to its partnership with GirlsDoPorn as part of its ViewShare Program (discussed *supra*), defendant Aylo Freesites, Ltd. processed revenue for and made monthly payments to the forum-based sex traffickers representing GirlsDoPorn's share of revenues Aylo Freesites Ltd. received by advertising, marketing, selling, and exploiting the victims' sex trafficking videos on Aylo Freesites, Ltd.'s websites.

295.   On information and belief, Aylo Billing US Corp. processed payments for Plaintiffs' videos published on Aylo's ViewShare Program and received affiliate fees

processed by GirlsDoPorn's credit card processors for subscriptions purchased on GirlsDoPorn.com after Aylo redirected users from one of its Tubesites to GirlsDoPorn.com.

296.   Through the ViewShare Program, Aylo processed millions of dollars in revenue, kept a portion of those revenues, and then transferred a significant portion of it to GirlsDoPorn.

297.   The members of GirlsDoPorn–Aylo Enterprise were economically dependent on each other and acted in concert to increase their profits in a way that they could not accomplish independently.

a.   On information and belief, Defendants generated millions of dollars in affiliate fees and premium subscriptions from selling, marketing, and exploiting videos featuring victims of GirlsDoPorn's sex trafficking venture, including Plaintiffs.

b.   With nearly one billion views of GirlsDoPorn's videos on Aylo's Tubesites, GirlsDoPorn's videos generated an enormous amount of traffic for Aylo's Tubesites, increasing Aylo's ability to sell advertisements to third parties and increasing its ability to advertise and sell its own products on its Tubesites.

c.   GirlsDoPorn's practice of doxing its victims also increased traffic to Aylo's Tubesites as the victims' friends, family, colleagues, classmates, and acquaintances scrambled to view GirlsDoPorn's videos of women they knew and shared the videos with others.

d.   Defendants used GirlsDoPorn's victims' real names in its search engine optimization so that links to Defendants' websites would appear in search results for the victims' names.  After GirlsDoPorn was indicted for sex trafficking, Defendants removed the videos from its Tubesites.  Despite removing the videos from its tubesites, Defendants continue to profit from the victims by using the victims' names (which are highly searched) to drive traffic to Defendant's websites.

298.   Defendants' illegal motives existed beyond that which were merely necessary to commit predicate acts and, among other things, Defendants oversaw,

operated, managed, and coordinated the commission of numerous predicate acts on an on-going basis in furtherance of the Enterprise, in violation of U.S.C. 1962(c), which resulted in direct harm to Plaintiffs.

299.   Defendants attempted to conceal the true nature and extent of Defendants' pattern of racketeering activities. Defendants willfully and fraudulently concealed the pattern of racketeering activities by, among other things:

a.   Falsely representing that a human content moderator reviews every video and either approves or denies the video based on content moderation policies that prohibit videos of persons performing commercial sex activities under the threat of force, fraud, or coercion.

b.   Falsely representing that Plaintiffs' and third-parties' DCMA requests were properly investigated and that Defendants and its representatives would perform due diligence to verify the identity of the alleged copyright holder for each video request.

c.   Maintaining the full-length GirlsDoPorn videos behind its GirlsDoPorn Pornhub Premium pay wall, even after taking the videos down from their general library after receiving information that the videos were not obtained consensually.

## C.   DAMAGES

300.   As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages in an amount to be proven at trial. Plaintiffs have suffered damages in their business and property, within the meaning of Section 1964(c), including, but not limited to, damages for misuse and misappropriation of their likenesses, damages for out-of-pocket expenses incurred attempting to have the videos removed from the internet, and damages related to Plaintiffs' abilities to find and maintain employment.

301.   Plaintiffs are entitled to recover from Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of 18

U.S.C. § 1962(c), and disgorgement of Defendants' illicit proceeds. Plaintiffs are also entitled to an injunction against future misuse of their image.

302.   Aylo's actions were intentional, malicious, fraudulent, oppressive, outrageous, despicable, and taken in reckless disregard of the Plaintiffs' rights.  Plaintiffs are entitled to punitive damages to punish Aylo for its actions and to deter others from acting similarly in the future.

**THIRD CAUSE OF ACTION**

**Conspiracy to Commit Racketeering (18 U.S.C. § 1962(d))**

**(All Plaintiffs Against All Defendants)**

303.   Plaintiffs incorporate by reference all paragraphs above as though fully set forth herein.

304.   Beginning at least as early as 2011 through the present, Defendants conspired to violate 18 U.S.C. § 1962(c) by agreeing to participate in a pattern of racketeering activities of the Aylo-GDP Enterprise, in violation of 18 U.S.C. § 1962(d).

305.   As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered damages in an amount to be proven at trial. Plaintiffs have suffered damages in their business and property, within the meaning of U.S.C. 1964(c), including, but not limited to, damages for misuse and misappropriation of their images, damages for out-of-pocket expenses incurred attempting to have the videos removed from the internet, and damages related to Plaintiffs' ability to find and maintain employment.

306.   Plaintiffs are entitled to recover from Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of 18 U.S.C. § 1962(d), and disgorgement of Defendants' illicit proceeds. Plaintiffs are also entitled to an injunction against future misuse of their image.

///

///

70

FIRST AMENDED COMPLAINT

307.   Aylo's actions were intentional, malicious, fraudulent, oppressive, outrageous, despicable, and taken in reckless disregard of the Plaintiffs' rights.  Plaintiffs are entitled to punitive damages to punish Aylo for its actions and to deter others from acting similarly in the future.

## FOURTH CAUSE OF ACTION

## Human Trafficking (Cal. Civ. Code § 52.5)

## (All Plaintiffs Against All Defendants)

308.   Plaintiffs incorporate by reference all paragraphs above as though fully set forth herein.

309.   GirlsDoPorn and Defendants deprived Plaintiffs of their personal liberty within the meaning of California Penal Code § 236.1(h)(3) by using force, fear, fraud, deceit, coercion, violence, duress, menace, and threats of unlawful injuries to get Plaintiffs to travel to San Diego, remain in San Diego, and film pornographic videos under false pretenses and through fear.

310.   Defendants aided and abetted and conspired with GirlsDoPorn's direct violation of Penal Code California Penal Code § 236.1.  A tacit agreement existed between GirlsDoPorn and Defendants to continue their joint sex trafficking enterprise whereby Defendants would assist GirlsDoPorn by monetizing and otherwise exploiting the sex trafficking videos filmed by GirlsDoPorn.  Defendants engaged in overt acts as part of that conspiracy, including, but not limited to, advertising the videos for sale, processing payments for the sale of the videos, transferring money to GirlsDoPorn, publishing the videos on its websites, and refusing to remove videos when the victims flagged the videos, complained, or sent takedown requests.

311.   Further, Defendants' refusal to remove, take down, or otherwise de-publish Plaintiffs' sex trafficking videos is a deprivation of Plaintiffs' personal liberty as defined by Penal Code 236.1.

312.   As a proximate result of Defendants' violation of Penal Code § 236.1, Plaintiff has suffered serious harm and damages. Further, Defendants have received ill-

gotten gains from the unlawful advertisement and exploitation of Plaintiffs' videos, name, images, likeness, and/or identity for its own business purposes and profit.

313.   Defendants' actions were intentional, willful, malicious, fraudulent, oppressive, outrageous, despicable, and taken in reckless disregard of Plaintiffs' rights. Plaintiffs are entitled to punitive damages to punish Aylo for its actions and to deter others from acting similarly in the future.

**VII.**

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally:

a.   Awarding Plaintiffs compensatory damages in an amount that exceeds five million dollars for each plaintiff;

b.   Awarding Plaintiffs restitution for all monies Aylo earned marketing, selling and exploiting Plaintiffs' videos in an amount that exceeds one hundred thousand dollars for each plaintiff;

c.   Awarding Plaintiffs punitive damages in an amount that exceeds five million dollars per plaintiff;

d.   Awarding Plaintiffs their attorney fees;

e.   Awarding Plaintiffs their costs and expenses;

f.   Awarding Plaintiffs pre-judgment and post-judgment interest;

g.   Permanently enjoining the Defendants from hosting Plaintiffs' videos and/or profiting therefrom and from using Plaintiffs' names and likenesses for advertising;

h.   Declaring the Defendants as alter egos; and

i.   Granting such other and further relief as this Court deems just and equitable.

///
///
///
///

# VIII.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial for all triable issues of fact.


RESPECTFULLY SUBMITTED:                    HOLM LAW GROUP, PC


Dated: March 5, 2024              By:    *s/ Brian M. Holm*_____
                                         Brian M. Holm
                                         Joseph S. Green
                                         Nathan G. Batterman

EXHIBIT 1

ATTACHMENT C
**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the
Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office
for the Eastern District of New York (the "United States") and the defendant Aylo Holdings
S.À.R.L., formerly known as "MindGeek S.à.r.l. (together with its wholly-owned subsidiaries and
affiliated entities, "MindGeek" or the "Company").   Certain of the facts herein are based on
information obtained by the United States from third parties, through its investigation, and
described to MindGeek.  MindGeek admits, accepts and acknowledges that it is responsible for the
acts of its officers, directors, employees and agents as set forth below.  Should the United States
pursue the prosecution that is deferred by this Agreement, MindGeek agrees that it will neither
contest the admissibility of, nor contradict, the facts in this Statement of Facts in any such
proceeding.  The following facts took place in or about and between January 2009 and December
2020, unless otherwise noted, and establish beyond a reasonable doubt the charges set forth in the
Information attached to the Agreement.

**The Defendant MindGeek and Affiliated Entities**

1.      From in or about and between January 2009 and December 2020, MindGeek
was a global, privately held group of entities (including MindGeek USA, Inc., MG Freesites Ltd.,
and MindGeek S.à.r.l.), the business of which included the maintenance and operation of websites
that enabled third parties to post and distribute adult videos.  MindGeek owned and operated
numerous pornographic websites and brands including Pornhub.com ("Pornhub").  MindGeek's
websites were accessible within the United States through an internet connection, including in the
Eastern District of New York.

2.       MindGeek S.à.r.l. was the ultimate corporate parent company for MindGeek USA, Inc. and MG Freesites Ltd.  MindGeek S.à.r.l. was a foreign entity organized and existing under the laws of Luxembourg.  Although its corporate headquarters was in Luxembourg, MindGeek also had offices with employees in Montreal, Canada, and, among other places, Los Angeles, California.

3.       MindGeek offered to the public both free and paid adult websites. MindGeek allowed users to access content for free on certain of its websites, including on Pornhub, YouPorn.com, RedTube.com, Tube8.com and Thumbzilla.com (collectively the "Free Sites"). Pornhub was MindGeek's flagship video-sharing platform and its leading free, ad-supported, adult content hosting and streaming website, offering visitors the ability to view content uploaded by users, models and third-party adult entertainment companies.  MindGeek also owned or operated websites that required users to purchase a membership to access their content.  These sites included the MindGeek-owned PornhubPremium.com ("Pornhub Premium"), YouPornPremium.com and RedTubePremium.com (collectively, the "Premium Sites"), which provided paid subscribers with additional exclusive model or third-party-studio-produced content in an ad-free environment behind a paywall.

4.       MindGeek offered third-party adult entertainment companies the ability to become content partners ("Content Partners") and members of its content partner program ("Content Partner Program").  Content Partners were generally third-party adult entertainment companies that operated their own website(s), which offered content to users for a fee or via paid subscription.  Under the Content Partner Program, when a third-party entertainment company signed up to be a Content Partner with MindGeek, MindGeek offered the Content Partner separate

webpages that included channels on Pornhub and its other Free Sites.  Content Partners could upload content onto the Free Sites, and place advertisements on their channels and video watch pages with links to the Content Partners' websites.  MindGeek promoted the Content Partners to its users.  For example, each personalized channel contained a link to the Content Partner's website.  These advertisements and links directed users to go to the Content Partner's website where they could be converted to paying members of the Content Partner's website.  When a user referred through such advertisements or links purchased a subscription to the Content Partner's website, where applicable, MindGeek earned a commission, or a share of the revenue earned by the Content Partner.

5.      MindGeek also offered its Content Partners the ability to join a view share program ("View Share Program") for Pornhub Premium by signing a content license agreement.  The View Share Program was designed for Content Partners to promote their content and help them earn revenue based on views of their content by subscribers of Pornhub Premium.  Under the View Share Program, the Content Partner could upload videos that were locked behind a paywall and thus only available to users who purchased a subscription.  Content Partners in the View Share Program were compensated based on views of their videos.  MindGeek helped drive users to the Content Partners by, among other things, promoting links to its users to join the Content Partners' pay-sites.

### Other Relevant Entities and Individuals

6.      GirlsDoPorn.com ("Girls Do Porn" or "GDP") was a pornography website featuring videos of young women from 18 to 23 years old engaging in sexual intercourse with a male actor.  GDP promoted the women in the videos as amateur college-aged women filming

C-3

pornography for the first time.  GDP's channel on Pornhub advertised: "Real amateur girls having sex on video for the very first time . . . .  You will not find these girls on any other website - all girls are 100% exclusive - this is the one and only time they do porn."  GDP earned money by selling subscriptions to view the complete video content in its members-only section.  The Girls Do Porn channel on MindGeek's platforms, including Pornhub, was popular, with more than 700,000 subscribers and more than 60 million unique page views during the relevant time period.

7.      GirlsDoToys.com ("Girls Do Toys" or "GDT") was a pornographic website featuring young women in "solo" scenes (i.e., using sex toys).  GDT videos featured many of the same women who appeared in GDP videos.  The GDT channel on MindGeek's platforms had more than 780,000 unique page views between January 2009 and December 2020.

8.      Michael James Pratt ("Pratt") and Matthew Wolfe ("Wolfe"), both citizens of the United States, together with others (collectively, the "GDP Operators"), ran an online pornography business in which they operated several pornography websites, including Girls Do Porn and Girls Do Toys.  The GDP Operators used numerous entities to operate their pornography enterprise, including the following: BLL Media, Inc.; BLL Media Holdings, LLC; Domi Publications, LLC; and M1M Media, Inc.

9.      The GDP and GDT videos hosted by MindGeek were accessible in and were, in fact, accessed by users within the Eastern District of New York.

### The Unlawful Monetary Transactions

10.      In or about and between September 15, 2017 and October 2019, MindGeek operated and hosted GDP and GDT content on its Free Sites, including on Pornhub, and knowingly received payments of approximately $106,370.05 through United States financial institutions, from

C-4

the GDP Operators.  Those proceeds were criminally derived from the GDP Operators' sex trafficking.  All the above-mentioned monetary transactions occurred in the United States, including in the Eastern District of New York.  Moreover, between September 2017 and December 2020, MindGeek received payments from advertisers attributable to GDP and GDT content totaling approximately $763,890.72.

**Background**

A.    <u>Contractual Relationships Between GDP Operators and MindGeek</u>

11.    Beginning in or about 2009, Pratt joined MindGeek's Content Partner Program.  On or about December 2, 2015, BLL Media, Inc. entered into a content license agreement ("Content License Agreement") with MindGeek.  Pratt signed the contract on behalf of BLL Media, Inc.

12.    On or about March 4, 2016, Domi Publications LLC entered into a Content License Agreement with MindGeek.  Pratt also signed the contract on behalf of Domi Publications LLC.

13.    In 2016, Wolfe joined MindGeek's Content Partner Program.  On or about October 11, 2016, M1M Media, Inc. entered into a Content License Agreement with MindGeek. Wolfe signed the contract on behalf of M1M Media Inc.

14.    Pursuant to the above Content License Agreements, in or about and between September 14, 2009 and October 14, 2019, MindGeek created and operated GDP channels for Pratt and the GDP Operators on its Free Sites, including on Pornhub.  In or about and between January 28, 2016 and December 16, 2020, MindGeek also created and hosted a GDT channel for Wolfe and the GDP Operators on its Free Sites, including on Pornhub.  The GDP and GDT channels contained

mostly 5- to 7-minute clips of videos filmed by the GDP Operators and included links to their paid websites so that users could access the full videos.

      B.    <u>GDP Lawsuit</u>

      15.    In June 2016, multiple plaintiffs filed a civil lawsuit in San Diego Superior Court against Pratt, Wolfe, Ruben Andre Garcia ("Garcia"), BLL Media, Inc., BLL Media Holdings, LLC, Domi Publications, LLC, M1M Media, LLC and others alleging that the civil defendants had tricked the plaintiffs into appearing in pornographic videos posted to Girls Do Porn (the "GDP Lawsuit").  The complaint alleged, among other things, that the civil defendants had offered the plaintiffs money for adult film work and assured them that the civil defendants would not post the videos online or distribute the videos within the United States, and would keep the plaintiffs' identities anonymous.  The complaint further alleged that the civil defendants coerced the plaintiffs into signing consent release forms and having sex with one of the civil defendants.  Moreover, the complaint alleged that some of the plaintiffs' videos had been posted to Pornhub without the plaintiffs' consent.

      16.    MindGeek was notified of the GDP Lawsuit, at the latest, on or about September 15, 2017, after it received a subpoena for production of business records from plaintiffs' counsel in the GDP Lawsuit.

      17.    Separately, after the filing of the GDP Lawsuit, between August 2016 to August 2019, MindGeek received at least 15 content removal requests, from at least 11 complainants seeking to have Pornhub remove GDP videos on its platform.  The complainants stated that videos in which they appeared had been posted on Pornhub without their consent and that the producers who made the GDP videos lied to them about not posting the videos online.

C-6

Some of the content removal requests also made reference to the GDP Lawsuit.  MindGeek sought, and received, information from GDP that purported to establish that the complainants had given consent for their videos to be posted online, but MindGeek did not independently verify consent. MindGeek removed some, but not all, of the GDP videos as requested.

18.     For example, on or about August 29, 2016, a complainant asked Pornhub to remove a GDP video, stating that GDP "made me believe that this will be distributed to foreign countries to private members only.  It has strongly impacted my professional and social life." Pornhub did not remove the requested video and instead responded that the "following video(s) was/were uploaded by one of our Content Partners as part of our Content Partner Program" and directed the complainant to submit a Digital Millennium Copyright Act ("DMCA") takedown notice if she felt that the video violated copyright and wished to pursue the video removal.

19.     On or about October 19, 2018, a complainant submitted a content removal request to Pornhub asking Pornhub to remove a video, stating that she "did not agree to have this content on pornhub."  Later that day, Pornhub informed the complainant that the video would be removed.

20.     On or about November 1, 2018, a complainant submitted a content removal request to Pornhub asking the company to remove four videos.  In the complaint, the writer stated that the individual in the video was her friend and that her friend was "lied to," told "it would never go online" and "never told [] the company they work for."  In response, Pornhub stated that the complainant needed to "contact girls do porn to have the video removed, because the video is sponsored content."

21.    On or about March 2, 2019, a complainant submitted a content removal request to Pornhub asking the company to remove a GDP video.  In the request, she stated that she "was told this video would never be online.  I did not consent to have this on Pornhub!  Please take this down.  It is ruining my life."  Pornhub responded and stated that the "following video(s) was/were uploaded by one of our Content Partners as part of our Content Partner Program" and directed the complainant to submit a DMCA takedown notice if she felt that the video violated copyright and wished to pursue the video removal.

22.    On or about June 16, 2019, a complainant submitted a content removal request to Pornhub, stating that she "was lied to in order for this video to be filmed."  On June 17, 2019, Pornhub informed the complainant that the video had been removed.

23.    In or about and between June and July 2019, MindGeek executives also became aware, through public sources, that the GDP Lawsuit was proceeding to trial over allegations that women were tricked into making the GDP videos.  For example, on or about June 28, 2019, a senior MindGeek employee received an alert of a VICE article titled, "Girls Do Porn Goes to Trial Over Allegations Women Were Tricked into Videos."  The article was circulated and discussed among MindGeek's employees, including senior executives.

24.    In or about and between late June and July of 2019, MindGeek executives discussed whether to remove the GDP videos implicated in the GDP Lawsuit.  On July 15, 2019, a senior MindGeek employee explained that she has "contacted [Pratt] and let him know that we would suspend their channel at the end of the week if we don't hear back."

25.    On or about July 18, 2019, MindGeek separately contacted plaintiffs' counsel in the GDP Lawsuit and requested a list of GDP content that the company should remove

C-8

from its website.  MindGeek then removed the videos identified by plaintiffs' counsel.

26.     However, MindGeek did not deactivate, suspend or remove the official GDP and GDT channels at that time.

27.     Instead, on or about July 19, 2019, several MindGeek executives identified GDP as an "untrusted partner."  Specifically, a senior MindGeek employee emailed another senior MindGeek employee and stated that GDP was on its list of "untrusted partners."  The MindGeek executives agreed that, with respect to an "untrusted partner," upon receiving any complaints from the individuals who appeared in the videos, MindGeek would "inactivate the videos immediately and reach out to the Content Partner to tell them we've taken down the video.  If they contest it, it will be case by case.  For full DMCA requests, we will DMCA the video and the partner can counter."  Despite this, MindGeek left the GDP and GDT channels on MindGeek's websites.

28.     On or about August 20, 2019, the bench trial in the GDP Lawsuit commenced in San Diego Superior Court.  Throughout the trial, MindGeek employees reviewed news media articles reporting on the trial.  For example, on or about August 30, 2019, a senior MindGeek employee received a news article reporting that a GDP videographer, Theodore "Teddy" Gyi ("Gyi"), had testified during trial that he, at the direction of the GDP Operators, lied to women that their sex videos would not appear online so that the women would agree to appear in the videos.  The article further stated that videos Gyi shot were posted on MindGeek's Free Sites such as Pornhub and YouPorn.

29.     On or about October 10, 2019, the U.S. Attorney's Office for the Southern District of California charged Pratt, Wolfe, Garcia and Valorie Moser by complaint on federal sex trafficking charges.  The criminal complaint specifically referenced Girls Do Porn and Girls Do

C-9

Toys and also stated that pornographic videos posted to Girls Do Porn and Girls Do Toys were also posted on Pornhub.

30.     On or about October 14, 2019, MindGeek, at the direction of its Chief Operating Officer, removed the official Girls Do Porn channel from its platforms.  However, MindGeek did not remove the official Girls Do Toys channels from its platforms or seek to identify for removal all unofficial Girls Do Porn content from its websites at that time.  As a result, users could still access numerous GDP videos on MindGeek's Free Sites, including Pornhub.

31.     MindGeek did not receive any payments from the GDP Operators after October 2019, including for GDT content.

32.     In or about November 2019, a federal grand jury returned an eight-count indictment against Pratt, Wolfe, Garcia, Gyi and other conspirators in the Southern District of California on charges of sex trafficking, conspiracy to commit sex trafficking, and production of child pornography.

33.     After the above referenced individuals were indicted, between November 2019 and January 2020, MindGeek continued to receive complaints from individuals seeking to remove GDP content from its platforms.  For example, in November 2019, one individual contacted Pornhub and explained that while Pornhub had removed the official channel, a simple search for "Girls Do Porn" or "GDP" on the website produced clips and compilations uploaded from Pornhub users.  Later, MindGeek removed all identified videos from its sites.

34.     On or about January 2, 2020, the court in the GDP Lawsuit issued a public Statement of Decision, finding the GDP Operators liable.  The Statement of Decision explained that the GDP Operators used a number of fraudulent and threatening practices to recruit women to make

pornographic images, including posting misleading ads to recruit women, falsely promising more pay than they intended, lying to the women about how, where and to whom their videos would be distributed and using coercive tactics to force the women to perform sex when necessary. The court noted that with respect to Girls Do Toys, "the women are usually the same as those who shoot boy-girl GDP videos because [the GDP Operators] do not separately recruit women for solo videos."

35.    On or about January 3, 2020, a MindGeek executive received notification of the decision through a news alert with a link to an article titled, "Girls Do Porn Has to Pay Millions in Damages for Coercing Women Into Porn."

36.    On or about January 23, 2020, four MindGeek executives received an email from MindGeek's external consultant. MindGeek's external consultant forwarded the executives a list of email inquiries from VICE magazine, including the following inquiry: "Girls Do Toys, a site that is owned and operated by the same people that own and operate Girls Do Porn, still has an official channel on Pornhub. Some of the women in the Girls Do Toys videos are the same women from the Girls Do Porn videos. Why has Pornhub allowed this channel to remain on its platform?"

37.    On or about February 10, 2020, Pornhub conducted a sweep to remove all existing GDP content from its site. Nonetheless, users continued to post GDP-created content on Pornhub. In or about and between May 2020 and December 9, 2020, MindGeek continued to receive content takedown requests from individuals seeking to remove user-posted GDP video content. After receiving the requests, MindGeek then removed the identified videos.

38.    On or about June 18, 2020, a senior MindGeek employee forwarded to a MindGeek executive a May 1, 2019 email that had originally been sent from Pratt to a Pornhub

account representative.  In the forwarded email, which discussed a female complainant who had submitted to MindGeek a content removal request to remove her GDP video, Pratt informed the Pornhub representative that the female complainant had also appeared in a GDT video.

39.     MindGeek did not remove the official GDT channel from its websites until on or about December 16, 2020, even though the company knew that the individuals operating GDT were the same as those who operated GDP and that many of the individuals featured in GDP videos were also used to produce GDT content.