UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE NOS. 60 through 121 inclusive, individuals,<br>Plaintiffs,<br>v.<br>AYLO HOLDINGS S.A.R.L., (f/k/a "MindGeek S.a.r.l.") a foreign entity; AYLO FREESITES, LTD., (f/k/a "MG Freesites, Ltd." and d/b/a "PornHub," "YouPorn," "RedTube," and "Tube8") a foreign entity; AYLO BILLING US CORP., (f/k/a "MG Billing US Corp." and d/b/a "ProBiller") a Delaware corporation; and 9219-1568 QUEBEC, INC., a foreign entity,<br>Defendants. | Case No.: 23-cv-1821-WQH-KSC<br>**ORDER** |

HAYES, Judge:

The matter before the Court is the Motion to Dismiss Amended Complaint filed by Defendants Aylo Holdings S.a.r.l. ("Aylo Holdings"); Aylo Freesites, Ltd. ("Aylo Freesites"); Aylo Billing US Corp. ("Aylo Billing"); and 9219-1568 Quebec Inc. (ECF No. 42.)

## I. PROCEDURAL HISTORY

On October 3, 2023, Plaintiffs Jane Doe Nos. 60 through 121 ("Plaintiffs") initiated this action by filing a Complaint against Defendants asserting trafficking and racketeering claims related to Defendants' alleged involvement with a sex trafficking venture named "GirlsDoPorn." (ECF No. 1.)

On December 21, 2023, the parties jointly moved to stay this action pending a mediation session scheduled for February 5, 2024. (ECF No. 18.) On January 2, 2024, the Court stayed this action. (ECF No. 19.) On February 15, 2024, the parties filed a Joint Status Report stating that their mediation was unsuccessful. (ECF No. 20.)

On March 12, 2024, Plaintiffs filed a First Amended Complaint ("FAC"). (ECF No. 24.)

On March 26, 2024, Defendants filed a Motion to Dismiss. (ECF No. 26.)

On May 16, 2024, the parties filed a Joint Motion to Stay Action because two alleged members of the GirlsDoPorn venture were charged in the Southern District of California with sex trafficking and related criminal offenses. (ECF No. 32.)

On June 4, 2024, the Court issued an Order granting the joint motion and staying this action pursuant to 18 U.S.C. § 1595(b) pending the final adjudication of two cases: *United States v. Michael J. Pratt*, Crim. Case No. 19CR4488-JLS-1 (S.D. Cal.) and *United States v. Valorie Moser*, Crim. Case No. 19CR4488-JLS-5 (S.D. Cal.). (ECF No. 33.) The Court denied the Motion to Dismiss (ECF No. 26) without prejudice. (ECF No. 33 at 2.)

On December 12, 2025, Plaintiffs filed a Notice stating that sentencing proceedings in the above-referenced criminal cases had concluded. (ECF No. 36; *see* ECF No. 463, *United States v. Michael J. Pratt*, Crim. Case No. 19CR4488-JLS-1 (S.D. Cal.); ECF No. 490, *United States v. Valorie Moser*, Crim. Case No. 19CR4488-JLS-5 (S.D. Cal.).) On December 16, 2025, the Court lifted the stay of this action. (ECF No. 37.)

On January 30, 2026, Defendants filed the pending Motion to Dismiss Amended Complaint. (ECF No. 42.) On March 6, 2026, Plaintiffs filed an Opposition. (ECF No. 50.) On March 27, 2026, Defendants filed a Response. (ECF No. 51.)

## II. ALLEGATIONS IN THE FAC

### A. Parties

Plaintiffs are all victims of the GirlsDoPorn sex trafficking venture. (FAC ¶¶ 13–74, 265–66.)

Aylo Holdings is a foreign entity incorporated in Luxembourg with its principal place of business in Montreal, Canada. *Id.* ¶ 75.[1] Aylo Holdings owns and operates over 100 pornographic websites, production companies, and pornography brands. *Id.* Aylo Holdings was owned by Feras Antoon, David Tassillo, and Bernd Bergmair at all relevant times and, as of 2022, its directors were Andreas Andreou, Anis Baba, and Claude Favre. *Id.* ¶ 76.

Plaintiffs refer to Feras Antoon, David Tassillo, and Bernd Bergmair, and "the carefully selected directors they appointed, including Corey Urman, Andreas Andreou, Anis Baba, and Aylo's Chief Legal Officer, Anthony Penhale" as the "Aylo Control Group." *Id.* ¶ 77.

Aylo Freesites is a foreign entity incorporated in the Republic of Cyprus. *Id.* ¶ 78. Aylo Freesites is a wholly owned subsidiary of Aylo Holdings. *Id.* Aylo Freesites "operates" the websites where Aylo Holdings publishes its pornographic videos and sells advertising space related to those videos, including the pornographic videos that feature Plaintiffs. *Id.* ¶ 100.

Aylo Billing is a payment processing company incorporated in Delaware that does business under the name "ProBiller." *Id.* ¶ 79. Aylo Billing is a wholly owned subsidiary of Aylo Holdings. *Id.* Aylo Billing processes payments from consumers purchasing pornographic videos from Aylo Holdings' websites. *Id.* ¶ 97.

9219-1568 Quebec Inc. is a company organized and existing under the laws of the Province of Quebec with its principal place of business in Montreal, Canada. *Id.* ¶ 80. 9219-

[1] Aylo Holdings was formerly known as "MindGeek S.a.r.l." (FAC ¶ 75.)

1568 Quebec Inc. is a wholly owned subsidiary of Aylo Holdings. *Id.* 9219-1568 Quebec Inc. hires the employees that maintain, edit, and optimize the pornographic videos hosted on Aylo Holdings' websites. *Id.* ¶ 100.

Aylo Holdings, Aylo Freesites, Aylo Billing, and 9219-1568 Quebec Inc. operate as a single enterprise that, at all relevant times, was controlled by the Aylo Control Group. *Id.* ¶¶ 82–83. Plaintiffs are "unaware of any Aylo-related entity that does not act at the direction of or take orders from the Aylo Control Group." *Id.* ¶ 77. For the purpose of this Order, the Court collectively refers to Aylo Holdings, Aylo Freesites, Aylo Billing, and 9219-1568 Quebec Inc. as "Aylo" or "Defendants."

**B. Aylo's Pornography Business**

Aylo operates "paysites" and "freesites" to distribute pornographic content. *Id.* ¶ 84. Paysites require a user to pay to view pornographic content. *Id.* ¶ 141. Freesites, which are often referred to as "tubesites," allow users to view pornographic content for free. *Id.* ¶ 142.[2] Freesites host "massive libraries of videos uploaded by members of the public." *Id.*

Aylo operates dozens of pornographic websites and brands. *Id.* ¶ 145. As relevant here, Aylo generates revenue from four freesites: PornHub.com, YouPorn.com, RedTube.com, and Tube8.com. *Id.* ¶ 84. Aylo also operates four related paysites: PornHubPremium.com, YouPornPremium.com, RedTubePremium.com, and Tube8VIP.com. *Id.*

Aylo's flagship freesite, PornHub.com, is the eighth most visited website in the world. *Id.* ¶ 146. In 2019, PornHub.com had approximately 42 billion visits. *Id.* PornHub.com hosts approximately 14 million pornographic videos in its free video library. *Id.* ¶ 149. Videos in this library come from "several different sources, including members of the public, third party pornography production companies, and Aylo itself." *Id.*

[2] Freesites are referred to as "tubesites" because they adopt the business model made popular by YouTube. (FAC ¶ 142.)

In addition to paid advertising, freesites generate significant revenue from "affiliate fees." *Id.* ¶ 143. An affiliate fee is a "customer referral fee paid by paysites to freesites for helping paysites attract customers to their websites." *Id.* Affiliate fees are administered by payment processors. *Id.* ¶ 144. Freesites may register with a payment processor, which will allow the freesite to "publish *trailer* versions of the paysite's videos on its website, which the third-party affiliate surrounds with hyperlinked advertisements for the paysite." *Id.* (emphasis in original).

Aylo generates revenue through direct subscriptions to its paysites, affiliate fees generated by its freesites, advertising revenue, and the sale of user data. *Id.* ¶ 145. Aylo's paysites generated approximately $1.3 billion in subscription revenue between 2012 and 2018. *Id.* ¶ 148.

### C. Aylo's Content Partner Program

Aylo operates a Content Partner Program, in which the company promotes the pornographic content created by a production company in exchange for a share of their revenue. *Id.* ¶ 152.

Aylo describes its Content Partner Program:

> The Content Partner Program is designed for studios with a pay site to expose their content to millions of visitors. Once partnered, you receive a personalized channel that includes free ad space both on your channel and on your videos. Through the use of video features on our homepage, your content is promoted to our users which will direct traffic back to your pay-site, with the intention of converting them into paying members. In turn, we would receive a share of this revenue through your affiliate program. There is no compensation based on views in this program.

*Id.* ¶ 153.

A production company must apply to join Aylo's Content Partner Program. *Id.* ¶ 156. If the production company is accepted as a Content Partner, Aylo creates a "channel" on its freesites that operates as "a single location where Aylo's potential customers can search the Content Partner's videos, organize them by ratings and recentness, and receive email notifications when a Content Partner posts a new video or takes other actions on the

channel." *Id.* These channels also include "five to ten minute *trailer versions* of the Content Partners' videos that may be viewed for free." *Id.* ¶ 159 (emphasis in original). Aylo provides its Content Partner with a "dedicated account representative who actively promotes [their] videos." *Id.* ¶ 157. Aylo also offers a "Playbook" to its Content Partners with directions on how to create, edit, film, name, tag, brand, optimize, title, and thumbnail their pornographic content. *Id.* ¶ 166.

Aylo also offers a Premium Viewshare Program, in which production companies are invited to "upload full-length, HD videos" that are "locked behind [Aylo's] paywall." *Id.* ¶ 159. These production companies are compensated "every time a Premium [PornHub] user watches" one of these videos. *Id.* By participating in the Premium Viewshare Program, the production company licenses its pornographic content to Aylo, which advertises, edits, and distributes the content on their paysites. *Id.* ¶ 160. If a Content Partner also participates in the Premium Viewshare Program, Aylo creates "advertisements, tags, and hyperlinks on the [C]ontent Partner's channel" to solicit users to view the Content Partner's videos on Aylo's own paysites. *Id.* ¶ 164.

Aylo states that it "work[s] closely with [Content Partners] to clearly understand their business requirements, vision, and needs in order to provide the best customized solution. . . . Our Search Engine Optimization is dedicated to uncovering the best keyword combinations to target exposure, ensure sites are compliant with search engine behavior, checks for the best user experience, and provides performance optimization and website architecture tactics." *Id.* ¶ 162.

**D. 'GirlsDoPorn' Sex Trafficking Venture**

In 2006, Michael Pratt ("Pratt") and Matthew Wolfe ("Wolfe") began a sex trafficking venture based in San Diego, California known as GirlsDoPorn. *Id.* ¶¶ 1, 110. Pratt and Wolfe hired other members of the venture, including Andre Garcia (a male actor and recruiter), Valorie Moser (an administrative assistant and driver), Theodore Gyi (a videographer), and Amberlyn Nored Clark (a reference model). *Id.* ¶ 110.

Over the course of a decade, GirlsDoPorn "used force, fraud and coercion to get hundreds of high school and college-aged women to film pornographic videos." *Id.* ¶ 1. In some instances, GirlsDoPorn "groomed sixteen and seventeen-year-olds so they would fly to San Diego and film [pornographic videos] on their eighteenth birthdays. Those videos begin with GirlsDoPorn presenting the victim with a birthday cake." *Id.* ¶ 111.

To lure its victims and create its pornographic content, GirlsDoPorn published Craigslist advertisements seeking "young women for *clothed* modeling gigs." *Id.* ¶ 113 (emphasis in original). These advertisements directed victims to learn more about the "supposed gigs" by inviting them to visit "sham fashion modeling websites" created by GirlsDoPorn. *Id.* These "sham website[s]" included social media accounts for a fictitious modeling agency. *Id.* The sham websites invited victims to apply for "fashion modeling gigs" by submitting their photographs and contact information through a "Contact Us" portal. *Id.* There were, however, "no clothed modeling gigs." *Id.*

GirlsDoPorn "graded the submissions" for its Craigslist advertisement and selected victims, who were sent a "long email cryptically offering thousands of dollars for an 'adult gig.'" *Id.* ¶ 115. After sending the email, GirlsDoPorn called victims and began "its campaign of lies and coercion." *Id.* During these calls, GirlsDoPorn "gauged victims' willingness to do semi-nude or modeling." *Id.* ¶ 116. GirlsDoPorn "would mention that they produce adult films, but quickly assured the victims the videos they created would be released on DVDs overseas, usually in Australia, and that the videos would never be published online." *Id.* GirlsDoPorn would routinely "book[] a flight and a hotel while victims were still on the initial call" and email confirmation to the victims. *Id.*

GirlsDoPorn would "say or do anything necessary to get victims to fly to San Diego." *Id.* ¶ 112. To bolster its claims about the distribution of its production, GirlsDoPorn "paid and coached 'reference models' to confirm the videos would never be published online and to assuage any other concerns the victim may have had." *Id.* ¶ 117. GirlsDoPorn instructed these reference models to falsely claim that they had "filmed videos for the company, received thousands of dollars in cash, and that no one in the woman's life had

ever seen the video because they were distributed on DVDs overseas." *Id.* ¶ 118–19. Pratt directed Valorie Moser, his assistant, to make "recruiting calls" because a "female's voice would be more reassuring than his." *Id.* ¶ 122.

GirlsDoPorn offered victims $5,000 to film pornographic videos but would "routinely fabricate supposed imperfections to use as a pretext to reduce the offer, such as claiming the victim had cellulite, uneven breasts, bruises, or some other made-up flaw." *Id.* ¶ 121. If a victim "did not seem open to pornography in the first place," GirlsDoPorn would offer "a clothed modeling gig" for $300. *Id.* ¶ 123. These offers were pretext to lure victims to "a hotel room in San Diego" and create an opportunity to film a pornographic video. *Id.*

Upon arrival in San Diego, GirlsDoPorn presented victims with a contract but failed to provide sufficient time for the victims to read the contract and did not provide the victims with a copy of the document. *Id.* ¶ 124. GirlsDoPorn used "veiled and direct threats . . . to ensure victims complied with their demands," including "blockad[ing] the hotel room doors with furniture or camera equipment." *Id.* ¶ 126. GirlsDoPorn "never let[] the victim leave the room for any reason, even to get fresh air or food." *Id.*

The filming of the pornographic videos was an "extremely long and painful process" that "sometimes lasted six to eight hours." *Id.* ¶ 125. "[M]any of GirlsDoPorn's final videos depict obvious signs of pain and suffering, including bloodstained sheets, shouts of pain, and tear tracks visible in the victim's makeup." *Id.* If a victim refused to film the pornographic video or tried to stop after filming began, GirlsDoPorn would falsely claim that her contract required performance of sexual acts, threaten to sue the victim for the costs of "hotel, flights, and time she allegedly wasted," and threaten to or actually cancel the victim's return flight. *Id.* ¶ 127 (internal quotation omitted).

GirlsDoPorn monetized its pornographic videos by publishing them on their subscription websites, GirlsDoPorn.com and GirlsDoToys.com, and on Aylo's tubesites and paysites. *Id.* ¶ 111. After publishing the videos, GirlsDoPorn would send "links for victims' video trailers to social media accounts to the victims' friends, family, co-workers,

employers, teachers and classmates." *Id.* ¶ 132. GirlsDoPorn established a "cult following," including numerous websites created for the purpose of revealing personally identifiable information about the victims. *Id.* ¶ 133.

The Federal Bureau of Investigation estimates that GirlsDoPorn made over $17 million from its sex trafficking venture between 2009 and 2019. *Id.* ¶ 140.

On June 2, 2016, four victims filed a civil complaint against Pratt, Wolfe, and Garcia. *Id.* ¶ 3 (citing *Jane Does Nos. 1–22 v. GirlsDoPorn.com, et al*, San Diego Superior Court Case No. 37-2016-0019027-CU-FR-CTL). In 2019, the Honorable Kevin A. Enright found that GirlsDoPorn used force, fraud, and coercion as part of its customary business practices and awarded over $24 million in damages to the victims. *Id.*

On or about October 9, 2019, the United States Attorney for the Southern District of California charged Pratt, Wolfe, Garcia, Moser, and Gyi with sex trafficking and conspiracy to commit sex trafficking. *Id.* ¶ 4 (citing ECF No. 149, *United States v. Pratt et al.*, S.D. Cal. Case No. 3:19-cr-04488-JLS). Pratt was added to the FBI's Top Ten Most Wanted list before his arrest in Spain on December 23, 2022. *Id.* Wolfe, Garcia, Gyi, and Moser have pleaded guilty to various sex trafficking crimes. *Id.* ¶ 5. United States District Judge Janis L. Sammartino sentenced Garcia to twenty years in prison and Gyi to four years in prison. *Id.* ¶ 5.

**E. Aylo's Partnership with GirlsDoPorn Sex Trafficking Venture**

In or around 2009, GirlsDoPorn created accounts on Aylo's freesites. *Id.* ¶ 169. GirlsDoPorn began posting its "trailer videos" on Aylo's freesites as advertisements for its own paysite. *Id.*

In or around 2011, GirlsDoPorn applied to participate in the Content Partner Program and Premium Viewshare Program. *Id.* ¶ 170. Aylo accepted their application. *Id.* At that point, Aylo began assisting the GirlsDoPorn sex trafficking venture by "developing and promoting its content, enhancing the visibility and popularity of its brand, processing financial transactions for the sale of its illegal videos, increasing the traffic to and the sale of subscriptions for GirlsDoPorn's paysites, and selling GirlsDoPorn videos through

Aylo's Viewshare Program." *Id.* Aylo Freesites, Ltd., "at minimum, made bimonthly payments to GirlsDoPorn's bank" in fulfillment of their "share of the revenues generated by the sale" of their sex trafficking content. *Id.* ¶ 99.

Aylo assisted GirlsDoPorn by: "developing content and creating trailer versions of victims' videos . . . to post on its dedicated channel"; "naming, editing, and tagging" the videos; designing and creating advertisements to encourage users to view the GirlsDoPorn channel on Aylo's freesites; creating search engine optimization campaigns to maximize the videos; suggesting the GirlsDoPorn channel and video to users; processing payments generated by the sale of the videos. *Id.* ¶¶ 171–76.

The GirlsDoPorn channel on PornHub.com, the flagship Aylo freesite, had "around 70 videos published on it at any given time." *Id.* ¶ 177. As of May 2019, the channel had more than 700,000 subscribers and the videos had collectively been viewed approximately 700 million times. *Id.* The GirlsDoPorn channels on other Aylo freesites contained between 100 to 200 videos of victims and garnered hundreds of millions of views in total. *Id.* Among the thousands of channels on PornHub.com, the GirlsDoPorn channel was at least the twenty-fifth most popular based on Aylo's rankings. *Id.* In 2014, a GirlsDoPorn video was the "second most viewed video on PornHub.com." *Id.* ¶ 182.

Plaintiffs estimate that the GirlsDoPorn videos "generated more than 2 billion views of Aylo's [freesites], which in turn generated millions of dollars in affiliate fees, advertising revenue, and data sales." *Id.* ¶ 177. "GirlsDoPorn would never have been profitable absent its partnership with Aylo." *Id.* ¶ 183.

Aylo "generated millions of dollars in affiliate fees and premium subscriptions from selling, marketing, and exploiting videos featuring victims of GirlsDoPorn's sex trafficking venture, including Plaintiffs." *Id.* ¶ 185.

**F. Aylo's Knowledge of GirlsDoPorn Sex Trafficking Venture**

Beginning in 2009, Aylo knew or acted in reckless disregard of the fact that GirlsDoPorn used force, fraud, and coercion to have its victims engage in commercial sexual acts. *Id.* ¶ 188.

Victims of GirlsDoPorn repeatedly sent takedown requests to Aylo requesting that the company remove the videos from its websites "due to lack of consent." *Id.* ¶ 189. The takedown requests included descriptions of GirlsDoPorn's coercive techniques and the emotional damage suffered by continued publication of the videos. *Id.* ¶ 189–96. Victims also hired "takedown companies" that submitted "hundreds, if not thousands," of requests to Aylo on the same basis. *Id.* ¶ 198–99. In response to the takedown requests, GirlsDoPorn provided Aylo with contact information for a fictitious person and a business address located in Port Vila, Vanuatu. *Id.* ¶¶ 224–25.

GirlsDoPorn published information on the homepage of its website in 2020 that indicated its use of coercive and fraudulent techniques: "All the girls you will finrised d on my site are normal everyday girls you would find in the city streets - malls - colleges and normal 9-5 jobs. I personally hunt out each and every one for your viewing pleasure. You would be suphow quickly the offer of quick cash turns these girls into part time pornstars. Everything you read or see on this website is 100% real and true." *Id.* ¶ 200 (without alteration). The caption of one pornographic video produced by GirlsDoPorn read, in part: "She contacted us regarding an add I had placed for beauty models wanted , having no idea it was actually for adult videos instead ha :)." *Id.* ¶ 201 (without alteration). These admissions were public at the time that Aylo accepted GirlsDoPorn into its Content Partner Program. *Id.* ¶ 202. Beginning in 2014, GirlsDoPorn also operated an online forum in which it described its fraudulent and coercive tactics. *Id.* ¶ 210–11.

GirlsDoPorn videos included content indicating that the production company used fraudulent techniques, including interviews with victims that "made clear [the victims] believed the video would not be published on the Internet or available to anyone in the United States." *Id.* ¶ 204–06. The videos also depict "visible distress," including bloodstained sheets and condoms, furniture piled in front of a hotel room door, and "women under 21-years-old who were clearly under the influence of drugs and/or alcohol based on [their] gait, blurred eyes, and slurred speech." *Id.* ¶ 208–09.

In or around June 2012, a woman who was "actively competing in beauty pageants" and won "Miss Delaware Teen USA" filmed a pornographic video for GirlsDoPorn because of force, fraud, and coercion. *Id.* ¶ 215. In February 2013, GirlsDoPorn released a pornographic video featuring the woman on its channels on Aylo's freesites. *Id.* ¶ 217. The woman was forced to resign her position as "Miss Delaware Teen USA." *Id.* ¶ 218. In response, Aylo publicly stated: "Though [the woman] resigned her title as Miss Teen Delaware, YouPorn has stepped in to take the sting out of the situation, offering her a $250,000 deal to become the first ever Miss YouPorn!" *Id.* ¶ 221.

In June 2016, four victims filed an action in the Superior Court of California, County of San Diego against GirlsDoPorn. *Id.* ¶ 227. On September 19, 2017, the plaintiffs in that action subpoenaed Aylo seeking documents related to takedown requests of GirlsDoPorn videos. *Id.* During the action, GirlsDoPorn designated "Aylo's very own DMCA attorney" as an expert on affiliate marketing issues. *Id.* ¶ 231. During this period, Aylo continued to "publish and profit from the GirlsDoPorn victims' videos." *Id.* ¶ 232. In July 2019, Aylo removed videos of the plaintiffs in the action but did not remove "the hundreds of other GirlsDoPorn videos from its sites." *Id.* ¶ 234.

Around 2018, Aylo entered a Letter of Intent with GirlsDoPorn to purchase its video library. *Id.* ¶ 235. In October 2019, Aylo "technically ended its partnership with GirlsDoPorn" because "there was simply no company left to partner with." *Id.* ¶ 251. Aylo continued to profit from videos of the victims because news coverage of criminal and civil litigation generated interest in the videos. *Id.* ¶¶ 251–53.

In December 2020, Aylo removed GirlsDoPorn videos from its websites. *Id.* ¶ 254.

### G. Causes of Action

Plaintiffs assert four causes of action against Defendants: (1) sex trafficking under the federal Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591, 1594, 1595; (2) racketeering under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (3) conspiracy to commit racketeering

under RICO, 18 U.S.C. § 1962(d); and human trafficking under California's Trafficking Victims Protection Act ("CTVPA"), Cal. Civ. Code § 52.5. (FAC ¶¶ 263–313.)

## III. CONTENTIONS

As a preliminary matter, Defendants contend that Aylo Holdings should be dismissed from this action for lack of personal jurisdiction because it is a "foreign holding company with no employees, assets, or operations in the United States." (ECF No. 42-1 at 13, 34–36.) Plaintiffs respond that Aylo Holdings is subject to both general and specific personal jurisdiction. (ECF No. 50 at 41–46.) Plaintiffs request that, if the Court holds otherwise, it grants jurisdictional discovery. *Id.* at 46.

Defendants contend that Plaintiffs' FAC should be dismissed because it fails to provide adequate notice, pursuant to Federal Rule of Civil Procedure 8, as to the claims at issue. (ECF No. 42-1 at 16–17.) Defendants contend that the FAC "refers to all 62 plaintiffs collectively, without differentiating among them," and fails to provide Defendants with adequate information to "formulate a defense." *Id.* Plaintiffs respond that, although each of their claims includes particularized facts, there is a substantial share of allegations that are "identical" among claims because each claim "relate[s] to the decade-long partnership between Defendants and GirlsDoPorn, which has nothing to do with the specific Plaintiffs." (ECF No. 50 at 15–16.) Defendants also contend that the FAC should also be dismissed under Rule 8 because it improperly "lump[s] all defendants together" and makes it impossible to determine which Defendant is responsible for allegedly wrongful conduct. (ECF No. 42-1 at 17–22.)

Defendants move to dismiss each of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Defendants move to dismiss Plaintiffs' claim under the TVPRA because "Plaintiffs do not contend any [D]efendant was involved in the creation of GirlsDoPorn's videos or had knowledge of the circumstances of those videos at the time they were made." (ECF No. 42-1 at 22–25.) Defendants move to dismiss Plaintiffs' claims under the CTVPA because the state law does not provide for secondary liability. *Id.* at 25–26. Defendants move to

dismiss Plaintiffs' claims under the federal RICO statute because the claims are time-barred and, separately, because the FAC fails to plead the requisite elements of a RICO claim. *Id.* at 26–34.

## IV. LEGAL STANDARD

Rule 12(b)(2) of the Federal Rules of Civil Procedure permits dismissal for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). "Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (citing *Sher v. Johnson,* 911 F.2d 1357, 1361 (9th Cir. 1990)). Although a plaintiff may not "simply rest on the bare allegations of its complaint," a district court must accept "uncontroverted allegations . . . as true" and require only that the plaintiff "make a prima facie showing of jurisdictional facts." *Id.* (citations and quotations omitted). A district court "may not assume the truth of allegations in a pleading which are contradicted by affidavit." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (quotation omitted).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim for relief, a pleading "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) is "proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting Fed. R. Civ. P. 8(a)). While a pleading "does not require 'detailed factual allegations,'" Rule 8 nevertheless "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

## V. DISCUSSION

### A. Personal Jurisdiction over Aylo Holdings

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). "Under California's long-arm statute, California state courts may exercise personal jurisdiction 'on any basis not inconsistent with the Constitution of this state or of the United States.'" *Id.* (quoting Cal. Civ. Proc. Code. § 410.10). Under the United States Constitution, due process "permits a court to exercise personal jurisdiction over a nonresident defendant if that defendant has at least minimum contacts with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice." *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020) (citations and quotations omitted). The Supreme Court states that federal courts may exercise "two types of personal jurisdiction" over a defendant: general and specific personal jurisdiction. *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017).

#### *1. General Jurisdiction*

To exercise general jurisdiction over a foreign corporation, courts must determine "if the corporation's connections to the forum state are so 'continuous and systematic' as to render it essentially at home in the forum [s]tate." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020 (9th Cir. 2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "The paradigmatic locations where general jurisdiction is appropriate over a corporation are its place of incorporation and its principal place of business. Only in an exceptional case will general jurisdiction be available anywhere else." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015) (citations and quotations omitted).

Plaintiffs allege that Aylo Holdings is incorporated in Luxembourg and maintains its principal place of business in Montreal, Canada. (FAC ¶ 75; *see also* Declaration of Andreas Andreou in Support of Motion to Dismiss ("Andreou Decl."), ECF No. 42-2 ¶ 11 (stating that Aylo Holdings "does not have any offices or employees in the State of California, let alone the United States").) Defendants do not dispute this allegation. (ECF No. 42-1 at 34.) These facts do not support the conclusion that Aylo Holdings is essentially "at home" in California. *Yamaha Motor Company*, 851 F.3d at 1020. In *Fleites v. MindGeek S.A.R.L.*, upon review of a motion to dismiss of claims arising from Aylo's alleged distribution and promotion of child sexual abuse material depicting the plaintiff, the Central District of California reached the same conclusion. 801 F. Supp. 3d 1045, 1089 (C.D. Cal. 2025). Here, the Court likewise concludes that it may not exercise general personal jurisdiction over Aylo Holdings.

*2. Specific Personal Jurisdiction*

To exercise specific personal jurisdiction, a court must determine whether the action "arise[s] out of or relate[s] to the defendant's contacts with the forum." *Bristol-Myers Squibb*, 582 U.S. at 262 (quotation omitted). "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (quoting *Goodyear,* 564 U.S. at 919).

In determining whether plaintiffs have made a "prima facie showing of jurisdictional facts to withstand [a] motion to dismiss," a court must "resolve factual disputes in the plaintiff's favor" but "may not assume the truth of allegations in a pleading which are contradicted by affidavit." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011) (quotations and citations omitted). Here, Plaintiffs allege that Aylo Holdings "owns and operates over 100 pornographic websites, production companies, and pornography brands, and is believed to own most of the pornography on the Internet, much of which it distributes for free, to any person with a web connection, regardless of age." (FAC ¶ 75.) Plaintiffs allege that Aylo Holdings is the parent company of the remaining Defendants, and that all Defendants operate as a single enterprise under the direction of the Aylo Control Group. *Id.* ¶ 77. Plaintiffs allege that Defendants: commingle their funds; treat each other's assets as their own; hold themselves out as liable for each other's debts; use the same business location and employees; fail to conduct arm's length negotiations; and "divert[] assets without consideration from/to one another to the detriment of creditors, including Plaintiffs." *Id.* ¶¶ 82–90. Plaintiffs allege that Defendants conduct "significant business activities" in California, including the operation of freesites and paysites. *Id.* ¶ 97–98. Plaintiffs also allege that, in 2019, residents of Los Angeles, California constituted the fourth-largest region of PornHub.com consumers in the world and that the GirlsDoPorn sex trafficking operation was conducted in San Diego, California. *Id.* ¶¶ 98–99.

Defendants' sworn declaration contradicts some of these allegations. Mr. Andreou swears that: Defendants "do not operate as a single business entity" and each entity maintains its own adequately capitalized bank account and boards of directors; Aylo Holdings is a private limited liability company operating only as a holding company that "directly and indirectly" owns other entities but does not "exercise any control over the day-to-day decisions of . . . any other Aylo corporate entities"; and Aylo Holdings does not "own or operate any adult-oriented websites." (Andreou Decl. ¶¶ 5–13.)

"As a general principle, corporate separateness insulates a parent corporation from liability created by its subsidiary, notwithstanding the parent's ownership of the

subsidiary." *Ranza*, 793 F.3d at 1070. "However, in certain limited circumstances, the veil separating affiliated entities may be pierced to impute liability" and "to exercise personal jurisdiction over a foreign defendant." *Id.* at 1071. In the Ninth Circuit, courts apply the "alter ego test" to determine whether "the parent and subsidiary are not really separate entities, such that one entity's contacts with the forum state can be fairly attributed to the other." *Id.* (internal quotation omitted).

"To satisfy the alter ego test, a plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Id.* at 1073 (cleaned up).

The first prong of the alter ego test requires "a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Id.* The "relevant factors" to the first prong are:

> inadequate capitalization, commingling of funds and other assets, holding out by one entity that it is liable for the debts of the other, identical equitable ownership, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers.

*Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1250 (9th Cir. 2017). "Total ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Ranza*, 793 F.3d at 1070.

The second prong of the alter ego test requires "some evidence of bad faith conduct on the part of defendants." *Daewoo Electronics*, 875 F.3d at 1250. "Conclusory allegations that [the defendant] structures companies to escape liability are insufficient to confer personal jurisdiction. Something more is needed." *In re Boon Glob. Ltd.*, 923 F.3d 643, 654 (9th Cir. 2019).

Here, Plaintiffs' allegations regarding the commingling of Aylo's funds and its shared direction from the Aylo Control Group are broadly conclusory and, in large part, contradicted by Aylo's affidavit. *See Gerritsen v. Warner Bros. Ent. Inc.*, 116 F. Supp. 3d

1104, 1140–41 (C.D. Cal. 2015) ("Conclusory allegations of 'alter ego' status are insufficient to state a claim."). Courts have also held that "common ownership" and "consolidated financial statements" are inadequate to establish alter ego liability. *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 956 (N.D. Cal. 2015); *Barantsevich v. VTB Bank*, 954 F. Supp. 2d 972, 986 (C.D. Cal. 2013). Moreover, Plaintiffs fail to allege, in a non-conclusory fashion, that Defendants are structured to avoid liability such that the Court can find "evidence of bad faith conduct." *Daewoo Electronics*, 875 F.3d at 1250. Plaintiffs allege that the "Aylo Control Group could easily restructure the company" or otherwise employ deceptive corporate tactics to "avoid collection" of judgment. (FAC ¶ 89.) Defendants' declaration does not support the same conclusion. *See* Andreou Decl. ¶¶ 4–5 (denying that Aylo is structured to avoid liability and swearing that each Defendant is "adequately capitalized"). Plaintiffs' allegations, read in connection with Defendants' sworn statements, do not support a finding that failure to disregard the separateness of Aylo's various parent and subsidiary entities would "result in fraud or injustice." *Ranza*, 793 F.3d at 1073 (quotation omitted).

Other courts have held—based on substantially similar allegations—that they cannot properly exercise specific personal jurisdiction over Aylo Holdings. In *Fleites*, the Central District of California considered whether it could properly exercise personal jurisdiction over Aylo Holdings under an alter ego theory. 801 F. Supp. 3d at 1089–94. The district court held that the plaintiff failed to satisfy the second prong of the alter ego test because she did "not allege that the [Aylo subsidiary defendants] are undercapitalized such that she cannot seek redress from these Defendants." *Id.* at 1090–95; *see id.* at 1094 (stating that "Plaintiff conceded at oral argument that she cannot meet the second prong" of the alter ego test); *see also C.S. v. MindGeek S.a.r.l. et al. Additional Party Names: 9219-1568 Quebec Inc., MG Freesites Ltd., MG Premium Ltd.*, No. 2:24-CV-04992-WLH-ADS, 2026 WL 2372638, at *7–8 (C.D. Cal. July 22, 2026) (holding that the court could not exercise specific personal jurisdiction over the defendants under an agency or alter ego theory).

The motion to dismiss is granted with respect to claims asserted against Aylo Holdings.[3] The Court does not find good cause to permit jurisdictional discovery at this stage of the proceedings; however, as discussed below, the Court grants Plaintiffs leave to file a Second Amended Complaint if they choose.

**B. Group Pleading**

Defendants contend that Plaintiffs' allegations fail to satisfy the Rule 8 pleading standard because it refers to "all 62 plaintiffs collectively, without differentiating among them, even though each plaintiff's claims arise from a distinct set of facts." (ECF No. 42-1 at 16–17.) Defendants also contend that Plaintiffs' improperly "lump all defendants together." *Id.* at 17–18. Plaintiffs respond that most of the facts relevant to each of their claims are related to "the decade-long partnership between Defendants and GirlsDoPorn," and that they adequately "allege each of the corporate Defendant's role in the overall operation of Defendants' websites and how each participated in GirlsDoPorn's sex trafficking venture." (ECF No. 50 at 15–18.)

Federal Rule of Civil Procedure 8(a) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Failure to comply with Rule 8 requires that a court dismiss a complaint for failure to state a claim on which relief can be granted. *Twombly*, 550 U.S. at 555. To avoid dismissal for failure to state a claim a complaint must contain more than "naked assertions," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id*. at 555–57. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Iqbal*, 556 U.S. at 678.

**1. Collective Pleading of 62 Plaintiffs**

In moving for the dismissal of the FAC pursuant to Rule 8, Defendants rely upon *Bautista v. Los Angeles County*, 216 F.3d 837 (9th Cir. 2000), wherein the Ninth Circuit

---

[3] For the purposes of this Order, subsequent references to "Aylo" or "Defendants" should be understood to refer only to the remaining Defendants.

reviewed a district court's dismissal of the complaint, which alleged that "fifty-one named plaintiffs" "performed their jobs satisfactorily and were each qualified for positions with [defendant] R.A. Music, that they applied for such positions and that they were denied employment based upon their race, age and disability." *Id*. at 840. The *Bautista* complaint "also allege[d] that after R.A. Music took over, it substantially reduced the percentage of minority workers and increased the percentage of white workers, reduced the percentage of minority workers in higher paid positions, and reduced the percentage of workers over forty years of age." *Id*. The *Bautista* complaint alleged three claims for relief: "[t]he first claim, on behalf of twenty of the named plaintiffs, alleges that they were over the age of forty and were denied employment by defendant in favor of younger employees"; "[t]he second claim, on behalf of fifty-one named plaintiffs, alleges that defendant discriminated against them on account of their race, national origin and ancestry by denying them employment while employing less qualified Anglo employees"; "[t]he third claim, on behalf of three named plaintiffs, alleges that defendant discriminated against them on the basis of their physical disabilities while employing less qualified employees." *Id*. In *Bautista*, the Ninth Circuit affirmed the dismissal of the complaint, stating:

> While the complaint contains stray allegations of discriminatory policies or practices imposed by R.A. Music, what it seeks is individual relief for each of the plaintiffs. Each plaintiff's right to relief therefore depends upon proof of the operative facts giving rise to an enforceable right in favor of that plaintiff. The three claims alleged in the complaint do not meet that test; they are hybrids that qualify neither as class action allegations nor as statements of individual claims. To comply with Rule 8 each plaintiff must plead a short and plain statement of the elements of his or her claim, identifying the transaction or occurrence giving rise to the claim and the elements of the prima facie case: that he or she is a member of a particular protected class, was qualified and applied for the position he or she sought and was rejected on a prohibited ground.

*Id;*[4] *see also Hernandez v. Clover Flat Land Fill Inc.*, No. 3:24-CV-07490-JSC, 2025 WL 2624966, at *2 (N.D. Cal. Sept. 11, 2025) (dismissing complaint for failure to comply with Rule 8, stating in part that the 15 plaintiffs "plead their claims as to all Defendants and allege conduct as to 'Plaintiffs' collectively").[5]

In the FAC, Plaintiffs identify themselves anonymously and the only individual fact alleged about each Plaintiff is whether they resided in California "at all relevant times." (FAC ¶¶ 13–74.) The FAC fails to specify what constitutes the "relevant times" for any Plaintiff. The FAC alleges that "Plaintiffs are all victims of GirlsDoPorn's sex trafficking venture within the of meaning of 18 U.S.C. § 1591," and "Plaintiffs' videos were all sold and monetized on Defendants' Tubesites and Paysites within the last ten years." (FAC ¶¶ 265–66.) The FAC's collective allegations regarding Plaintiffs are even more threadbare than the collective allegations of plaintiffs that the Ninth Circuit found deficient in *Bautista*. As in *Bautista*, the FAC "seeks … individual relief for each of the plaintiffs." *Bautista*, 216 F.3d at 840; *see also* FAC at 72 (demanding "an amount that exceeds" $10,100,000 "for each plaintiff"). "Each plaintiff's right to relief therefore depends upon proof of the operative facts giving rise to an enforceable right in favor of that plaintiff," and "[t]o comply with Rule 8 each plaintiff must plead a short and plain statement of the elements of his or her claim, identifying the transaction or occurrence giving rise to the

---

[4] The Ninth Circuit nevertheless reversed the district court's dismissal with prejudice because the complaint's "deficiencies were readily curable with some guidance from the court." *Bautista*, 216 F.3d at 841. Defendants' characterization of the Ninth Circuit decision as "affirming dismissal of a complaint with prejudice" is unsupported. (ECF No. 42-1 at 17.)

[5] Plaintiffs cite only one appellate case in support of its argument that its use of collective pleading of plaintiffs satisfies Rule 8, *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016). However, in that case, there was only a single plaintiff; the issue related to collective pleading of *defendants*, with the court stating that "[t]here is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *Id*. at 1184. The Court applies that principle in the next section, *infra*, with respect to the collective allegations as to Defendants that the Court finds are sufficient. But with respect to Plaintiffs, there is no indication that all 62 Plaintiffs are alleging that each were victimized by Defendants at precisely the same place, time, and manner. Plaintiffs cite no case approving the use of collective allegations made by many plaintiffs.

claim and the elements of the prima facie case." *Bautista*, 216 F.3d at 840. As in *Bautista*, with respect to the allegations related to the Plaintiffs, the "claims alleged in the [FAC] … qualify neither as class action allegations nor as statements of individual claims." *Id.*

Accordingly, the Court finds that the FAC fails to satisfy Rule 8 and must be dismissed for failure to state a claim on which relief can be granted. As discussed below, this dismissal is without prejudice and with leave to amend. Therefore, the Court will address the other arguments raised in the pending Motion to Dismiss. The Court notes that the holding herein does not affect Plaintiffs' right to pursue their claims anonymously. *See, e.g.*, *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828 (C.D. Cal.) (putative class action asserting claims arising from Aylo's alleged hosting of child sexual abuse material), *adhered to on denial of reconsideration,* 574 F. Supp. 3d 760 (C.D. Cal. 2021). The Court also does not hold that Plaintiffs must publicly allege specifics regarding their alleged victimization by the GirlsDoPorn trafficking venture; the Court will consider any appropriate motion to seal portions of filings containing such allegations or evidence in support of those allegations.

**2. Collective Pleading of Defendants**

Although Plaintiffs' allegations regarding Defendants' corporate interrelatedness are insufficient to establish alter ego liability with respect to Aylo Holdings, their allegations are sufficient to satisfy Rule 8's pleading standard for the remaining Defendants. As discussed, Plaintiffs allege that Aylo operated as a "single business enterprise dedicated to producing, distributing, and monetizing pornography." (FAC ¶¶ 82–90.) However, Plaintiffs also allege the specific role that each subsidiary played in the operation. *See id.* ¶ 97 (alleging that Defendants Aylo Freesites, Ltd. and 9219-1568 Quebec, Inc. "operate and service Aylo's" freesites"; Defendant Aylo Freesites, Ltd. "sells advertising space" on Aylo's tubesites; and Defendant Aylo Billing Corp. "processes payments on Aylo's" paysites); *see also* Andreou Decl. ¶ 16 ("Aylo Freesites Ltd is the entity that is responsible for the operation of Aylo's sites."), ¶ 18 ("Aylo Billing US Corp. provides billing services

for subscription sites but not for tubesites.), ¶ 22 ("9219-1568 Quebec Inc. provides certain services to Aylo Freesites Ltd and other companies in the Aylo Group.").

Unlike the cases cited by Defendants, it is not "impossible to tell which Defendant did what allegedly wrongful conduct." *Armstrong v. Investor's Bus. Daily, Inc.*, No. CV182134MWFJPRX, 2018 WL 6787049, at *10 (C.D. Cal. Dec. 21, 2018); *see 818 Media Prods., LLC v. Wells Fargo Bank, N.A.*, No. CV16-9427 PSG (PLAX), 2017 WL 3049565, at *4 (C.D. Cal. Feb. 9, 2017) (holding that a complaint, which "obscure[d] the matter" by referring to defendants jointly "only sometimes," failed to provide "notice as to the factual and legal basis for the claims against them") (internal quotation omitted). Here, Plaintiffs plausibly allege a close corporate association between each Aylo entity and, moreover, allege with particularity each Defendant's role in business operations related to Aylo's maintenance of pornographic websites and its relationships with third-party producers of pornography.

**C. Trafficking Victims Protection Reauthorization Act**

In 2000, Congress enacted the Trafficking Victims Protection Act ("TVPA") to create "several new federal criminal offenses intended to more comprehensively and effectively combat human trafficking," *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1164 (9th Cir. 2022); *Doe (K.R.D.) v. Hilton Worldwide Holdings Inc.*, 798 F. Supp. 3d 1082, 1089 (N.D. Cal. 2025) (citing Pub. L. No. 106-386, div. A, 114 Stat. 1466 (2000)). "Among other things, the [statute] criminalized engaging in sex trafficking by means of force, fraud, or coercion." *Doe 1-10 v. Fitzgerald*, 102 F.4th 1089, 1091 (9th Cir. 2024). Section 1591 establishes criminal liability for any person that knowingly "entices, harbors, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person," or "benefits . . . from participation in a venture" that has engaged in such conduct. 18 U.S.C. § 1591; *see id.* § 1594 (establishing liability for those who conspire with another to violate Section 1591).

The Ninth Circuit states that "[t]o run afoul of § 1591, a defendant must knowingly benefit from and knowingly assist, support, or facilitate sex trafficking activities." *Does 1-*

*6 v. Reddit, Inc.*, 51 F.4th 1137, 1145 (9th Cir. 2022). "Mere association with sex traffickers is insufficient absent some knowing 'participation' in the form of assistance, support, or facilitation." *Id.* (citing 18 U.S.C. § 1591(e)(4)). "The statute does not target those that merely 'turn a blind eye to the source of their revenue.'" *Id.* (quoting *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016)).

In 2003, Congress reauthorized and amended the TVPA through the TVPRA, which "add[ed] a civil remedy provision codified at 18 U.S.C. § 1595." *Ratha*, 35 F.4th at 1164—65. In 2008, Congress again reauthorized the TVPRA and amended the civil remedy provision. *Id.*; *see Reddit, Inc.*, 51 F.4th at 1141. As amended, the TVPRA permits trafficking victims to "sue the perpetrators of their trafficking as well as anyone who knowingly benefits from participation in a venture which that person knew or should have known was engaged in sex trafficking." *Reddit, Inc.*, 51 F.4th at 1141 (quotation omitted).

Section 1595 of the TVPRA states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).

The civil defendants in an action under § 1595(a) "need not have committed the underlying criminal sex trafficking offense under § 1591" of the TVPRA.[6] *B.D.G. v. Choice Hotels Int'l, Inc.*, No. 2:22-CV-3202, 2023 WL 5935646, at *3 (S.D. Ohio Sept.

---

[6] Aylo contends that Plaintiffs fail to state a claim for *direct* liability under the TVPRA. (ECF No. 42-1 at 23–24.) Plaintiffs respond that, "at this time," their theory of liability under the TVPRA is "not based on a direct violation of Section 1591(a)(1)." (ECF No. 50 at 24.) Plaintiffs state that their claim is based on a direct violation of Section 1591(a)(2), which establishes liability for a person who knowingly benefits from participation in a sex trafficking venture, and "beneficiary liability and perpetrator liability against all Defendants under Section 1595." *Id.* In this Order, the Court reviews Plaintiffs' TVPRA claim under a theory of beneficiary liability based on the text of 18 U.S.C. § 1595.

12, 2023). "Section 1595 of the TVPRA provides trafficking victims with a private right of action to pursue claims against perpetrators of trafficking ('direct liability'), or those who knowingly benefit financially from trafficking ('beneficiary liability')." *Doe v. Mindgeek USA Inc.*, 574 F. Supp. 3d 760, 772 (C.D. Cal. 2021) (citing 18 U.S.C. § 1595), *abrogated on other grounds by Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137 (9th Cir. 2022).

To state a civil claim under Section 1595, a plaintiff must allege that the defendants (1) knowingly participated in a venture; (2) received a benefit from their participation in that venture; and (3) knew or should have known that the plaintiff was a victim of sex trafficking in connection with that venture. *Mindgeek*, 558 F. Supp. 3d at 837; *see also Mindgeek*, 574 F. Supp. 3d at 772 (explaining that a "plaintiff must allege that the defendant has 'constructive knowledge' of the trafficking at issue" to demonstrate beneficiary liability).

*1. Rule 8*

Aylo contends that Plaintiffs' TVPRA claim must be dismissed because the FAC fails to allege that Plaintiffs "were subject to force, threats of force, fraud, and/or coercion at the hands of GirlsDoPorn" and, relatedly, that the FAC fails to allege that Aylo "knew or should have known that these specific plaintiffs" were trafficked by GirlsDoPorn. (ECF No. 42-1 at 22–23 (emphasis added).) These contentions are substantially similar to the Rule 8 arguments discussed above. As discussed above, the Court holds that the FAC fails to comply with Rule 8 due to its collective allegations related to Plaintiffs. *See Bautista*, 216 F.3d at 840. Because the Court dismisses the FAC without prejudice and with leave to amend, the Court addresses Aylo's other arguments related to the TVPRA.

*2. Knowing Participation in a Venture*

Under the TVPRA, a "venture" is "any group of two or more individuals associated in fact." 18 U.S.C. § 1591(e)(6). In other cases regarding liability for defendant-websites hosting depictions of sex trafficking victims, district courts have considered whether the defendant: entered agreements with sex traffickers to share revenue from their content;

made significant amounts of sex trafficking content available on their platforms despite an ability to monitor and remove the content; used hashtags or other digital content to enable users to find sex trafficking content; provided search tools to allow users to find sex trafficking content; and failed to remove sex trafficking content after receiving notice. *See, e.g.*, *Mindgeek*, 558 F. Supp. 3d at 837–38 (holding that Aylo had participated in a venture with sex traffickers that uploaded child sexual abuse materials to its websites); *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889 (N.D. Cal. 2021) (holding that a website participated in a venture by hosting sex trafficking content after being "specifically alerted that [certain content] contained sexual images of children obtained without their consent on several occasions but either failed or refused to take action"), *aff'd in part, rev'd in part and remanded sub nom. Doe #1 v. Twitter, Inc.*, No. 22-15103, 2023 WL 3220912 (9th Cir. May 3, 2023), and *abrogated by Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1145 (9th Cir. 2022) (requiring "knowing 'participation' in the form of assistance, support or facilitation"); *see also M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 971 (S.D. Ohio 2019) (hotel defendants participated in a venture by renting rooms to the operators of a sex trafficking venture despite "not hav[ing] actual knowledge of the sex trafficking" occurring on its property).

Here, Plaintiffs allege that Aylo encouraged users to view GirlsDoPorn's pornographic videos through various and sustained promotional methods. *See* FAC ¶ 177 (hosting "around 70 videos published by [GirlsDoPorn] at any given time"); *id.* ¶ 170 ("developing and promoting" the GirlsDoPorn videos); *id.* ¶ 171 ("creating trailer versions of victims' videos" and "naming, editing, and tagging" the videos); *id.* ¶ 172 ("creat[ing] hyperlinks and other advertisements to encourage users to view GirlsDoPorn's channels [and] premium pages"); *id.* ¶ 173 (creating "search engine optimization campaigns to promote and maximize the exposure" of GirlsDoPorn content); *id.* ¶ 180 ("refer[ing] and link[ing] more users to GirlsDoPorn's paysites than any other affiliate website"). Plaintiffs also allege sufficient facts to show that Aylo failed to remove sex trafficking content after being plausibly informed that the content depicted sex trafficking victims. *See id.* ¶¶ 189–

98 (describing takedown requests by victims); *id.* ¶ 198 ("[T]hird-party companies sent hundreds, if not thousands, of notices to Aylo advising Aylo that it was publishing the victims' GirlsDoPorn videos without the victims' consent"); *see also Mindgeek*, 558 F. Supp. 3d at 838 (holding that the plaintiff had adequately alleged a venture based on Aylo's "fail[ure] to remove" a video of the plaintiff that constituted child sexual abuse material).

Plaintiffs also allege that Aylo and GirlsDoPorn entered a business relationship through the application-only Content Partner and Viewshare Programs, which included "bimonthly payments" of shared revenue from Aylo Freesites, Ltd. to GirlsDoPorn and a "dedicated account representative." (FAC ¶¶ 99, 157, 170.) Drawing all reasonable inferences in favor of Plaintiffs, their allegations support the conclusion that Aylo maintained a business relationship with the GirlsDoPorn sex trafficking venture that included, among other things, promoting and selling its pornographic videos, processing financial transactions on their behalf, and using sophisticated tactics to "enhance[e] the visibility and popularity" of its pornographic content. (FAC ¶ 170.)

Accordingly, Plaintiffs adequately allege that Aylo knowingly participated in a venture with GirlsDoPorn.

*3. Benefit from Participation in the Venture*

To demonstrate that a defendant benefitted from their participation in a venture, a plaintiff must allege that the defendant received an identifiable benefit because of their participation in the venture. *Mindgeek*, 558 F. Supp. 3d at 838–39 (holding that Aylo "knowingly received benefits from the trafficking venture); *see Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) (explaining that allegations must support a causal connection between the benefits and the underlying sex trafficking offense). A defendant-website does not receive a benefit within the meaning of Section 1595 if they merely derive advertising revenue from their hosting of sex trafficking content during their regular business operations. *Reddit*, 51 F.4th at 1145.

Here, Plaintiffs allege that GirlsDoPorn was "one of Aylo's top ten most profitable Content Partners" during their partnership, and that the pornographic videos hosted by

Aylo on the GirlsDoPorn channels had "over one billion views" by 2019. (FAC ¶ 178–79, 185–88.) Plaintiffs allege that the GirlsDoPorn videos "generated millions of dollars in affiliate fees, advertising revenue, and data sales for Aylo." *Id.* These allegations support a finding that Aylo received significant financial benefits from their participation in the GirlsDoPorn sex trafficking venture.

These allegations also suggest that the revenue was not, like *Reddit*, merely a portion of the advertising revenue that Aylo "makes from advertising on all" pornography videos hosted on its websites. *Reddit*, 51 F.4th at 1145. Plaintiffs allege that Aylo, like Reddit and other websites that host user-generated content, derives advertising revenue from users' traffic to its freesites. (FAC ¶ 143.) Plaintiffs also allege, however, that Aylo cultivated a more active financial relationship with GirlsDoPorn: through their Content Partner and Viewshare Programs, Aylo maintained a "personalized channel that includes free ad space" for GirlsDoPorn and promoted GirlsDoPorn's sex trafficking content in exchange for a "share of th[e] revenue through [GirlsDoPorn's] affiliate revenue" generated by users' subscriptions to GirlsDoPorn's own "paysite." *Id.* ¶ 154. In other words, Aylo offered premium services to GirlsDoPorn and, in exchange, was entitled to revenue sharing from GirlsDoPorn's own paid subscribers. This financial relationship is unlike the generalized advertising revenue that courts have found insufficient to establish Section 1595 liability for other defendant-websites. *See Doe v. WebGroup Czech Republic*, 767 F. Supp. 3d 1009, 1023 (C.D. Cal. 2025) (holding that beneficiary liability was not adequately alleged when the complaint alleged that the defendant websites "gain[ed] revenue generated by all content posted by third-party users," including sex trafficking content).

Plaintiffs adequately allege that Aylo benefitted from its participation in a venture with GirlsDoPorn.

*4. Knowledge or Reckless Disregard of Sex Trafficking*

Section 1595 requires that a beneficiary of the sex trafficking venture "knew or should have known" that the venture was "engaged in an act" of sex trafficking. 18 U.S.C. § 1595(a). It is not enough that a defendant-website merely "turn[s] a blind eye" to the

posting of "unlawful content on its platform." *Reddit*, 51 F.4th at 1145 (citing *Afyare*, 632 F. App'x at 286). In *Mindgeek*, for example, the district court held that the plaintiff plausibly alleged that Aylo knew or acted with reckless disregard as to the fact that the "videos depicting [the plaintiff] constituted child pornography and that she was solicited or recruited into such acts" based on allegations that Aylo reviewed the videos on its platforms, the video identified the plaintiff as a "teen," the plaintiff appeared young in the video, and Aylo was aware of the "pervasiveness of child pornography on their platforms." 558 F. Supp. 3d. at 839; *see also Choice Hotels International*, 2023 WL 5935646, at *6 (allegations that the defendant hotel staff observed "physical abuse" of the plaintiff in public spaces and "other red flags, such as frequent linen changes, excessive condoms in the trash, and signs of illegal drug use," in addition to general knowledge of sex trafficking in their hotel, was adequate to plead constructive knowledge under Section 1595).

Plaintiffs allege that Aylo knew or should have known that GirlsDoPorn used force, fraud, and coercion to victimize the women in its pornographic videos because: victims filed takedown requests indicating that they had been "scammed," "lied to," and "did not consent" to publication; third-party companies sent thousands of notices indicating that GirlsDoPorn published its videos without the victims' consent; and GirlsDoPorn itself published admissions—including on the homepage of its website—that it "hunt[s] out each and every one" of its "amateur girls" to entice them to become "part time pornstars" and, with respect to one victim, stated that she "ha[d] no idea [the offer for a modeling job] was actually for adult videos instead hah :)." (FAC ¶¶ 190–211.)

Plaintiffs also allege that the pornographic videos produced by GirlsDoPorn contain "obvious indicia" of fraud, coercion, and force, including interviews with victims that "made clear they believed the video would not be published don the Internet"; victims in "visible distress"; "[b]loodstained sheets and condoms"; furniture piled in front of hotel room doors, and underage use of drugs and alcohol. *Id.* ¶ 208–09. Plaintiffs also allege that, based on a civil lawsuit filed in state court in June 2016, Aylo received notice of the fraudulent and coercive tactics used by GirlsDoPorn. *Id.* ¶¶ 227–34.

These allegations indicate that Aylo had multiple and persistent opportunities to obtain knowledge that the videos produced by GirlsDoPorn were sex trafficking content. Based on the allegations regarding the closeness of the relationship between Aylo and GirlsDoPorn, in addition to their alleged review of videos submitted to their websites, Plaintiffs plausibly allege that Aylo knew or should have known of the nature of these pornographic videos. Drawing all inferences in favor of Plaintiffs, the FAC adequately demonstrate that Aylo acted with knowledge or with a regard disregard as to the fact that GirlsDoPorn used force, fraud, and coercion to solicit its victims and conduct its sex trafficking operation.

Defendants' citations to cases in which courts have reached different conclusions upon review of TVPRA claims are unavailing. This action is distinguishable from cases in which courts have found that allegations regarding a defendant-website's involvement in a sex trafficking venture was too attenuated to establish liability under Section 1595. Plaintiffs do not merely allege, like *Reddit*, that Aylo provided a platform that made it "easy to share" sex trafficking content and failed to remove that content. 51 F.4th at 1145; *see also Doe v. Grindr Inc.*, 128 F.4th 1148, 1155 (9th Cir.) (defendant "provid[ing] a platform that facilitated sharing of messages between users" and "generally receiving advertising revenues" did not establish beneficiary liability), *cert. denied,* 146 S. Ct. 319 (2025); *WebGroup Czech Republic*, 767 F. Supp. 3d at 1022–23 (allegations related to defendants' revenue "generated by all content posted by third-party users" without "knowing participation in [child sexual abuse material] development" did not establish beneficiary liability); *L.W. through Doe v. Snap Inc.*, 675 F. Supp. 3d 1087, 1099 (S.D. Cal. 2023) ("user reviews . . . generally discussing underage sexual misconduct occurring on [the defendant application]" was insufficient to "confer actual knowledge" and satisfy the *Reddit* standard).

Here, unlike the cases cited above, Plaintiffs identify a specific relationship between Aylo and the GirlsDoPorn trafficking venture that included tailored services, promotional efforts, and shared revenue from users. Plaintiffs' theory of beneficiary liability under

Section 1595 does not merely rely on Aylo's hosting of sex trafficking content that was created and supplied by a third-party venture; instead, Plaintiffs allege with adequate detail that Aylo received benefits from their knowing participation in a sex trafficking venture.

**D. California Trafficking Victims Protection Act**

The California Trafficking Victims' Protection Act ("CTVPA") provides that "[a] victim of human trafficking, as defined in Section 236.1 of the [California] Penal Code, may bring a civil action . . . within seven years of the date on which the trafficking victim was free from the trafficking situation." Cal. Civ. Code § 52.5(a), (c).

Section 236.1 of the California Penal Code prohibits the deprivation or violation of another person's personal liberty "with the intent to obtain forced labor or services." Cal. Penal Code § 236.1(a). To establish a violation of Section 236.1, a plaintiff must show that "(1) the defendant either deprived another person of personal liberty or violated that other person's personal liberty; and (2) when the defendant did so, he or she intended to obtain forced labor or services from that person." *People v. Halim*, 14 Cal. App. 5th 632, 643 (Cal. Ct. App. 2017).

Under California law, the "deprivation or violation of the personal liberty of another" includes:

> substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out.

Cal. Penal Code § 236.1(h)(3).

Here, Plaintiffs assert civil liability under the CTVPA based on Defendants' alleged "tacit agreement [with GirlsDoPorn] to continue their joint sex trafficking enterprise," which provided that "Defendants would assist GirlsDoPorn by monetizing and otherwise explo[i]ting the sex trafficking videos filmed by GirlsDoPorn." (FAC ¶ 310.) Plaintiffs do not allege that Defendants participated directly in human trafficking, but rather that Defendants "aided and abetted and conspired with" GirlsDoPorn in support of direct

violations of Section 236.1. (ECF No. 50 at 25; FAC ¶¶ 310.) Plaintiffs contend that Defendants committed overt acts in furtherance of the conspiracy, including "advertising the videos for sale, processing payments for the sale of the videos, transferring money to GirlsDoPorn, publishing the videos on its websites, and refusing to remove videos when the victims flagged the videos, complained, or sent takedown requests." (FAC ¶ 310.)

Defendants dispute whether "aiding and abetting liability is available for civil claims under the CTVPA." (ECF No. 51 at 23.) In support of their theory of secondary liability, Plaintiffs cite only to state court cases reviewing violations of Section 236.1 in the context of criminal convictions. *See People v. Joseph*, 63 Cal. App. 5th 1058, 1065–68 (Cal. Ct. App. 2021) (affirming a defendant's conviction for conspiracy to commit human trafficking based, in part, on him forcing multiple women to engage in prostitution and engaging in a "regime of violence and fear"); *see also People v. Vaughn*, 292 Cal. Rptr. 3d 649, 659–62 (Cal. Ct. App. 2022), *cause transferred and opinion not citable*, 563 P.3d 1111 (Cal. 2025).

As a general matter, California Penal Code § 31 extends liability to "[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission." Cal. Penal Code § 31. The California Supreme Court states:

> [P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.

*People v. Perez*, 35 Cal. 4th 1219, 1225 (Cal. 2005)

Assuming without deciding that California Civil Code § 52.5 provides for secondary liability, Plaintiffs nevertheless fail to allege sufficient facts to state a claim for relief under the California law. Drawing all reasonable inferences in favor of Plaintiffs, the FAC supports an inference that Defendants benefitted from the GirlsDoPorn sex trafficking

venture and that Defendants knowingly distributed and profited from pornographic created by the venture. The FAC does not, however, support a finding that Defendants acted with knowledge of intent to either "deprive[] another person of personal liberty" or "obtain forced labor or services" from a victim of the sex trafficking scheme. *Halim*, 14 Cal. App. 5th at 643; *see People v. Beeman*, 35 Cal. 3d 547, 556 (Cal. 1984) ("There is no question that an aider and abettor must have criminal intent in order to be convicted of a criminal offense."). The FAC fails to support liability, even under an aiding and abetting theory, under the CTVPA.

The *Fleites* court reached the same conclusion with respect to the plaintiff's CTVPA claim based on Aylo's alleged distribution of child sexual abuse material. 801 F. Supp. 3d at 1043–44. The court held that similar allegations regarding Aylo's knowing distribution of child sex abuse materials "and other trafficked, rape, and sex abuse materials through their websites" was inadequate to "meet the required elements of the CTVPA" because the plaintiffs did not allege that Aylo "violated the personal liberty" of the plaintiff nor that Aylo "intended to obtain forced labor or services." *Id.* (citing Cal. Penal Code § 236.1(a), (h)(3)); *see also Lofthus v. Long Beach Veterans Hosp.*, 214 F. Supp. 3d 908, 916 (C.D. Cal. 2016) (dismissing CTVPA claim because the plaintiff "fail[ed] to allege any intent to obtain forced labor or services"); *Maslic v. ISM Vuzem d.o.o.*, No. 21-CV-02556-BLF, 2024 WL 3408217, at *7 (N.D. Cal. July 11, 2024) ("The text of the [CVTPA] does not provide for liability against a beneficiary of a trafficking scheme, rather than a perpetrator."); *S. S. v. Ali*, No. 3:23-CV-05074-JSC, 2024 WL 150728, at *7 (N.D. Cal. Jan. 11, 2024) ("Plaintiff's CTVPA claim differs slightly from her TVPRA claim—while not a requirement under the TVPRA, Plaintiff must allege Defendants 'intended to obtain forced labor or services' to plead a CTVPA violation.").

In *Doe v. Mindgeek*, the Central District of California reached the opposite conclusion. 558 F. Supp. 3d at 843. However, in reaching its conclusion, the court relied on a provision of the California Penal Code that is not applicable to this case. The *Doe v. Mindgeek* court reasoned:

> Under the CTVPA, Plaintiff sufficiently pleads the requisite intent if she plausibly alleges that Defendants had the intent to distribute, possess, prepare, publish, produce, develop, duplicate, or print matter depicting sexual conduct by a minor in violation of California Penal Code Section 311.1.
>
> Plaintiff correctly notes that her FAC alleges Defendants knowingly feature child pornography on their platforms, and therefore it is plausible that Defendants had the intent to distribute child pornography when they reviewed, approved, and disseminated videos of Plaintiff engaged in sexual intercourse when she was under the age of 18.

*Id.* (citations omitted). California Penal Code § 311.1 pertains to "obscene matter" that "depicts a person under 18 years of age," and establishes liability for persons who sell or distribute such materials in the state. Cal. Penal Code § 311.1(a). Unlike *Doe v. Mindgeek*, this action does not assert liability based on Aylo's alleged distribution of child sexual abuse materials. Plaintiffs' claims are based only on Aylo's alleged distribution of videos depicting their abuse from the GirlsDoPorn sex trafficking venture. *See Fleites*, 801 F. Supp. 3d at 1044 n.13 (stating that its contrary conclusion regarding the CTVPA despite similar allegations regarding child sex trafficking "deviates" from the *Doe v. Mindgeek* holding but stating that it "is not bound by a prior order in a related case").

Accordingly, in addition to the failure to comply with Rule 8 discussed above, the FAC fails to allege sufficient facts to state a claim for relief under the CTVPA.

**E. Federal RICO**

The RICO Act provides for both civil and criminal liability. *Odom v. Microsoft Corp.*, 486 F.3d 541, 545 (9th Cir. 2007) (citing Pub. L. No. 91-452, § 901, 84 Stat. 922 (1970)) (codified at 18 U.S.C. § 1964(c)). The RICO Act states, in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

The elements of a civil RICO claim are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') [and] (5) causing injury to plaintiff's business or property." *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Constr. Trades Dep't, AFL-CIO*, 770 F.3d 834, 837 (9th Cir. 2014) (quoting *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005)). "'Racketeering activity' includes, *inter alia*, 'any act which is indictable' under the Hobbs Act, 18 U.S.C. § 1951, or 'any act or threat involving … extortion, … which is chargeable under [s]tate law.'" *Id.* (quoting 18 U.S.C. § 1961(1)(A), (B)) (cleaned up).

*1. Statute of Limitations*

As a preliminary matter, Defendants contend that Plaintiffs' RICO claims are barred by the four-year statute of limitations for civil RICO claims. (ECF No. 42-1 at 26.) Plaintiffs raise multiple contentions in response, including that Aylo fraudulently concealed its role in causing their injuries by falsely representing that "a human content moderator reviews every video" posted on its websites and would remove videos depicting sex trafficking; falsely representing that "Plaintiffs' and third-parties' DMCA requests were properly investigated"; and maintaining the "full-length GirlsDoPorn videos behind its GirlsDoPorn Premium pay wall, even after taking the videos down from their general library after receiving information that the videos were not obtained consensually." (ECF No. 50 at 27 (citing FAC ¶ 200).) Plaintiffs contend that they only became aware of the "700,000 backlog of videos which had been flagged as being non-consensual or otherwise prohibited" in May 2020. *Id.* at 27–28.

The RICO Act does not contain an express statute of limitations, but the Supreme Court holds that civil claims arising under the RICO Act are subject to a "4-year statute of limitations." *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987); *Pincay v. Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001); *Mula v. Mula*, No. 23-3490, 2025 WL 1292526, at *1 (9th Cir. May 5, 2025). Courts in the Ninth Circuit "follow[] the 'injury discovery' statute of limitations rule for civil RICO claims," which provides that the "limitations period begins to run when a plaintiff knows or should know

of the injury that underlies [her] cause of action." *Pincay*, 238 F.3d at 1109 (quoting *Grimmett v. Brown*, 75 F.3d 506, 511 (9th Cir. 1996). "Equitable tolling doctrines, including fraudulent concealment, apply in civil RICO cases." *Grimmett*, 75 F.3d at 514 (citing *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1199 (9th Cir. 1988)). "The doctrine [of fraudulent concealment] is properly invoked only if a plaintiff establishes affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987) (quotation omitted).

The Ninth Circuit also states that, "[w]hen a motion to dismiss is based on the running of the statute of limitations, it can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980). Moreover, "[b]ecause the applicability of the equitable tolling doctrine often depends on matters outside the pleadings, it 'is not generally amenable to resolution on a Rule 12(b)(6) motion.'" *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995) (quoting *Cervantes v. City of San Diego*, 5 F.3d 1273, 1276 (9th Cir.1993)). "In fact, a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Id.* at 1207.

Plaintiffs allege that Aylo began hosting GirlsDoPorn's sex trafficking content in 2009 and that Aylo "finally removed" pornographic videos produced by GirlsDoPorn in December 2020. (FAC ¶ 254.) Plaintiffs initiated this action on October 3, 2023. (ECF No. 1.) Plaintiffs plausibly allege that Aylo did not remove GirlsDoPorn content from their platforms more than four years prior to the initiation of this action and, drawing all reasonable inferences in favor of Plaintiffs, it may be that Plaintiffs discovered the relevant sex trafficking content on Aylo's websites during the later portion of that period. Plaintiffs also allege that Aylo made affirmative misrepresentations regarding its content moderation, which might lead a reasonable listener to believe that sex trafficking content hosted on Aylo's freesites and paysites would be removed. Plaintiffs plausibly allege that

Aylo's affirmative misrepresentations and their publication of GirlsDoPorn videos behind a pay wall fraudulently concealed the facts that support Plaintiffs' claims. Based on these allegations, it has not been established "beyond doubt" that Plaintiffs could prove no set of facts that would "establish the timeliness of their claims." *Supermail Cargo*, 68 F.3d at 1207.

*2. Merits of RICO Claim*

Plaintiffs allege that, beginning in 2011, the "Aylo-GDP Enterprise" associated for the common purpose of "creating pornographic videos of high-school and college students, obtained using force, fraud, and coercion, and then monetizing the videos by publishing them on commercial websites controlled and operated by Defendants and GirlsDoPorn to enrich the members of the Enterprise." (FAC ¶¶ 277–78.) Plaintiffs allege that the Aylo-GDP Enterprise was comprised of Defendants, Michael Pratt, Matthew Wolfe, Andre Garcia, and multiple entities that "Pratt, Wolfe, and Garcia used to operate the GirlsDoPorn sex trafficking venture." *Id.* ¶ 277. Plaintiffs allege a "pattern of racketeering activity" based on Defendants' violations of 18 U.S.C. § 1591 for sex trafficking and, separately, for money laundering and engaging in monetary transactions regarding property derived from unlawful activity. *Id.* ¶ 281. Plaintiffs allege that they have suffered damages in their business and property, including for the misuse and appropriation of their likenesses, expenses incurred in their efforts to have the sex trafficking content removed from the Internet, and damages related to their ability to find and maintain employment. *Id.* ¶ 300.

Defendants raise four contentions regarding the plausibility of Plaintiffs' RICO claims: (1) Plaintiffs fail to allege that the members of the Aylo-GDP Enterprise acted with a "common purpose"; (2) Plaintiffs fail to allege that each Defendant participated in directing the affairs of the enterprise; (3) Plaintiffs fail to plausibly allege predicate RICO acts; and (4) Plaintiffs do not plausibly allege RICO damages. (ECF No. 42-1 at 27–33.) With the Supreme Court's instruction in mind that the "RICO [Act] is to be read broadly," the Court considers each of Defendants' contentions. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985).

i. Enterprise with a Common Purpose

The RICO Act defines an "enterprise" as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "As is evident from the text, this definition is not very demanding." *Odom*, 486 F.3d at 548. An "associated-in-fact enterprise"—that is, an enterprise that is not a single legal entity—does not need to have an "ascertainable structure." *Id.* at 551. The Ninth Circuit states that, "[t]o show the existence of an enterprise [within the meaning of the RICO Act], plaintiffs must plead that the enterprise has (A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

Here, Plaintiffs' allegations plausibly support the conclusion that the business relationship between Aylo and GirlsDoPorn, which included revenue sharing through its application-only partnership program, was an associated-in-fact enterprise operating with the shared purpose of monetizing the pornographic content created by GirlsDoPorn and distributed on Aylo's freesites and paysites. Defendants rely on *Stitt v. Citibank, N.A.*, in which the district court dismissed a plaintiff's claim for "failure to sufficiently allege an enterprise." 942 F. Supp. 2d 944, 957–58 (N.D. Cal. 2013). Unlike in *Stitt*, Plaintiffs do not "vaguely allege[] that unidentified subsidiaries" engaged in the racketeering conduct. *Id*. As discussed above, Plaintiffs allege with adequate specificity the role that each Defendant played in Aylo's business affairs and its relationship with GirlsDoPorn.

Defendants also contend that Plaintiffs fail to adequately allege that the Aylo-GDP Enterprise's "common purpose" was "independent" from the "ordinary business activity" of its members. (ECF No. 42-1 at 28.) District courts have dismissed RICO claims in which the plaintiffs "merely allege that the [d]efendants are associated in a manner directly related to their own primary business activities" rather than associating as "a vehicle through which unlawful activity is committed." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1202–03 (C.D. Cal. 2011)

(quotation and citation omitted). Defendants cite *Shawn v. Nissan North America, Inc.*, in which the district court held allegations that an automobile manufacturer knowingly sold its vehicles with a faulty element did not "demonstrate a common purpose, much less a fraudulent one" between the automobile manufacturer and its supplier. 220 F. Supp. 3d 1046, 1050, 1057 (C.D. Cal. 2016); *see also In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 598–603 (N.D. Cal. 2020) (holding that the plaintiffs failed to plausibly allege the existence of an enterprise with the purpose of "expand[ing] the market of nicotine-addicted e-cigarette users, including youth," rather than an enterprise with the purpose of conducting the regular operation of their business).

Here, conversely, Plaintiffs adequately allege that Aylo knowingly—or with a reckless disregard for the truth—published, maintained, and promoted sex trafficking content created by a business partner that made public statements about its coercive and fraudulent methods. Plaintiffs adequately allege that Aylo associated with GirlsDoPorn for the identifiable and illicit purpose of distributing its sex trafficking content. Unlike the typical business relationship between an automobile supplier and manufacturer, the shared purpose of the Aylo-GDP Enterprise was allegedly to distribute and profit from illicit sex trafficking operations. *See Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 942 (N.D. Cal. 2013) ("[The defendant's] challenge that its actions were simply 'normal business dealings' without the existence of an enterprise or any 'common purpose' is fact-determinative and cannot be resolved at this juncture."). Although Aylo distributes pornography from many third-party producers in its normal course of business, Plaintiffs' allegations regarding its knowing promotion of sex trafficking videos are sufficient to establish a common purpose within the meaning of the RICO Act.

ii. <u>Operation or Management</u>

Defendants contend that Plaintiffs do not "plausibly demonstrate how each [D]efendant's conduct meets the 'operations or management' test," which requires that a member of a RICO enterprise contribute more than "ordinary, independent business activities" that "happen to benefit the alleged 'conspiracy.'" (ECF No. 42-1 at 29–30.)

The RICO Act establishes liability for those who "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's" racketeering activities. 18 U.S.C. § 1962(c). The Supreme Court states that, "to participate, directly or indirectly," a person or entity "must have some part in directing [the] affairs" of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (internal quotation omitted). "Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required." *Id.* However, "[s]imply performing services for the enterprise does not rise to the level of direction." *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008)

As discussed above with respect to Rule 8, the Court concludes that Plaintiffs allege with sufficient specificity each Defendant's role in the distribution and promotion of sex trafficking videos. Defendants' particular responsibilities, which may constitute typical business services in other contexts, including the processing of payments and the hiring of employees, are adequately pled to have been direct and purposeful participation in the affairs of the alleged Aylo-GDP enterprise. The alleged division of labor among the subsidiary Defendants presents a different factual scenario than cases in which courts have held that an alleged member of a RICO enterprise did not satisfy the "operation or management" test. *Reves*, 507 U.S. at 186 (accounting firm that incorrectly certified records was not a participant in RICO enterprise); *Walter*, 538 F.3d at 1249 (law firm performing services was not a participant in RICO enterprise); *Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993) (attorney's preparation of a partnership agreement and assistance in bankruptcy proceedings did not establish participation in RICO enterprise). Here, conversely, the subsidiary Defendants are alleged to have "direct[ed] the enterprise's affairs by knowingly implementing decisions of upper management" (i.e., the Aylo Control Group) and directing the publication, promotion, and monetization of GirlsDoPorn's sex trafficking content through their coordinated efforts. *Walter*, 538 F.3d at 1249. The FAC

adequately alleges that each Defendant satisfies the "operation and management" test described in *Reves*.

iii. Predicate Acts

Defendants contend that Plaintiffs fail to adequately allege at least two predicate acts to support their RICO claim because their sex trafficking claims under the TVPRA and CTVPA are "defective." (ECF No. 42-1 at 30.)

The RICO Act defines "racketeering activity" to include "any act which is indictable under [18 U.S.C. §§ 1581–92] (relating to peonage, slavery, and trafficking in persons)." 18 U.S.C. § 1961(a). As discussed in its preceding analysis, an alleged violator of Section 1595 of the TVPRA "need not have committed the underlying criminal sex trafficking offense under § 1591," which is itself the enumerated predicate offense under the RICO Act. *Choice Hotels International*, 2023 WL 5935646 at *3. The Court is unaware of binding authority stating that a violation of Section 1595 based on a theory of beneficiary liability is sufficient to qualify as a predicate act for a RICO claim. However, the text of Section 1591 establishes liability for any person or entity that knowingly "benefits, financially or by receiving anything of value, from participating in a venture which has engaged in" sex trafficking conduct. At least one court has held that well-pled, repeated violations of Section 1595 by each defendant is adequate to constitute a predicate act of sex trafficking activity within the meaning of the RICO Act. *See Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923, 954, 958 (N.D. Cal. 2019) (holding that "there are sufficient allegations to render [two defendants] liable pursuant to § 1595(a)" for knowingly benefitting from forced labor and, later in the same order, holding that those "human trafficking claims could serve as a RICO predicate").

iv. Damages

Defendants contend that Plaintiffs fail to allege cognizable damages under the RICO Act because "[p]ersonal injury and emotional distress are not compensable under RICO, nor is damage to reputation or the consequential damages that flow therefrom." (ECF No. 42-1 at 32.) Defendants also contend that Plaintiffs "fail[] to plead with specificity how

each [D]efendants' conduct directly caused each of their injuries and merely state in conclusory fashion that they were damaged" as a direct and proximate cause of Defendants' conduct. *Id.*

"A civil RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008) (quotation and citation omitted). "To determine whether a plaintiff has sufficiently alleged that he has been 'injured in his business or property,' we must examine carefully the nature of the asserted harm." *Id.* The Ninth Circuit requires a plaintiff to identify a "harm to a specific business or property interest—a categorical inquiry typically determined by reference to state law." *Id.* (citing *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc)).

The FAC generally alleges three categories of damages: (1) misappropriation of Plaintiffs' likeness; (2) expenses incurred in attempting to remove the sex trafficking content from Aylo's websites; and (3) damages from Plaintiffs' inability to find and maintain employment. (FAC ¶ 300.) However, given the FAC's failure to adequately allege each Plaintiff's claims (including injuries) in compliance with Rule 8, as discussed above, the Court cannot assess at this stage whether these categories of alleged damages are cognizable under the RICO Act.

## VI. CONCLUSION

IT IS HEREBY ORDERED that the Motion to Dismiss Amended Complaint (ECF No. 42) is granted as follows: the FAC's claims against Defendant Aylo Holdings are dismissed for lack of personal jurisdiction; the FAC's claims against all Defendants are dismissed for failure to comply with Federal Rule of Civil Procedure 8; the FAC's claims under the CTVPA are additionally dismissed for failure to state a claim upon which relief can be granted. The dismissal of the FAC is without prejudice and with leave to amend. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."); *Jensen v. Brown*, 131 F.4th 677, 701 (9th Cir. 2025) ("[T]his policy [in Rule

15(a)(2)] is to be applied with extreme liberality.") (quoting, *inter alia*, *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)).

IT IS FURTHER ORDERED that Plaintiffs may file a Second Amended Complaint within forty (40) days of the date this Order is filed. If Plaintiffs do not timely file a Second Amended Complaint, the Court will order the Clerk of the Court to issue judgment and close the case.

Dated: 9/28/2026

William Q. Hayes

Hon. William Q. Hayes
United States District Court